United States Courts
Southern District of Texas
F I L E D

DEC 1 1 2023

Nathan Ochsner, Clerk of Court

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **CRIMINAL NO.   H-4:17-cr-00651-5** |
| | § | |
| **MARIA ANGELICA MORENO-REYNA,** | § | |
| | § | |
| **Defendant.** | § | |

## PLEA AGREEMENT

The United States of America, by and through Alamdar S. Hamdani, United States Attorney for the Southern District of Texas, and Adam Laurence Goldman, Assistant United States Attorney, and the defendant, Maria Angelica Moreno-Reyna ("Defendant"), and Defendant's counsel, Molly Bagshaw, pursuant to Rule **11(c)(1)(A) and 11(c)(1)(B)** of the Federal Rules of Criminal Procedure, state that they have entered into an agreement, the terms and conditions of which are as follows:

### Defendant's Agreement

1. Defendant agrees to plead guilty to Counts 1 and 4 of the Indictment. **Count 1** charges Defendant with Conspiracy to Engage in Sex Trafficking by Means of Force, Threats, Fraud, and Coercion, in violation of Title 18, United States Code, Sections 1594(c) and 1591(a). **Count 4** charges Defendant with Aiding and Abetting Sex Trafficking by Means of Force, Threats, Fraud, and Coercion, in violation of Title 18, United States Code, Sections 1591(a) and 2. Defendant, by entering this plea, agrees that she is waiving any right to have the facts that the law makes essential to the punishment either charged in the indictment, or proved to a jury or proven beyond a reasonable doubt.

**Punishment Range**

2.   The **statutory** maximum penalty for each violation of Title 18, United States Code, Section 1594(c) and 1591(a), is imprisonment for not less than any term of years of imprisonment and not more than life imprisonment and a fine of not more than $250,000.00  The **statutory** maximum penalty for a violation of Title 18, United Sates Code, Sections 1591(a) and 2), is imprisonment for not less than 15 years and not more than life imprisonment and a fine or not more than $250,000.00  With a conviction for Counts 1 or 4, there is a mandatory restitution under Title 18, United States Code, Section 1593 which is not less than the full amount of the victims' losses.  Additionally, under Counts 1 and 4, Defendant may receive a term of supervised release after imprisonment of not less than 5 years and up to life.  *See* Title 18, United States Code, section 3583(k).  Defendant acknowledges and understands that if she should violate the conditions of any period of supervised release which may be imposed as part of her sentence, then Defendant may be imprisonment for the entire term of supervised release, without credit for time already served on the term of supervised release prior to such violation.  *See* Title 18, United Stated Code, sections 3559(a)(3) and 3583(e)(3).  Defendant understands that she cannot have the imposition or execution of the sentence suspended, nor is she eligible for parole.

**Mandatory Special Assessment**

3.   Pursuant to Title 18, United States Code, section 3013(a)(2)(A), immediately after sentencing, Defendant will pay to the Clerk of the United States District Court a special assessment in the amount of one hundred dollars ($100.00) per count of conviction.  The payment will be by cashier's check or money order, payable to the Clerk of the United States District Court, c/o District Clerk's Office, P.O. Box 61010, Houston, Texas 77208, Attention: Finance.

2

4.   Pursuant to Title 18, United States Code, Section 3014(a)(3), if the court determines that the Defendant is a non-indigent person, the Defendant will pay to the Clerk of the United States District Court a special assessment in the amount of five thousand dollars ($5,000.00) per count of conviction.   The payment will be by cashier's check or money order, payable to the Clerk of the United States District Court, c/o District Clerk's Office, P.O. Box 61010, Houston, Texas 77208, Attention: Finance.

### Immigration Consequences

5.   Defendant recognizes that pleading guilty may have consequences with respect to her immigration status.  Defendant understands that if she is not a citizen of the United States, by pleading guilty she may be removed from the United States, denied citizenship, and denied admission to the United States in the future.  Defendant understands that if she is a naturalized United States citizen, pleading guilty may result in immigration consequences, such as denaturalization and potential deportation or removal from the United States.   Defendant's attorney has advised Defendant of the potential immigration consequences resulting from Defendant's plea of guilty, and Defendant affirms that she wants to plead guilty regardless of any immigration consequences that may result from the guilty plea and conviction.

### Cooperation

6.   The parties understand this agreement carries the potential for a motion for departure under Section 5K1.1 of the Sentencing Guidelines.  Defendant understands and agrees that whether such a motion is filed will be determined solely by the United States through the United States Attorney for the Southern District of Texas.  Should Defendant's cooperation, in the sole judgment and discretion of the United States, amount to "substantial assistance," the United States

reserves the sole right to file a motion for departure pursuant to Section 5K1.1 of the United States Sentencing Guidelines.   Defendant further agrees to persist in that plea through sentencing, fully cooperate with the United States, not oppose the forfeiture of assets contemplated in paragraphs 18-27 of this agreement.   Defendant understands and agrees that the United States will request that sentencing be deferred until that cooperation is complete.

7.   Defendant understands and agrees that "fully cooperate," as that term is used herein, includes providing all information relating to any criminal activity known to Defendant, including but not limited to sex trafficking, human smuggling, drugs, and illegal firearms.   Defendant understands that such information includes both state and federal offenses arising therefrom.   In that regard:

(a)   Defendant agrees that this plea agreement binds only the United States Attorney for the Southern District of Texas and Defendant; it does not bind any other United States Attorney or any other unit of the Department of Justice;

(b)   Defendant agrees to testify truthfully as a witness before a grand jury or in any other judicial or administrative proceeding when called upon to do so by the United States.   Defendant further agrees to waive her Fifth Amendment privilege against self-incrimination for the purpose of this agreement;

(c)   Defendant agrees to voluntarily attend any interviews and conferences as the United States may request;

(d)   Defendant agrees to provide truthful, complete and accurate information and testimony and understands any false statements made by the defendant to the Grand Jury or at any court proceeding (criminal or civil), or to a government agent or attorney, can and will be prosecuted under the appropriate perjury, false statement, or obstruction statutes;

(e)   Defendant agrees to provide to the United States all documents in her possession or under her control relating to all areas of inquiry and investigation; and

4

(f)     Should the recommended departure, if any, not meet Defendant's expectations, the Defendant understands that she remains bound by the terms of this agreement and cannot, for that reason alone, withdraw her plea.

### Waiver of Appeal and Collateral Review

8.   Defendant is aware that Title 28, United States Code, section 1291, and Title 18, United States Code, section 3742, afford a defendant the right to appeal the conviction and sentence imposed. Defendant is also aware that Title 28, United States Code, section 2255, affords the right to contest or "collaterally attack" a conviction or sentence after the judgment of conviction and sentence has become final.  Defendant knowingly and voluntarily waives the right to appeal or "collaterally attack" the conviction and sentence, except that Defendant does not waive the right to raise a claim of ineffective assistance of counsel on direct appeal, if otherwise permitted, or on collateral review in a motion under Title 28, United States Code, section 2255. In the event Defendant files a notice of appeal following the imposition of the sentence or later collaterally attacks her conviction or sentence, the United States will assert its rights under this agreement and seek specific performance of these waivers.

9.   In agreeing to these waivers, Defendant is aware that a sentence has not yet been determined by the Court.  Defendant is also aware that any estimate of the possible sentencing range under the sentencing guidelines that she may have received from her counsel, the United States or the Probation Office, is a prediction and not a promise, did not induce her guilty plea, and is not binding on the United States, the Probation Office or the Court.   The United States does not make any promise or representation concerning what sentence the defendant will receive. Defendant further understands and agrees that the United States Sentencing Guidelines are "effectively advisory" to the Court.  *See United States v. Booker*, 543 U.S. 220 (2005).

5

Accordingly, Defendant understands that, although the Court must consult the Sentencing Guidelines and must take them into account when sentencing Defendant, the Court is not bound to follow the Sentencing Guidelines nor sentence Defendant within the calculated guideline range.

10.    Defendant understands and agrees that each and all waivers contained in the Agreement are made in exchange for the concessions made by the United States in this plea agreement.

## The United States Agreements

11.    The United States agrees to each of the following:

(a)    If Defendant pleads guilty to Counts 1 and 4 of the indictment and persists in that plea through sentencing, and if the Court accepts this plea agreement, the United States will move to dismiss any remaining counts of the indictment at the time of sentencing;

(b)    If the Court determines that Defendant qualifies for an adjustment under section 3E1.1(a) of the United States Sentencing Guidelines, and the offense level prior to operation of section 3E1.1(a) is 16 or greater, the United States will move under section 3E1.1(b) for an additional one-level reduction because Defendant timely notified authorities of her intent to plead guilty, thereby permitting the United States to avoid preparing for trial and permitting the United States and the Court to allocate their resources more efficiently.

## Agreement Binding - Southern District of Texas Only

12.    The United States Attorney's Office for the Southern District of Texas agrees that it will not further criminally prosecute Defendant in the Southern District of Texas for offenses arising from conduct charged in the indictment.   This plea agreement binds only the United States Attorney's Office for the Southern District of Texas and Defendant.   It does not bind any other United States Attorney's Office.   The United States Attorney's Office for the Southern District of Texas will bring this plea agreement and the full extent of Defendant's cooperation to the attention of other prosecuting offices, if requested.

6

**United States- Non-Waiver of Appeal**

13.   The United States reserves the right to carry out its responsibilities under guidelines

sentencing.   Specifically, the United States reserves the right:

(a)      to bring its version of the facts of this case, including its evidence file and any investigative files, to the attention of the Probation Office in connection with that office's preparation of a presentence report;

(b)      to set forth or dispute sentencing factors or facts material to sentencing;

(c)      to seek resolution of such factors or facts in conference with Defendant's counsel and the Probation Office;

(d)      to file a pleading relating to these issues, in accordance with section 6A1.2 of the United States Sentencing Guidelines and Title 18, United States Code, section 3553(a); and

(e)      to appeal the sentence imposed or the manner in which it was determined.

**Sentence Determination**

14.   Defendant is aware that the sentence will be imposed after consideration of the United

States Sentencing Guidelines and Policy Statements, which are only advisory, as well as the

provisions of Title 18, United States Code, section 3553(a).   Defendant nonetheless acknowledges

and agrees that the Court has authority to impose any sentence up to and including the statutory

maximum set for the offenses to which Defendant pleads guilty, and that the sentence to be

imposed is within the sole discretion of the sentencing judge after the Court has consulted the

applicable Sentencing Guidelines.   Defendant understands and agrees that the parties' positions

regarding the application of the Sentencing Guidelines do not bind the Court and that the sentence

imposed is within the discretion of the sentencing judge.   If the Court should impose any sentence

up to the maximum established by statute, or should the Court order any or all of the sentences

imposed to run consecutively, Defendant cannot, for that reason alone, withdraw a guilty plea, and will remain bound to fulfill all of the obligations under this plea agreement.

### Rights at Trial

15.  Defendant understands that by entering into this agreement, she surrenders certain rights as provided in this plea agreement.  Defendant understands that the rights of a defendant include the following:

> (a)    If Defendant persisted in a plea of not guilty to the charges, defendant would have the right to a speedy jury trial with the assistance of counsel.  The trial may be conducted by a judge sitting without a jury if Defendant, the United States, and the court all agree.

> (b)    At a trial, the United States would be required to present witnesses and other evidence against Defendant.  Defendant would have the opportunity to confront those witnesses and her attorney would be allowed to cross-examine them.  In turn, Defendant could, but would not be required to, present witnesses and other evidence on her own behalf.  If the witnesses for Defendant would not appear voluntarily, she could require their attendance through the subpoena power of the court; and

> (c)    At a trial, Defendant could rely on a privilege against self-incrimination and decline to testify, and no inference of guilt could be drawn from such refusal to testify.  However, if Defendant desired to do so, she could testify on her own behalf.

### Factual Basis for Guilty Plea

16.  Defendant is pleading guilty because she is in fact guilty of the charges contained in Counts 1 and 4 of the indictment.  If this case were to proceed to trial, the United States could prove each element of the offenses charged beyond a reasonable doubt.  The following facts, among others, would be offered to establish Defendant's guilt:

**I.    Overview**

The Southwest Cholos and its associates (hereinafter referred to as "SWC") are a criminal

organization based in Southwest Houston, which is within the Southern District of Texas. In addition to its members, SWC also has associates operating throughout Texas, Mexico, and Central America who act in furtherance of the criminal scheme described herein affecting interstate and foreign commerce. SWC members and associates are engaged in a variety of criminal conduct, including, but not limited to, sex trafficking, drug trafficking, firearms trafficking, alien smuggling, and the smuggling of illegal aliens into and within the United States in order for the illegal aliens to engage in prostitution. This includes SWC members and associates operating brothels in Houston, Texas (which is within the Southern District of Texas), and Mexico and transporting individuals and money between the two countries which affects interstate and foreign commerce. Among the brothels operated by SWC in the Southern District of Texas were those at:

- The Carriage Way Apartments, 6021-23 Dashwood, Houston, Texas 77081 (which was operated by **Maria Angelica Moreno-Reyna** ("**Patty**"); was managed by **Gabriela Gonzalez-Flores** ("**Gabby**"); had security provided by, amongst others, **Eddie Alejandro Torres** ("**Eddie**") (who specifically provided security in a truck with red security strobe lights), **Raul Moreno** ("**Coney**"), and **Erik Ivan Alvarez-Chavez** ("**Ivan**"); and had furniture and drinks provided by **Ivan**));

- The Englewood Village Apartment, 6363 Skyline Drive, Unit 57 Houston, Texas 77057 (which was operated by **Patty** and **Eddie**; and managed by **Gabby**); and

- The Las Velas Apartments, 7111 Hillcroft, Houston, Texas 77081; The Bella Luna Apartment, 5261 Westward Street, First Floor, Houston, Texas 77081; the Windswept Gardens, 6320 Windswept Road, Building 5559 Houston, Texas 77057; and the Coral

Heights Apartment, 6363 Beverly Hills Street, Second Floor of Building 69-76, Houston

Texas 77057 (which were operated by **Walter Lopez** ("**Walter**"); managed by **Gabby,**

**Claudia Soriano-Hernandez** ("**Claudia**"), and **Anadalit Duarte** ("**Anadalit**"); provided

with prostitutes (including juveniles) by **Hector Reyna** ("**Hector**") that he recruited

through sex trafficking; and provided controlled substances for the prostitutes (some of

who were sex trafficking victims and/or juveniles) to calm them down so SWC members

and associates could control them by **Bianca Reyna** ("**Bianca**").

SWC and its associates also had a brothel in Cancun, Mexico, which was operated by

**William Lopez** ("**William**").  SWC members and associates also used stash houses, including

those operated by **Melisa Dominguez** ("**Melisa**"), in the Southern District of Texas portion of the

Rio Grande Valley to house the smuggled illegal aliens, including sex trafficking victims, as they

travelled from outside of the United States to the Houston, Texas vicinity.

## II.     MAVM

MAVM is a non-citizen who was working as a prostitute at the brothel in Cancun operated

by **Patty** and **William**.  In 2010, **William**, **Patty** and **Gilbert Garcia** ("**Gilbert**"), made

arrangements to transport MAVM to the United States to work at one of the organization's brothels

in Houston, Texas, which included having **Coney** assist MAVM in crossing the United States-

Mexico border without being inspected by immigration officers.  However, MAVM was

apprehended by immigration officers and returned to Mexico.  Afterwards, **William** successfully

had MAVM transported across the United States-Mexico border, and she was then transported to

Houston.  Once in Houston, MAVM worked at the brothels located at 6021-23 Dashwood,

Houston, Texas 77081, as well as the brothel at the Maria Bonita Cantina, 8403 Clinton Drive,

Houston, Texas 77029, which, at the time, were operated by **Eddie** and **Patty**, and managed on a day-to-day basis by **Gabby**.  At these brothels, **William**, **Walter**, and **Eddie** acted as pimps to control the women working there as prostitutes.  MAVM eventually indicated that she no longer wanted to work as a prostitute.  In order to make her continue to work in that capacity, **William** assaulted her and threatened to have her deported without her baby, which was born in the United States.

## III.    EMR

In August 2011, EMR, a non-citizen of the United States, was illegally smuggled into the United States to work as a prostitute for a different sex trafficking organization.  While working for this other sex trafficking organization, EMR met **William, Eddie, Walter**, and **Freddy Montes** ("Freddy").  **William, Eddie, Walter**, and **Freddy** offered EMR a job as a prostitute at a SWC controlled brothel at 6021-23 Dashwood Street, Houston, Texas 77081, where she would work under **Patty** and **Eddie**.  That brothel was primarily supervised on a day-to-day basis by **Gabby**. EMR agreed.  However, after EMR began working there, **William** used and threatened to use acts of physical violence, including assault, to have EMR work as a prostitute even on dates and times when she did not want to do so voluntarily.  **William** also used acts and threatened acts of physical violence to have EMR tattoo his name on to her right arm.  As a result of these acts and threatened acts of violence, on or about February 14, 2012, EMR returned to Mexico to reside with her family. Then, in early March 2012, **William** came to the residence of EMR and her family in Mexico to make arrangements to smuggle EMR back into the United States so that she could continue to work as a prostitute for the SWC organization.  EMR agreed to be smuggled back into the United States to continue working as a prostitute for the SWC organization under **Patty** because she was

11

afraid that **William** would harm her and her family based on **William's** prior conduct, and his knowledge of where her (EMR's) family lived in Mexico.     **Patty** made arrangements for EMR to be smuggled back into the United States, specifically from Mexico to Houston, Texas, with part of the journey being via tractor-trailer.     However, on April 24, 2012, the tractor-trailer in which EMR was being transported was intercepted by immigration authorities and EMR was apprehended.     EMR was later released from immigration custody and returned to Houston, Texas where she once again worked as a prostitute at the brothel operated by **Patty** located at 6021-23 Dashwood, Houston, Texas 77081, as well as the brothel operated by **Patty** and **Eddie** at 6363 Skyline Drive, Houston, Texas 77057.     **William** then instructed EMR to get cosmetic surgery because he believed EMR was not making sufficient money for the organization as a prostitute. During this time, EMR resided with **Freddy** and **William**.     EMR's residing with **Freddy** and **William**, agreeing to cosmetic surgery, and returning to work as a prostitute were due to the acts and threatened acts of physical violence by **William**.     Nevertheless, due to the amount of acts and threatened acts of physical violence by **William**, EMR returned on a second occasion to Mexico again to reside with her family.     However, **William** then contacted EMR's family in Mexico and requested that EMR return to Houston to work as a prostitute for the organization.     Due to the fear from the previous acts and threatened acts of violence by **William**, EMR returned to Houston. Again, **Patty** assisted EMR in being smuggled back into the United States to work again as a prostitute for the organization in Houston, Texas.     Part of this transportation was conducted by **Gilbert Garcia** ("**Gilbert**").     However, on July 18, 2013, **Gilbert** and EMR were apprehended by immigration authorities.     EMR was again released from immigration custody and returned to Houston, Texas, where she once again worked as a prostitute at the brothels operated by **Patty** and

**Eddie**.   When EMR returned, William physically abused her, in part, for her prior departures.

## IV.     AP

Beginning in September 2012, AP, a non-citizen, met **William** in Mexico.   **William** offered to smuggle AP into the United States in exchange for $4,500, which **William** stated AP would pay back by working in a restaurant operated by **Patty**.   AP agreed to this arrangement. **William** then made arrangements to smuggle AP into the United States, at which point she was transported to a stash house in McAllen, Texas, operated by **Melisa**.   Once at the stash house in McAllen, Texas, **Freddy** provided AP with a cellular telephone and took her to a hotel, where she stayed for approximately three (3) days while **Freddy** made arrangements to transport AP to Houston, Texas.   In Houston, Texas, AP met with **Patty** and **William** for lunch at a Chinese restaurant.   **William** and **Patty** asked AP many questions about AP and her family in Mexico. **Patty** told AP that the $4,500.00 it cost to smuggle AP into the United States was paid by her (**Patty**) and **William**.   AP agreed to pay them back and agreed to work at **Patty's** restaurant. **Patty** informed AP that there was no restaurant.   Instead, AP was going to have sex with men for money.   AP worked at the brothel located at 6021-23 Dashwood, Houston, Texas 77081, which, at the time, was operated by **Patty**, **William**, and **Ivan**, and which was managed on a day-to-day basis by **Gabby**.   While working as a prostitute, **Freddy** was responsible for ensuring that AP continued to work in that capacity, which he did by abusing and threatening to abuse her while they lived together and by having her tattoo his initials on her body.   **Freddy** also informed AP that her debt amount was increased when he obtained a loan to purchase a truck.   In addition, in the summer of 2013, **Freddy** physically assaulted AP while he was driving, and AP was in the passenger seat.   In so doing, **Freddy** lost control of his vehicle and crashed.   Furthermore,

**Freddy** instructed AP, while she was menstruating, to insert tissues into her vagina so that she could continue to perform sexual intercourse as a prostitute. Additionally, AP needed to visit a medical clinic in December 2012 and January 2013 as a result of sexually transmitted diseases she caught while working as a prostitute.

## V.   ABP

Beginning in April 2016, ABP's mother asked **Patty** to illegally smuggle ABP, a non-citizen, into the United States from Central America. **Patty** agreed and charged ABP and ABP's mother $9,000 total. **Patty** sent **William** to ABP's home in Central America to smuggle ABP to Cancun, Mexico. While in Cancun, Mexico, **William** obtained fake identification documents for ABP so as to make it appear that she was a citizen of Mexico. To obtain these Mexican documents, ABP provided **William** with her original identification documents which contained her address in her native country where her family still resided. In addition, during ABP's time in Cancun, Mexico, which lasted approximately three months, she worked as a prostitute in the brothel controlled by **William**. In order to coerce ABP into working for him, **William** physically assaulted ABP, gave her controlled substances to calm and control her, and carried a firearm on his person. **William** also had ABP tattoo his name on her neck and thigh. ABP was later able to leave the Cancun, Mexico brothel without **William's** knowledge or consent. ABP then contacted her mother to make arrangements to be illegally smuggled into the United States. ABP's mother then contacted **Patty**, who made new arrangements to smuggle ABP into the United States. **Patty** contacted **Coney**, who assisted ABP in crossing into the United States from Mexico. However, while crossing, ABP was apprehended by immigration officials on May 10, 2016. ABP was later released from immigration custody by immigration officials. ABP's mother, who

resided in an apartment at 6021-23 Dashwood, Houston, Texas 77081, went to the immigration facility to pick ABP up and brought ABP to Houston, Texas to reside with her.   Once in Houston, ABP was instructed that she had to work as a prostitute in the broth **Patty** controlled and **Gabby** managed on a day-to-day basis at 6021-23 Dashwood, Houston, Texas 77081, in order or ABP to repay the smuggling fee.

On August 8, 2016, ABP indicated that she no longer wished to continue working as a prostitute.   As a result, **Patty, Walter, Eddie** and another went to ABP's residence.   **Patty** placed her (**Patty's**) cellular telephone in front of ABP's face so that ABP could hear **William** on the other end of the telephone.   **William** then stated that if ABP did not do what he said, **William** knew where her (ABP's) family lived and he would kill her (ABP's) son and family in Nicaragua. ABP believed this threat because **William** kept ABP's identification which listed her Nicaraguan address.   **William** then told ABP to return to work as a prostitute and to pay an additional $20,000.00 tax for leaving him in Mexico and that the additional amount she owed was to be paid by working at **Patty's** brothel at 6021-23 Dashwood, Houston, Texas 77081, and the brothel controlled by **Walter** at 7111 Hillcroft Avenue, Houston, Texas 77081.   Later, when ABP did not want to work, **Patty** reminded her about William's threats to kill ABP's son and family.   This was corroborated by Whiteboy, ABP and ABP's mother (~~see page 1 on Giovani's report and page 3 on ABP's report~~).   On another occasion when ABP did not want to work, members of **Patty's** organization instructed **Giovani Alecio ("Whiteboy")** to threaten ABP.[1]   When this occurred on another occasion, **Jose Luis Moreno ("Jose Luis")** assaulted ABP's mother and pointed a gun at ABP's mother in order to force ABP to return to work as a prostitute.   When this occurred on

---

[1] If called to testify, **Whiteboy** would state that the instruction came from **Patty.**

another occasion, **Gabby** assaulted ABP.   When this occurred on another occasion, specifically January 6, 2017, **Gabby** assaulted a member of ABP's family as ABP locked herself into a bathroom to avoid working as a prostitute.   On several occasions that ABP refused to work, members of **Patty's** organization reminded ABP via threat that members of the organization knew where here (ABP's) family resided in Central America.

On January 4, 2017, in a court-authorized wire intercept, **Patty** and **William** had a telephone conversation, which was recorded, in which they began making arrangements to bring two of ABP's sisters into the United States to work in a brothel controlled by SWC members and their associates as prostitutes without their (the sisters') knowledge that they would be working in such a capacity.   **William** also stated that **Jose-Luis** would marry one of the sisters and said "but I'll do her first."   Following this conversation, ABP's sisters were moved at law enforcement's direction to a different location.   Then, days later, a vehicle matching the description of one driven by **William** was observed at the former residence of ABP's sisters.

## VI.    Real Properties

**Patty** admits that she used proceeds from the abovementioned conspiracy to engage in sex trafficking in order to buy real properties in the Houston, Texas vicinity, including, but not limited to:

**(1)** 4016 Woodleigh Street, Houston, Texas 77023;

**(2)** 7396 Irvington Boulevard, Houston, Texas 77022;

**(3)** 1110 Coral Street, Houston, Texas 77012;

**(4)** 1006 Shawnee St., Houston TX 77034;

**(5)** 812 Yorkshire Street, Houston, Texas 77022 (lots 178 and 179); and 8126 (sometimes known as 4901) Irvington Boulevard, Houston, Texas 77009 (Lt 11, Blk 2, REED P.A.; HCAD property acct. #0741010020011), at the corner of Irvington Boulevard and Norham Street.

**Patty** titled her real properties in the names of straw owners, including the name of her mother.

**Patty** admits that the following real properties were involved in and used to commit or facilitate the commission of the sex trafficking conspiracy:   The bar at 7396 Irvington Boulevard, Houston, Texas 77022, and the parking lot behind it (which is Lot 179 with an address of 812 Yorkshire Street, Houston, Texas 77022), were used to attract customers who would pay for sex with the sex trafficking victims; the house at 4016 Woodleigh Street, Houston, Texas 77023, was used to house sex trafficking victims; and the house at 1110 Coral Street, Houston, Texas 77022, was also used to house sex trafficking victims.   In addition to these above-listed real properties in which **Patty** had an interest, **Patty** is also aware that other properties (including those listed in the notice of forfeiture and described in this plea agreement) were used to facilitate the sex trafficking conspiracy.

### Breach of Plea Agreement

17.   If Defendant should fail in any way to fulfill completely all of the obligations under this plea agreement, the United States will be released from its obligations under the plea agreement, and Defendant's plea and sentence will stand.   If at any time Defendant retains, conceals, or disposes of assets in violation of this plea agreement, or if Defendant knowingly withholds evidence or is otherwise not completely truthful with the United States, then the United States may move the Court to set aside the guilty plea and reinstate prosecution.   Any information and documents that have been disclosed by Defendant, whether prior to or subsequent to this plea agreement, and all leads derived therefrom, will be used against defendant in any prosecution.

### Restitution, Forfeiture, and Fines – Generally

18.   This Plea Agreement is being entered into by the United States on the basis of

Defendant's express representation that she will make a full and complete disclosure of all assets over which she exercises direct or indirect control, or in which she has any financial interest. Defendant agrees not to dispose of any assets or take any action that would effect a transfer of property in which she has an interest, unless Defendant obtains the prior written permission of the United States.

19.  Defendant agrees to make complete financial disclosure by truthfully executing a sworn financial statement (Form OBD-500 or similar form) within 14 days of signing this plea agreement.  Defendant agrees to authorize the release of all financial information requested by the United States, including, but not limited to, executing authorization forms permitting the United States to obtain tax information, bank account records, credit histories, and social security information.  Defendant agrees to discuss and answer any questions by the United States relating to Defendant's complete financial disclosure.

20.  Defendant agrees to take all steps necessary to pass clear title to forfeitable assets to the United States and to assist fully in the collection of restitution and fines, including, but not limited to, surrendering title, executing a warranty deed, signing a consent decree, stipulating to facts regarding the transfer of title and the basis for the forfeiture, and signing any other documents necessary to effectuate such transfer.  Defendant also agrees to direct any banks which have custody of her assets to deliver all funds and records of such assets to the United States.

21.  Defendant understands that forfeiture, restitution, and fines are separate components of sentencing and are separate obligations.

### Restitution

22.  Defendant agrees to pay full restitution to the victims regardless of the counts of

conviction. Defendant understands and agrees that the Court will determine the amount of restitution to fully compensate the victims. Defendant agrees that restitution imposed by the Court will be due and payable immediately and that Defendant will not attempt to avoid or delay payment. Subject to the provisions of paragraph 8 above, Defendant waives the right to challenge in any manner, including by direct appeal or in a collateral proceeding, the restitution order imposed by the Court.

**Forfeiture**

23. Defendant stipulates and agrees that the property listed in the Indictment's Notice of Forfeiture (and in any supplemental Notices) is subject to forfeiture, and Defendant agrees to the forfeiture of that property. In particular, but without limitation, Defendant stipulates that the following specific property is subject to forfeiture (numbered as in the Supplement to the Notice of Forfeiture), whether as real property or, if already sold, as the net sales proceeds in lieu of the real property:

> 5. Real property at 1006 Shawnee St., in Houston, Texas (sold; proceeds held).

> 7. Real property at 812 Yorkshire Street in Houston, Texas, which is legally described as follows: Lots One Seventy-Eight (178) and One Seventy-Nine (179) of Block Eight (8) COLONIAL GARDENS, an addition in Harris County, Texas, according to the map or plat thereof recorded in Volume 13, Page 4 of the Map Records of Harris County, Texas. (Parking lot sold by City; net proceeds held in Cause No. 2019-29492, 165th District Court of Harris County, Texas)

> 8. Real property at 7396 Irvington Boulevard, in Houston, Texas (sold; proceeds held).

> 9. Real property at 4016 Woodleigh Street, in Houston, Texas.

> 10. Real property at Irvington Boulevard, in Houston, Texas, which is legally described as Lot Eleven (11), Block Two (2) of P.A. REED

19

subdivision, an addition in Harris County, Texas, according to the map or plat thereof recorded in Volume 25, Page 3 of the Map Records of Harris County, Texas.

Defendant also stipulates that the additional property is subject to forfeiture:

-- Real property at 4901 Irvington Boulevard, Houston, Texas, 77079;

-- Real property at 7923 Clinton Drive, Houston, Texas 77029;

-- Real property at 7929 Clinton Drive, Houston, Texas 77029;

-- Real property (or the net sale proceeds) at 1325 Berry Road, Houston, Texas 77022;

-- Real property (or the net sale proceeds) at 1110 Coral Street, Houston, Texas 77012;

-- Real property at 8306 La Porte Drive, Houston, Texas 77012; and

-- Real property at 8312 La Porte Drive, Houston, Texas 77012.

24.   Defendant agrees to waive any and all interest in any asset which is the subject of a related administrative or judicial forfeiture proceeding, whether criminal or civil, federal or state. Defendant stipulates and admits that one or more of the conditions set forth in Title 21, United States Code, section 853(p), exists.

25.   Defendant consents to the order of forfeiture becoming final as to Defendant immediately following this guilty plea, pursuant to Federal Rule of Criminal Procedure 32.2(b)(4)(A).

26.   Subject to the provisions of paragraph 8 above, Defendant waives the right to challenge the forfeiture of property in any manner, including by direct appeal or in a collateral proceeding.

**Fines**

27.   Defendant understands that under the Sentencing Guidelines the Court is permitted to

order Defendant to pay a fine that is sufficient to reimburse the government for the costs of any imprisonment or term of supervised release, if any. Defendant agrees that any fine imposed by the Court will be due and payable immediately, and Defendant will not attempt to avoid or delay payment. Subject to the provisions of paragraph 7 above, Defendant waives the right to challenge the fine in any manner, including by direct appeal or in a collateral proceeding.

### Notification of the Sex Offender Registration and Notification Act

28.    Defendant has been advised and understands, that under the Sex Offender Registration and Notification Act, a federal law, she must register and keep the registration current in each of the following jurisdictions: where she resides; where she is an employee; and where she is a student. Defendant understands that the requirement for registration includes providing her name, her residential address and the names and addresses of any places where she is or will be an employee or student, among other information. Defendant further understands that the requirement to keep the registration current includes informing at least one jurisdiction in which she resides, in an employee, or is a student not later than three (3) business days after any change of residence, employment, or student status. Defendant has been advised, and understands, that failure to comply with these obligations subjects her to prosecution for failure to register under federal law, 18 U.S.C. § 2250, which is punishable by a fine or imprisonment, or both.

### Complete Agreement

29.    This written plea agreement, consisting of 24 pages, including the attached addendum of Defendant and her attorney, constitutes the complete plea agreement between the United States, Defendant, and Defendant's counsel. No promises or representations have been made by the United States except as set forth in writing in this plea agreement. Defendant acknowledges that

no threats have been made against her and that she is pleading guilty freely and voluntarily because she is guilty.

30.   Any modification of this plea agreement must be in writing and signed by all parties.


Filed at _____Houston_____, Texas, on _____December 11_____, 20**23**

_____Moreno Maria_____
Maria Angelica Moreno-Reyna
Defendant


Subscribed and sworn to before me on _____December 11_____, 20**23**

NATHAN OCHSNER, Clerk
UNITED STATES DISTRICT CLERK

By: _____
Deputy United States District Clerk


APPROVED:

Alamdar S. Hamdani
United States Attorney

By: _____
Adam Laurence Goldman
Assistant United States Attorney
Southern District of Texas
Telephone:  713-567-9534
Facsimile:  713-718-3303

_____
Molly Bagshaw
Attorney for Defendant


22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL NO.   H-4:17-cr-00651-5 |
| | § | |
| MARIA ANGLICA MORENO-REYNA, | § | |
| | § | |
| Defendant. | § | |

PLEA AGREEMENT -- ADDENDUM

I have fully explained to Defendant her rights with respect to the pending indictment. I have reviewed the provisions of the United States Sentencing Commission's Guidelines Manual and Policy Statements and I have fully and carefully explained to Defendant the provisions of those Guidelines which may apply in this case.  I have also explained to Defendant that the Sentencing Guidelines are only advisory and the court may sentence Defendant up to the maximum allowed by statute per count of conviction.   Further, I have carefully reviewed every part of this plea agreement with Defendant.   To my knowledge, Defendant's decision to enter into this agreement is an informed and voluntary one.

_____
Molly Bagshaw
Attorney for Defendant

12-11-2023
_____
Date

I have consulted with my attorney and fully understand all my rights with respect to the indictment pending against me.   My attorney has fully explained, and I understand, all my rights

23

with respect to the provisions of the United States Sentencing Commission's Guidelines Manual which may apply in my case.   I have read and carefully reviewed every part of this plea agreement with my attorney.   I understand this agreement and I voluntarily agree to its terms.

_Moreno Maria_
Maria Angelica Moreno-Reyna
Defendant

_12-11-2023_
Date