IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| USA | § | CASE NO. 4:17-cr-651-18 |
| | § | HOUSTON, TX |
| VERSUS | § | THURSDAY, |
| | § | AUGUST 7, 2025 |
| MONTES et al | § | 3:02 TO 6:10 PM |

SENTENCING

BEFORE THE HONORABLE CHARLES R. ESKRIDGE
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE PARTIES:                SEE NEXT PAGE

ELECTRONIC RECORDING OFFICER: BRAD WILLIAMS

COURT CLERK:                JENNELLE GONZALEZ

TRANSCRIPTION SERVICE BY:

Veritext Legal Solutions
330 Old Country Road, Suite 300
Mineola, NY 11501
Tel: 800-727-6396 ▼ www.veritext.com

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

APPEARANCES:

FOR THE PLAINTIFF:                    DEPARTMENT OF JUSTICE
                                      UNITED STATES ATTORNEY FOR THE
                                      SOUTHERN DISTRICT OF TEXAS
                                      Adam Goldman
                                      1000 Louisiana Street
                                      27th Floor
                                      Houston, Texas 77208
                                      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


FOR HECTOR REYNA:                     HILDER & ASSOCIATES P.C.
                                      Quentin Tate Williams
                                      819 Lovett Boulevard
                                      Houston, TX 77006
                                      713-655-9111

HOUSTON, TEXAS; THURSDAY, AUGUST 7, 2025; 3:02 PM

CLERK:  All rise.  The United States District Court for the Southern District of Texas is now in session with the Honorable Charles Eskridge presiding.  God save the United States and this Honorable Court.

THE COURT:  Thank you, everyone.  Please be seated.  All right.  I call for sentencing hearing, Criminal Cause 17-651-18, United States v. Hector Reyna.  Can I get appearance of counsel, please.

MR. GOLDMAN:  Yes.  Good afternoon, Your Honor.  Adam Goldman for the United States.

THE COURT:  Thank you, sir.

MR. WILLIAMS:  Tate Williams for Mr. Reyna, who is present.  He can't stand, he's in a wheelchair.

THE COURT:  I understand.  Thank you, Mr. Williams.  Defendant is present.  Welcome, sir.

All right.  We now proceed to sentence hearing in this case.  Mr. Reyna, you'll have the opportunity to address me before this hearing is over.  I may have some questions or you may discuss some things as we proceed, so I need to have you under oath.  Can you raise your right hand, please.

CLERK:  Do you solemnly swear that any testimony you're about to give in the case pending now before this court shall be the truth, the whole truth and nothing but the truth, so help you God.

MR. REYNA:  Yes, ma'am.

THE COURT:  All right.  Do you understand that you're now under oath to tell the truth?

MR. REYNA:  Yes, sir.

THE COURT:  If you answer of my questions falsely, the government has a right to prosecute you for perjury or false statement.  Do you understand?

MR. REYNA:  Yes, sir.

THE COURT:  Yes?

MR. REYNA:  Yes, sir.

THE COURT:  Okay.  If you don't understand a question I ask, you can have me repeat or rephrase it before you answer. Okay?

MR. REYNA:  Yes, sir.

THE COURT:  And if you want to ask your attorney a question privately, you can do so at any time.  Just let me know, okay?

MR. REYNA:  Yes, sir.

THE COURT:  All right.  Let me briefly describe the Court's sentencing procedures.  The Supreme Court holds that the United States sentencing guidelines are advisory, not mandatory on me as the judge.  This means that I'll first consider and apply the guidelines in their entirety, along with the relevant policy statements to correctly determine the total offense level in the criminal history category.  That will

establish the applicable guideline range.

I'll then exercise my discretion to tailor the sentence in light of other statutory concerns.  In doing so, I'll consider the factors set out in Section 3553(a) to fashion an appropriate sentence in this case to achieve the sentencing purposes mandated by Congress in the Sentencing Reform Act of 1984.

The Supreme Court stresses that the guidelines are the starting point in the initial benchmark in the sentencing process.  District Courts are to remain cognizant of them throughout the process.  The Supreme Court also states that these requirements mean that in the usual sentencing, the Court will impose a sentence within the applicable guideline range. This is because such range is the Federal government's authoritative view of the appropriate sentence for specific crimes.  I'll abide by these directions from the Supreme Court. But to be clear, any comment I make today isn't an indication that I believe the guidelines are somehow mandatory on me or that they constrain my ultimate sentencing discretion.

Standard of proof for factual findings in connection with sentencing is a preponderance of evidence, and in determining whether that standard is met, a presentence report is generally considered sufficiently reliable to be considered by the trial court as evidence in making factual determinations required by the guidelines.

All right.  In advance of the hearing, I have received a lot of materials.  These include: the written plea agreement, the presentence investigation report, objections filed by the government, objections and I believe amended objections by the defendant.  There are two addendums to the presentence investigation report.

The defendant's sentencing memorandum and its attachments and the sentencing recommendation and then there's a second revised sentencing recommendation by probation.  I've also seen the government's sentencing memo and the government's response to the defendant's sentencing memo.  There's a supplemental -- a supplement to the notice of forfeiture and there's a victim impact by N.L.

Is there anything else I should have seen before now? Mr. Goldman.

MR. GOLDMAN:  Before now, no, Your Honor.

THE COURT:  Okay.  Mr. Williams.

MR. WILLIAMS:  No, Your Honor.

THE COURT:  All right.  So as to -- let's start with the objections and let's start with the government's objections, many of which were I think resolved in the government's favor, but let's work through each of them so that the record is clear.  I'm going to go through them, Mr. Goldman.  And then, Mr. Williams, when I'm going through yours, if there's anything that you think the probation officer

overlooked that's not in the addendums that I go through, let me know.  But I'm going to go through it in the order that it's in the addendums.

So in the first addendum, probation addressed the government's objections.  As to Paragraphs 45 and 53, about a two-level increase for willful obstruction and the administration of justice.  It appears to me that probation concurred and amended in that respect.  Is that correct?

MR. GOLDMAN:  That is correct, Your Honor.

THE COURT:  All right.  As to Paragraph 50, there was an objection that a two-level increase should apply because N.G.L. was otherwise in the custody, care, or supervisory control of the defendant.  Probation believes there's insufficient information to determine that she was entrusted to defendant's care.  So that was not resolved in the government's favor, so Mr. Goldman.

MR. GOLDMAN:  Yes, Your Honor.  I will go to that one first, so let me go to my guidelines, Your Honor.  It states that the person's otherwise in the custody, care, or supervisory control of the defendant, and that the commentary explains it is supposed to have broad application and it even applies to those under age 18 or who entrusted temporarily to the defendant.  The Court should also look to the actual relationship that existed between the defendant and the minor and not simply the legal status.

Your Honor, in this case, what happened -- and this is, I don't think, even disputed -- N.G.L. ran away from home because, in part, she was suffering physical abuse from her father.

THE COURT:  At age 14.

MR. GOLDMAN:  Yes.

THE COURT:  Okay.

MR. GOLDMAN:  At age 14 at Jane Long Middle School. I'm going to be saying that a lot today, just so I know it's going to be tiresome after a while.

THE COURT:  I know.

MR. GOLDMAN:  But this 14-year-old middle school student had nowhere to live except under the care, custody, and control of the defendant.  First, the defendant and a man known as Sombrous lived solely with the victim at the Pelican Pointe apartment.  And then after Sombrous' death, it was solely the defendant and N.G.L.  This is the only adult that could have any custody, care, or control over this minor.  She is a minor, she cannot live by her own; thus, she had to live there.  The only way she could live there was to be under his custody, his care, his control.  It is his apartment, it is his.  He is the one that has the only ability to give her a place and this applies temporarily under the commentary.

So she is a minor.  She is living with him and no one else for part of this, and there is nowhere else for her to go.

And it under this where he said that to make her stay there -- to allow her to stay there, she still had to live as a -- she had to work in the prostitution at the other place.

So, Your Honor, he may not have had a legal status as a guardian, but as the commentary is very specific; that is irrelevant. The actual relationship between the two of them required him to have supervisory control because, otherwise, she could not have lived there. And as part of that custody and control, he made her work as a prostitute to continue to live there, for lack of a better term, to have a job. That was the one job that she was allowed to have.

So we submit, Your Honor, that application of 2L1.3(b)(1)(B) should apply and that two offense levels should be added.

THE COURT: Okay. Thank you. Mr. Williams.

MR. WILLIAMS: First of all, commentary is not final a court. Secondarily, no one entrusted N.G.L. to defendant. He's not entrusted with her. She's just living with him and she's living with him voluntarily, and so, he's not responsible for her. She's not within his care, custody, and control. He doesn't have control over her. In fact, the best evidence of that is, the government's not going to dispute, at the time that she finally decides to leave her work in the brothels, in the Lopez family brothels, she actually goes and stays with a friend, who then ultimately tells her to go home.

So she has the ability to walk out and leave and go back home or go stay with a friend at any time.  But no one has entrusted N.G.L. to Hector Reyna.  Hector is -- she's staying at a place with Hector, but he doesn't have control over here. She could leave.  In fact, she ultimately did go live with friends and then did go home several months in June of 2011. So he's not entrusted with her and he's not in control over her within the meaning of the guideline.  That's more applicable for someone who maybe they don't have a guardianship, but they're in loco parentis or some other type of relationship where they've been entrusted.

I think that we look at the text of the guideline or just think about the term entrusted, you think of it as, you know, somebody has -- you have abused that.  You have voluntarily been given by a third party control over this either incompetent person or this minor.  And that's not what happened in this case and the two points just simply is not applicable.

THE COURT:  Okay.

MR. GOLDMAN:  I must respond, Your Honor.  I must respond because that is false and I am sorry to be so emotional about this, Your Honor.  She was not there voluntarily, again, a 14-year-old middle school student.  Second of all, she did not decide to leave; she escaped.  And she did not stay with a friend to escape; it was a co-defendant, Denis Amaya-Caballero,

who she went with.  She was placed there by the defendant and by Walter Lopez because the brothel was being raided.  And then when he discovered the age, he let her escape.  She was still threatened afterwards by this defendant.  So the idea that she was there voluntarily, that she decided to leave, and that she stayed with a friend is patently false.

MR. WILLIAMS:  Well, there's a point, Judge, where I'm going to object to counsel testifying.  We could have had a trial.  My client pled guilty, okay, and the government is now trying to get a backdoor trying for cases they didn't indict.  If they want -- the testimony evidence in this case in the form -- if we had had a trial and we had impeached her with her prior CAC statement, et cetera, whether she was forced or not is my client pled guilty.  I want to make that clear because it seems to be in dispute, that he accepts responsibility.

What we're talking about is a legal standard and whether or not to apply special offense characteristics within the rubric of the United States sentencing guidelines.

THE COURT:  Sure.

MR. WILLIAMS:  Okay?  And whether there is a preponderance of the evidence and Your Honor has to consider that.  And me, requiring the government to meet its burden in that regard is not a withdrawal of acceptance, it's not a lie, it's not in bad faith, and the facts I have came from their discovery.  At some point in time, whether we characterize it

as escape or what have you, she left the co-defendant's house and she went to live with a friend before she went to go home. She -- I contend that (a), she was never entrusted to this defendant and, number two, she had the physical ability to leave.

In fact, in the discovery I received, there was a discussion where one of the women at the second brothel she was at told her, why are you here; you can leave any time. And then that person also said to her, you know, she's like, well, it's like you belong to Walter now at that point. Something had changed, the details don't matter. But the point is that she was told by the madam at the second brothel she was at, you can leave at any time, girl.

But regardless of that, she was never entrusted to Hector Reyna. He's not in her -- she's not in his care, custody, and control within the framework of the guideline's special offense characteristic.

THE COURT: Mr. Goldman, anything further?

MR. GOLDMAN: Yes. Number one, this is a sentencing, so we do not have to have the strict rules of evidence here.

THE COURT: I understand that.

MR. GOLDMAN: Yes. Number two, the evidence he refers to discovery. The discovery points out that later on, she had a statement where she indicates everything I just stated. This Court is well aware of sex trafficking cases and

how nervous people are. And again, Your Honor, Mr. Williams is treating this victim as an adult. It is a 14-year-old middle school student. And to say that she has this free will, she has all this ability is perverse. This is a 14-year-old middle school student who ran away because she was being assaulted by her stepfather or father and she was under his care, custody, and control.

MR. WILLIAMS: Therein lies the exact dilemma. She escaped one abusive relationship using her own will, but not this one. And so, that underscores my point that she had the ability to leave. She escaped her father who is, as a matter of -- excuse me.

THE COURT: But that's -- well, I'm going to let you argue. I mean, but I'm just saying, whether with Mr. Reyna she escapes, that's within the relationship and an exit from it, as opposed to this talks about being entrusted to the defendant.

MR. WILLIAMS: Which is where I started.

THE COURT: I know, but that's sort of on the front end. Well, so I keep hearing all of this about did she escape or didn't she. There's a lot of things -- I want to make it very clear that there are a lot of things about the conduct by the defendant at issue here that are scored highly and heavily against him, and that 's why the guideline range here is going to be very high. The question is whether there's only an additive amount for custody, care, and supervisory control,

correct?

MR. WILLIAMS:  Yes.  That's correct, Your Honor.

THE COURT:  All right.  All right, so I'm sort of focusing you on that.  Y'all are like arguing like the whole big picture, but we're talking about custody, care, and control right now.

MR. WILLIAMS:  Judge, I'm sorry, but I have a question.  Because after I came in and I saw that Mr. Goldman was ready to use an ELMO, I was concerned about the procedure and the process of this proceeding.  If, for the purposes of these objections, that we are going to get into a litigation of relevant conduct that was not part of the original indictment, et cetera, and we are going to be plastering the overhead and the walls with second- and third-hand police reports and debating what the meaning of what somebody told a police officer in 2016 about something that happened in 2013 means, I'd like to know that now for the purposes of scheduling and timing and how to proceed as part of this process.

Are we going to -- because that, I believe is his intent.

MR. GOLDMAN:  No.

MR. WILLIAMS:  And if we're going to do that as part of the objections, that is what this extra conversation outside of where you started at is going and I'd like to know how to --

THE COURT:  Let me give you the big picture, the way

I approach sentencing on something like this, especially in these types of circumstances.  Your client has been in custody for a long time.

MR. WILLIAMS:  Eight years.

THE COURT:  Eight years.

MR. WILLIAMS:  Yes, sir.

THE COURT:  Really, regardless of what's happening and the decisions I make, he's going to be serving more time. If something happens that it's a surprise, if something happens that you think I need more time to prepare for that, let me know.  We'll adjourn and you'll get more time to do that, okay?

MR. WILLIAMS:  Okay.

THE COURT:  I give the defendant the time that they need --

MR. WILLIAMS:  I understand.

THE COURT:  -- as long as it's not, you know, a decision is needed to determine whether the defendant is or is not in custody.  The defendant's in custody and is going to remain in custody for at least some amount of time, even, by what I understand, you're preparing to ask for.

MR. WILLIAMS:  There's more --

THE COURT:  If there's evidence that's coming up and you think, whoa, this isn't the hearing that was noticed or that we've prepared for, we'll take it up when that moment happens.

MR. GOLDMAN:  Well --

MR. WILLIAMS:  I'm asking as a point of order, clarification, depending on your Robert's Rules references that we could -- I may have mistaken.  Is it if we're just going to highlight portions of various documents, I'm asking if Your Honor wants to do that on an objection-by-objection basis or if this is going to bleed into the lawyer's argument.

THE COURT:  I typically -- here's how I go at it.  I go objection-by-objection whatever we need to do.

MR. WILLIAMS:  Okay.

THE COURT:  And a lot of things, I understand it may get repetitive and things get worked out on whatever objection is there.  If it repeats into other things, it's like, okay, we've already heard that.  But I don't do a big overall evidentiary presentation.

MR. WILLIAMS:  And that's what I'm really getting at because if that's what -- and I fear that most of this is not.

THE COURT:  It's because right now, all I'm trying to resolve is -- I'm trying to resolve the correctness of the presentence report, and so we're talking about that.

I don't know.  Are you planning to show me evidence--

MR. GOLDMAN:  No.

THE COURT:  -- or the presentence report?  There may be evidence and testimony then when it goes towards before we go to the appropriate sentence.  And that, I mean, that's not a

surprise to you, that happens.

MR. WILLIAMS:  Fair enough.  So with respect to the objection pending before the Court, and I agree with Your Honor that there's a mandatory applicable minimum in this case of 10 years and he has not been in custody for 10 years; that is correct.  And so, I do not feel at this point that I need additional time based on what I've just heard and I wasn't walking and planning to ask for additional time.

So with respect to the pending objection, I believe that that's special offense characteristic or I contend that it is -- my belief is irrelevant -- that it is inapplicable because the young -- the minor was never entrusted to my client.

THE COURT:  All right, I understand.  I get that.

MR. WILLIAMS:  Thank you.

THE COURT:  And so, it is -- look, it's a textual argument that has to then be applied to the facts.  Mr. Goldman, is there anything else?

MR. GOLDMAN:  No, Your Honor.  But I can just say that I have no evidence for the PS or objections.  I'm going to show one of the exhibits I gave counsel but to blow it up before I make my argument.

THE COURT:  All right.  On this objection and the way it is written, particularly in terms of the application comment, I am overruling the objection.  I think that a lot of

what is being argued as to this is accounted for and comes into play on why other aspects of the guidelines are so high.  But I'm looking at this and when the victim is less than 18 years of age, the application note says -- it uses the term, "entrusted to the defendant, whether temporarily or permanently," and then it refers -- and, of course, the overall reference is it should have broad application.  But it says, for example, teachers, daycare providers, babysitters, or other temporary caretakers.  That indicates that the one who has primary custody, care, and control is giving that -- offloading that somehow, entrusting that custody, care, and supervisory control to another that is then abused.

That's not the situation that happened here.  That's not to say that that conduct is not itself being taken into account for purposes of sentencing.  I just think that it is being taken into account elsewhere, and so, there's not an additive feature to be added because of that now, so the objection is overruled.

MR. GOLDMAN:  Yes, Your Honor.

THE COURT:  All right.  As to Paragraph 50, this was that 2G1.3(d)(1) should be applied to all minors of the offense, including N.G.L., C.G., W.S., J.S., L.G. and M.R.  And there is now -- there are paragraph information, I believe, about all of those acronyms, correct, in the amendment.

MR. GOLDMAN:  I believe so, Your Honor.

THE COURT: Did that then count up to -- did it add any points anywhere? Because this is all information that is in there now. But I'm not sure whether it was something that was -- it's like for practical purposes. Does it -- did that take care of your objection or was there something more?

MR. GOLDMAN: I think that took care of the objection. I'll just doublecheck, Your Honor.

THE COURT: Because I want to make sure, I think the information is in there. And then my question is, did that increase anything because, if so, Mr. Williams, I want to hear from you about whether it was a problem.

MR. WILLIAMS: And that's what I'm saying --

MR. GOLDMAN: It does not, Your Honor.

THE COURT: It didn't, and so --

MR. WILLIAMS: We did not get that revised PSIR until Friday the first.

THE COURT: Okay.

MR. WILLIAMS: And because I did not see that it affected the guidelines calculation within the revised PSIR. I did not file a second amended objection to it.

THE COURT: Okay.

MR. WILLIAMS: Okay? However, it --

THE COURT: That's why I was looking for it. Like, after it was added in, I was then looking at the revision thinking, okay, since it involved three or more or five or

more, something like there was some enhancement and I didn't see it.

MR. WILLIAMS:  Well, and this is kind of the rub is that it's addressed in Mr. Goldman's objections and his memo and then in my memo, more than I certainly would have otherwise, because the government keeps coming back to these other complainants.  And so, and that's why I asked the question earlier, are we really going to spend a lot of time arguing about complainants that were outside the indictment.

THE COURT:  Well, it would be -- and it is fair, I think, for the government to do that.  What you would be really concerned about, I think, is --

MR. WILLIAMS:  The impact of that.

THE COURT:  -- did it increase the guideline range. But if Mr. Goldman wants to argue, but you've got this factual basis and now very upward, which might be where he's going, you do have the information for that.

MR. WILLIAMS:  I have the information to address that as I have done and I can do even within the flawed exhibits that he provided this morning.

THE COURT:  All right.  I will -- okay.  So now as I understand it, we are on -- I guess we're on exhibit -- excuse me -- his objection with respect to -- what's the next objection?

MR. WILLIAMS:  It was the objection to Paragraph 50.

THE COURT:  Okay.  The information that was requested there has been included.

MR. WILLIAMS:  Got it.

THE COURT:  So it resolved your objection, correct, Mr. Goldman.

MR. GOLDMAN:  Yes, Your Honor.

MR. WILLIAMS:  Right.

THE COURT:  Okay.  And I think Mr. Williams, unless you have anything else, I think that that's where that is.

MR. WILLIAMS:  I have that on my chart as well, Your Honor.

THE COURT:  Okay.  So then the objection to Paragraph 52; that's as to Guideline 3B1.4 for the use of a minor to commit a crime.  And the government argued that that was with reference to Bianca Reyna, who was under the age of 18 at the time.  Probation concurred, correct?

MR. GOLDMAN:  Yes, Your Honor.  And there's one other individual also, Belinda, the other sister with the (indiscernible).

THE COURT:  Okay.  And, Mr. Williams, you have --

MR. WILLIAMS:  I have a corresponding objection to that.  It's my Objection Number 5, I believe.

THE COURT:  Yes.

MR. WILLIAMS:  Is that correct, or what are we looking at?

THE COURT:  Let me look at her chart.  And I'm doing this by way --

MR. WILLIAMS:  This is a 3B1.4?

THE COURT:  -- the second amended -- yeah, and that's --

MR. WILLIAMS:  I believe it's Number 5 under my second amendment.

THE COURT:  Yes, it is.

MR. WILLIAMS:  Okay.  So I can address that now or at your Court's leisure.

THE COURT:  And so, that was -- so, yeah, because your reference is then about whether that means N.G.L. or not, which is different than where --

MR. WILLIAMS:  Well, there's two issues to it.  I mean, the first is with respect to the victim of this crime.  I don't think anybody here dispute that she was victimized and used to commit a crime, but I don't think that's what the objection --

MR. GOLDMAN:  That's not what the government's arguing.

MR. WILLIAMS:  No, Your Honor.

MR. GOLDMAN:  That's not what's being argued.

MR. WILLIAMS:  So let's move that to the side, so

THE COURT:  So that's off to the side.

MR. WILLIAMS:  With respect to the Reyna sister or

sisters, the fact -- there's insufficient factual basis, I contend, because -- or the defendant contends because -- and this goes to the overall nature of the case, is it --

THE COURT:  Let me do this because I'm going to -- and we're going to get to your objections.  Just to make it easier on the record, probation resolved the objection in the way that the government wished.

MR. WILLIAMS:  That's correct, Your Honor.

THE COURT:  That's where it stands.  Then when I get to your objections --

MR. WILLIAMS:  Okay.

THE COURT:  -- you can then argue why that should be changed.

MR. WILLIAMS:  Fair enough.  And because of what it comes after, that actually makes more sense, at least from my list.

THE COURT:  Okay.  All right.  Then Paragraph 62, the government -- it was an addition requested that the defendant failed to appear in court on July 18, 2008, and it's been revised to reflect that, correct?

MR. GOLDMAN:  Yes, Your Honor.

THE COURT:  All right.  Paragraph 68 was an addition. One level increase applies because the defendant committed the instant offense while under another sentence, including probation, et cetera.  Probation concurred and it was revised,

correct, Mr. Goldman?

MR. GOLDMAN:  Yes, Your Honor.

THE COURT:  Okay.  Paragraphs 69 -- oh, an addition requested between Paragraphs 69 and 70, that an incident about disorderly conduct in September of 2006 be included, and then there's a reference to further conduct in March of 2007.  And those were included, correct?

MR. GOLDMAN:  Yes, Your Honor.

THE COURT:  All right.  And then Number 8, government contends if 2A3.1 were to be applied, the defendant's offense level would be higher.  What is that in reference to?

MR. GOLDMAN:  Yes, Your Honor.  There is a cross-reference in this case.  Under -- let me get to the section, Your Honor.

THE COURT:  Yup.

MR. GOLDMAN:  It is under Section 2G1.3(c)(3) that states that for an offense under 2241 or 2242, 2A3.1 is to be applied.  Now, this is where it gets important, Your Honor.

THE COURT:  Let me catch up with you --

MR. GOLDMAN:  Okay.

THE COURT:  -- at 2G1.3.  What reference in it, 2G1.3 --

MR. GOLDMAN:  (c)(3).

THE COURT:  (c)(3), okay.

MR. GOLDMAN:  Your Honor, at the time, because he had

a license under that PSR, the probation office determined that that wasn't important or was it a germane issue. But now since it's been reduced to 360 to life, as opposed to life, we will submit that the cross-reference now is applicable and that 2A3.1 should be applied, which would result in a life guideline sentence.

Specifically, Your Honor, for the 2241, I would cite the case of United States v. Lucas, for which I have a copy; it is at 157 F.3d 998, and it goes to the issue of fear. And we would submit that that issue of fear is clearly established under that definition because it is a very broad definition. Moreover, Your Honor, even under commentary 5B that also explains that 2241 -- a 2242 be applicable. Therefore, with that applied and then we're going through what we explained in the objections, we would be back at a life sentence. And so, therefore, we do believe that is applicable.

THE COURT: So then 2A3.1, when it referenced, it says to cross-reference to that. That's a long provision. Is there any particular --

MR. GOLDMAN: Yes, Your Honor. I can go through it. 2A1.3.

THE COURT: 2A3.1.

MR. GOLDMAN: 3.1, sorry. It's backwards here, Your Honor. So for that one, we will submit that it would begin with a Level 30 under A1, because the conduct that's described

in 2241(a) or (b) would go up by four.  Because the victim was under -- had not obtained 16, it would then go up by two.  My upper objection was overruled obviously, so (b)(3) and (b)(4) would not apply.  Because there was a misrepresentation of the age, (b)(6) would apply; that would be another two.  So, therefore, we would be at 34, 36 --

THE COURT:  38.

MR. GOLDMAN:  --38.  And then we would add some other enhancements, but that would be 38 there.  And then we believe that when the -- I think we have a --

THE COURT:  So the starting point would be 38 --

MR. GOLDMAN:  Yes.

THE COURT:  -- at that point?  Let me now see where that -- it says here.

MR. GOLDMAN:  And we would have the enhancements --

THE COURT:  Hold on one second.

MR. GOLDMAN:  Okay.

THE COURT:  So you're saying -- so when I look at this according to your argument, is it that the -- so we added that up and it was to 38.

MR. GOLDMAN:  And then you would add the --

THE COURT:  Would that be like then, you're saying, okay, so Paragraph 83 instead of being 30, it should be 38?  Where does that fit in?

MR. GOLDMAN:  Let me go to the last PSR, Your Honor,

here.  Yes, that would change Paragraph -- I think I'm looking at the one from August 1st, Your Honor.  So that would change 83, 84, and 85, and then we would add eight under 87, 88, and 89, so we get to 46.  And then if the Court gives the exception, we'd be down to 43, which would be the life sentence.

THE COURT:  So work me through that again.

MR. GOLDMAN:  So, Your Honor --

THE COURT:  Are you saying -- Mr. Williams, for purposes of argument.

MR. WILLIAMS:  Really, yeah.  I'm not following --

THE COURT:  No, no, listen to me.  Assuming I agreed with this, where does it fit in on what it would be adjusting to the offense level computation.

MR. GOLDMAN:  Yeah.

THE COURT:  And I want to make sure that we're not double counting because some of these things that are accounted for in 2A3.1 appear to be conduct as you yourself recognized, for instance, 2A3.1(b)(3) is not going to apply because that was custody, care, and control.  But had not attained -- the victim had attained the age of 12, but hadn't attained 16 years, increased by two levels.  That's --

MR. GOLDMAN:  So if I may, Your Honor.

THE COURT:  Yeah.

MR. GOLDMAN:  Paragraph 83 would still be 30.  I

guess Paragraph 84 and 85 -- I know that sounds a little strange.

MR. WILLIAMS:  Are we referring to PSIR paragraphs?

MR. GOLDMAN:  Yes, in Document 1037.  I guess we would add another one.  We would add four levels for (b)(1).  We would add another two levels for (b)(2).

THE COURT:  Okay.

MR. GOLDMAN:  And then we would add another two levels for (b)(6), so we would be at 38 there.

THE COURT:  Okay, got it.

MR. GOLDMAN:  And then when we add the --

THE COURT:  And then you have the other things, and so, that's adjusting the total.  Let me ask this, Mr. Williams, before you argue.  From probation standpoint, if I found 2A3.1 to apply, as Mr. Goldman just articulated, the plus four, the plus two and the plus two that he just articulated, is that accounted for in the way that he suggested; that if I found that to apply, we would be adding another eight points that way.

MS. CHESTER:  Yes, Your Honor.  If the Court were to agree with counsel for the government, the calculation under Chapter 2 would be higher in 2A3.1 than it would be in 2G, and so, then the class reference would apply.

THE COURT:  Okay.  All right.  And so, now let me look at --

MR. WILLIAMS:  So can I --

THE COURT:  Actually, I want to look at one more thing.  What is the contention that the base offense level would be under 2A3.1, 30 or 38?

MR. WILLIAMS:  30.

MR. GOLDMAN:  30.

THE COURT:  Okay.  There would just then be --

MR. WILLIAMS:  A2.

THE COURT:  -- a plus four, a plus two, and a plus two for 2A3. -- what's accounted for at 2A3.1(b)(1), (b)(2), and (b)(6).  And so, give me just one second.

And so, Mr. Goldman, probation's response was the offense level is capped at 43, and so, 43 was used and there were reductions taken for that.  And so, what you're suggesting is additive and tops over that, but why doesn't it stop at 43?

MR. GOLDMAN:  Well, you first have to go -- so that would get you to 46, right then and there.  And then you minus three, you're back to 43, because the highest number at the end you can to is 43.

THE COURT:  I understand that.

MR. GOLDMAN:  Yeah.  So we would set -- so under 1037 --

THE COURT:  And you're saying it just would get so high that at the end of the day, it would be 43.

MR. GOLDMAN:  At the end of the day it would be 43

instead of 39, which is what's listed in Paragraph 93 currently in Document 1037.

THE COURT: All right. Probation, based on what you've heard, does that change your recommendation or do you stand? And I'm not trying to influence. I'm just wondering if that did anything to your prior thinking on this before I get Mr. Williams' view, so he knows what's on the table.

MS. CHESTER: Your Honor, the only thing I would note is when we made that response that it ended up at a 43, we were using a higher base offense level than we are currently using. We had initially applied -- started with a 34, which was incorrect, based on the subsection that the defendant pled to.

THE COURT: Yup.

MS. CHESTER: So the original BSR and the response that we made to that objection and to the calculations now, we started off four levels lower in the final report.

THE COURT: Okay.

MS. CHESTER: And that's I think where the -- that's I think where the cross-reference could possibly apply now because the 2A guideline now would be higher if the --

THE COURT: Would be in play. Okay. All right. So now, Mr. Williams, with that understanding.

MR. WILLIAMS: So I'm not sure I understand. So I understand what a cross-reference is. So their contention is that, if I understand this, that under 2A3.1, the base offense

level is A, then the special offense characteristic at (b)(1) of plus four applies and (b)(2) of plus two; is that correct? I'm trying to figure out what -- I mean, without seeing this in a revised PSIR, it's very hard for me to visualize it and track what the different numbers being floated around are.  So I'm trying to understand literally the mechanics, what are the sections in the proposed calculation.

THE COURT:  I'm wondering now in fairness with probation.  Probation, with the government's argument and laying it out and noting the difference between the first PSR that you had and then the revised one -- and I give you a lot of credit for how complicated this has been to where you've gotten it.  Is your -- would your -- if you had understood it this way going in, would I have a different PSR in front of me articulating your reasons about that?

MS. CHESTER:  I believe you would, Judge.  Probation doesn't necessarily agree with all of the proposed calculations that the government submits.  I believe there's one that would not apply, but even without --

THE COURT:  And which one is that?

MS. CHESTER:  (b)(6).

THE COURT: Okay.  All right.

MS. CHESTER:  Because it talks about the knowing misrepresentation of a participant's identity.

THE COURT:  Okay.

MS. CHESTER:  And participant is defined as someone who's criminally liable for the offense.  And the identity that was misrepresented was the victim, so I don't think that would apply.  But even without that, we would still be two levels higher --

THE COURT:  Exactly.

MS. CHESTER:  -- than 2A than we would be in 2G.

THE COURT:  And if we were two levels higher, that would be 44.  And, Mr. Goldman, for purposes of your argument, you need all eight of those points to get it to 43 at the end of the day, correct?

MR. GOLDMAN:  That would be correct, Your Honor.

THE COURT:  And so, you would meet that.  Although otherwise, it would be 41 instead of 39.

MR. GOLDMAN:  Yes, Your Honor.

THE COURT:  If you got six of those.

MR. GOLDMAN:  Yes.

THE COURT:  Okay.  Mr. Williams, I'm going to be candid.  I'm catching up on the fly on this to try to get the math correct.  And I will tell you I'm content to go forward today if you want to, but I'm also content to ask probation to revise it so that you can properly -- so that you can consider it and then object.  I don't want to rush you on this.

MR. WILLIAMS:  Judge, I think the threshold question is whether that other section applies.  And if Your Honor finds

that -- which we haven't addressed; they've just floated.  And so, if Your Honor determines that for a 1 point -- excuse me -- the 2A3.1 is the applicable guideline, then I just think we should recess to get a revised PSIR based upon that ruling, and then an opportunity to object to the then-proposed applicable special offense characteristics and other adjustments under the guidelines.

THE COURT:  Okay.

THE COURT:  It might not be long because the objection to the role enhancement and the other ones outside the Chapter 2 are going to be the same.

THE COURT:  Well, the thing -- I mean, let's look at 2A3.1 is itself titled, criminal sexual abuse, attempt to commit criminal sexual abuse; whereas, 2G1.3 is promoting commercial sex acts, et cetera, and sex trafficking and related things.  I mean, so just even on the basis of what we've been talking about, you can see how 2A3.1 would apply.  And the statute of conviction here is --

MR. WILLIAMS:  1951(b).

THE COURT:  Is it 19- -- 1591.

MR. WILLIAMS:  1591.  Sorry, I reversed numbers.

THE COURT:  That's okay.  And if it involved conduct in 2241 and 2242.  I'm not sure I have a -- does anybody happen to have handy 18 U.S.C. 2241 and 2242?

MR. WILLIAMS:  I have it right here, Your Honor.

THE COURT:  Can I see it?  Mr. Williams, I'll let you take a look at this after I'm done.

MR. WILLIAMS:  Well, I mean, I can just tell you I don't think they apply because it's within the special maritime and territorial.

MR. GOLDMAN:  Your Honor, first to the conduct.  The cross-reference does not apply to the jurisdiction; that is well established.

THE COURT:  Yup.  If it involved conduct described by these, by force or threat.  And, Mr. Goldman, do you need this back specifically for argument?

MR. GOLDMAN:  I can try to remember it, Your Honor.

THE COURT:  Because I'm going to say what -- these are lengthy -- what specific provisions are you saying bring it into that by conduct?  I mean, I can look at it and think, oh, he's probably arguing acts, but I'd like to know actually what you're arguing.

MR. GOLDMAN:  I think both 2241 and 42 apply.  The primary sections, Your Honor, are the -- I believe it's use of force and the use of threat or is that one (indiscernible)?  For 2242 --

THE COURT:  2241(a) is by force or threat.

MR. GOLDMAN:  Yeah.

THE COURT:  There's (b), it's by other means, but that goes to -- that's like a drug or intoxicant, it looks

like.  Well --

MR. GOLDMAN:  I think the drug or intoxicant would be unknowingly given and, here, it was knowingly given.  But I (off mic) to be sure.  I can (off mic) if I'm allowed to.

THE COURT:  Go ahead.  And then 2242 --

MR. GOLDMAN:  That would be the element of fear.

THE COURT:  So that's just 2241(1), by placing the other person in fear while being subjected to death, bodily injury, kidnapping, et cetera.  Okay.  All right.

MR. GOLDMAN:  Yes.  We think for 2241, it will be by either -- it would be (b)(2) or it would be both (a)(2) and (b)(2) both apply, Your Honor.

THE COURT:  (a)(2) and (b)(2).  Administers to another person by force (sound drops).  Yeah.

MR. GOLDMAN:  The matter, I'll be able to issue, Your Honor, if probation determines that (b)(6) is not appliable because I think then we're back to the 360 to life.

THE COURT:  Even at 41?

MR. GOLDMAN:  Well, I think as counsel -- as probation just stated, if 2A3.1(b)(6) is not applicable, the ultimate guideline will still be 360 to life as it is today.

THE COURT:  Oh, that's true.  All right, so let's look -- let's just do this before we decide whether we're going to revise in this regard and then let you further object. Let's assume arguendo that I find 2A3.1 to apply but the

question is factually whether (b)(6) applies: to persuade, induce, entice, or coerce a minor to engage in prohibited sexual conduct or if to facilitate transportation or travel by a minor or participant to engage in prohibited sexual conduct. The offense involved knowing misrepresentation of the participant's identity or the use of a computer or interactive computer service.

It would be a question of, well, there's several different factual aspects there. On the (a) or the (b), are you contending both of those or --

MR. GOLDMAN: I think, Your Honor, actually probation is correct; that based on the definition of participant under 3B1.1, it would not be applicable, so we would still be 360 to life.

THE COURT: Okay.

MR. GOLDMAN: I think I have to sort of --

THE COURT: Okay, that's fine.

MR. GOLDMAN: We're still at 360 to life either way, I think.

THE COURT: All right, so the objection is withdrawn.

MR. GOLDMAN: I think withdrawn pending the ruling on counsel's objections because if counsel's objections are granted and it gets to below 360 to life --

THE COURT: You would want to then --

MR. GOLDMAN: -- I would then want this to be

considered, yes.

THE COURT: All right, on that basis.

MR. GOLDMAN: Yes.

THE COURT: Okay. Because I don't want to be -- I don't think you would do this. I just don't want to say that I'm overruling your objection and then I get appealed on that.

MR. GOLDMAN: Yes, Your Honor.

THE COURT: I'm not ruling on it because you're saying now you don't believe that it matters mathematically. But if it comes around to that, you want another chance at it.

MR. GOLDMAN: Exactly, Your Honor.

THE COURT: Okay. All right, so it's provisionally withdrawn.

MR. GOLDMAN: Yes. Thank you.

THE COURT: All right. And that is all of your objections, correct?

MR. GOLDMAN: That is correct, Your Honor.

THE COURT: All right, thank you. All right. So now, Mr. Williams, let's look at your objections.

MR. WILLIAMS: Okay.

THE COURT: Objection Number 1, that's the mandatory minimum.

MR. WILLIAMS: That was resolved.

THE COURT: And probation conceded that and it was revised. Objection 2, objecting to the base offense level and

asserting that it should be 30; probation conceded and that was corrected, correct?

MR. WILLIAMS:  Yes, sir.

THE COURT:  Objection 3, Paragraph 51, the specific offense characteristic.  You object to enhancement for undue influence and that was maintained by probation, correct?

MR. WILLIAMS:  That's correct, sir.

THE COURT:  All right.  So let's hear your argument.

MR. WILLIAMS:  Well, my argument is that he's not exerting undue influence.

THE COURT:  I'm sorry?

MR. WILLIAMS:  That Mr. Reyna is not -- there's no presumption that he's -- first of all, there's no presumption that he's exerting undue influence because a more than 10 years age difference doesn't apply.  And so, as far as an undue influence goes, there's no evidence that he has somehow overpowered her.  Subject -- you know, other than the existence of threats as outlined in the -- excuse me -- the existence of threats as outlined in the offense conduct in the plea agreement, which were I believe I just reviewed it whereby Stephanie Bianca Reyna and not Hector, at least in respect for the factual basis, that there's no evidence that he exerted some other type of undue influence over here and there's certainly not a preponderance.

THE COURT:  Okay.  Mr. Goldman.

MR. GOLDMAN:  There's plenty of evidence of his undue influence, Your Honor.  First of all, as noted in the facts and as in the PSR itself, he makes numerous threats not only to her but also to the principal of Jane Long Middle School and threatening her to continue the conduct or threatening to go into the school itself; that constitutes threats and that constitutes undue influence.

It's also undue influence because, again, Your Honor, the undue influence is that she has to go back to the other abusive relationship if she doesn't stay there.  There's more undue influence, Your Honor, because Your Honor charges in aiding and abetting.  It's not just charges him acting alone.  This is an aiding and abetting charge, which you've pled guilty to.  Under aiding and abetting, he acts with the other people; he doesn't act alone.  And together, they all had this undue influence over here.

And so, therefore, Your Honor, when you look at all that and, again, the fact that, again, 10 years is not just the requirement.  The requirement, Your Honor, is that it --

THE COURT:  That would be a rebuttable presumption.

MR. GOLDMAN:  Yes.

THE COURT:  But what we're looking at is whether conduct clearly compromised the voluntary evidence.

MR. GOLDMAN:  But if I may finish.  Again, Your Honor -- and I'm going to say this over and over -- a 14-year-old

middle school student and, for some reason, throughout however much time we've been here, that keeps getting overlooked by the defendant as if she's some adult making rational decisions. She is a 14-year-old middle school student living with the defendant under his roof. And that's undue influence where he's also threatening her, he's going to the school to threaten her. All those facts are already in the PSR. I'm not adding them newly. So, therefore, it unquestionably applies.

THE COURT: Okay. Mr. Williams.

MR. WILLIAMS: But the question of the text of the guidelines special offense, correct, is undue influence, it's not threats. Threats are built into the offense itself and we've talked about that. So if we look at, like, what's actually undue influence, I think that's a separate category of behavior because if it included threats, it would say that; it doesn't say that.

And so, what is the undue influence beyond the existence of these threats and threats to third parties certainly don't apply. So if we look at -- so let's focus on what's the --

THE COURT: There are also drugs that were given to her to subdue her.

MR. WILLIAMS: By other people, not by this defendant in particular. They were given to her, if I recall correctly, at the brothel.

THE COURT: But it goes on to -- if a participant otherwise unduly influenced a minor to engage in prohibited sexual conduct. It doesn't have to be the defendant him or herself.

MR. WILLIAMS: It depends on the offense of conviction. This is not -- he did not plead guilty to a conspiracy. He pled guilty to aiding and abetting, which I think also called into question, pursuant to the other argument, whether 2241 would apply, the behavior. But with respect to that, if we look at undue influence by this defendant, okay, the age difference is significant; of course, that's why it created a rebuttable presumption at the 10-year mark, because they felt like 10 years was the line where clearly the sentencing commission determined that it's a rebuttable presumption. So less than 10, then it becomes a fact issue.

THE COURT: She was 14 at the time. Your client was how old at the time?

MR. WILLIAMS: He was born in '91, she's born roughly eight or nine years -- I don't have the exact dates.

MR. GOLDMAN: He was 22 at the time, Your Honor.

THE COURT: 22, so he's --

MR. GOLDMAN: Your Honor, there's another issue --

THE COURT: He's not finished. Go ahead.

MR. WILLIAMS: So with respect to this special

offense characteristic, the undue influence, I think there has to be more than just the age alone, that he's older. There has to be something to exert. If you think about it from terms of, like, probate court, for example, that they -- it's overpowering such that they don't have any will.

THE COURT: Well, there's a rebuttable presumption set at 10 because then it's so broad. But then, you know, obviously, you're looking at it -- it's one thing if it's someone 19 and someone 17. But after that, you're looking at how minor is the minor and how major is the other. And we have somebody here who's not -- he's not in the majority because he's older than 18; he's in the majority because he's older than 21 and she is younger than 16, she's 14.

MR. WILLIAMS: No one contests that she's 14 and he's --

THE COURT: No. I mean, I know no one -- I mean, it's mathematical. But I'm just sort of saying this starts to show the type of influence that he is able to exert over here. And so, let me hear -- because what I see are threats and what I see is the -- it's not saying that he did it, but the intentional giving of drugs to her to subdue her so that she would engage in prostitution at a brothel. And that strikes me as undue, so tell me why under the law, those don't apply.

MR. WILLIAMS: I don't -- it's not clear from the text of the guideline that the use of chemical substances to

facilitate the commission of the offense, similar to a threat, is what the guideline is referring to because it would just say that. In law, when we criminalize the use of intoxicants to induce somebody's control, whether it's in the Texas Penal Code or elsewhere, it just -- this legislators or the administration just say that. They just say if you use intoxicating substance, if you use force or threats.

THE COURT: When you're talking about when you're on drugs or alcohol, it's you're under the influence of them.

MR. WILLIAMS: This is true.

THE COURT: I think it's undue when someone who's in the majority administers that to someone who's in the minority. I mean, I just think that that's textbook undue influence. So unless you have anything else, I'm --

MR. WILLIAMS: Well, I do have something else and it's what is it the undue influence to do. And this goes back to a pleading and a hearing we had at an earlier time in this case --

THE COURT: Okay, go ahead.

MR. WILLIAMS: -- and evidence that's already in the record that there was a point in time, according to evidence from another purported complainant, that this individual had engaged in prostitution at an earlier time. So is the undue influence to commit prostitution at all or to commit the acts within this particular indictment? And so, because I contend

that if it's the former, rather than the latter, then the undue influence doesn't apply.  So that's the last thing that I would submit.

Your Honor will recall that we did have the Rape Shield Act hearing here some time ago and the pleadings and the records in that, you know.  Obviously, Your Honor, ruled that that evidence was not admissible if and when at the time we went to trial that I'd offered it.  But we're not a jury trial, so I would just offer that you consider that as well with respect to making your decision on this objection without getting into the weeds sort of.

THE COURT:  Okay.

MR. GOLDMAN:  I can easily -- Your Honor, this is all a red herring.  If you look at (b)(2), there's two sections of it.  If the offense involving knowing misrepresentation of a participant's identity to persuade, induce, and coerce a minor to engage in prohibited sexual conduct.

As the plea agreement, which Mr. Reyna admitted to and said was truthful, they admitted that they got her a fake ID to make her -- to indicate she was 18, showing a fake identity so she could perform at the brothel.  Case closed. This is red herring and a waste of time.

THE COURT:  What about the assault and the drugs?

MR. GOLDMAN:  Oh yeah, that's on top of everything else, Your Honor.

THE COURT:  But like legally when you say that applies.

MR. GOLDMAN:  Yes.

THE COURT:  Both.

MR. GOLDMAN:  Yes, Your Honor.  Yes, Your Honor, we have either one, yes.

THE COURT:  Because of -- and the provision.

MR. GOLDMAN:  Yes.

THE COURT:  Well, you quoted me one.  Quote me the other.

MR. GOLDMAN:  Okay.  So the other one is unduly influence, Your Honor.  Counsel keeps referring to this victim engaging in prior prostitution, which she has never denied. But I want to -- again, I sound like a broken record -- 14, a 14-year-old and acting like she's some sort of professional prostitute as an adult is -- I can't believe we're having this conversation really.

MR. WILLIAMS:  Well --

MR. GOLDMAN:  If I could finish, counsel.  I was polite enough to let you finish.  In this case, Your Honor, he used the fact --

THE COURT:  Well, in fact, you were polite enough because I cut you off.

MR. GOLDMAN:  Yes, Your Honor.

THE COURT:  Because you tried to cut him off, so

let's just try not to do that to each other.

MR. GOLDMAN:  All right.

THE COURT:  Go ahead.

MR. GOLDMAN:  I'll try to keep my powder dry, Your Honor.

THE COURT:  Yeah.

MR. GOLDMAN:  What we have here, Your Honor, is that as stated in there, the undue influence was that she would have to go back to the abusive parent if she did not work at the brothel.  She said, I'm underage and illegal.  He said, you got to paid your way.  The only way to do it is to work at the brothel.  That is textbook undue influence and he admitted it in the plea agreement.

THE COURT:  Mr. Williams, anything else?

MR. WILLIAMS:  My client has not disputed any of the facts that he swore to as part of the factual basis in this plea.  I would add one observation because we're going to hear someone yell 14 enough times in this courtroom that we'll all have it imprinted in our memory for the next six months.

There is not a -- when you look at international law and you look at national law, one of the things you look at is what is the universe of customary norm.  In other words, what is something that everybody in the world agrees as a matter of law or morality is flat-out we all agree.  The age of consent to engage in sexual conduct does not have the universal

customary norm within the United States, let alone the U.N. countries.

For example, Louisiana, unsurprisingly, is lower than Texas. I say that as a joke. But in all seriousness, 50 states -- and we've seen this with respect to debates about the Jeffrey Epstein saga. Different states set the age of consent at different years. In Texas, it's 17 for some purposes, 18 for others, so we're not even uniform within the State of Texas. Arguably, in Spain, it's 12 or 13 and France even longer -- it's more ambiguous. But my point is, is it --

THE COURT: Not under these circumstances. That's not going to be something that's found to be --

MR. WILLIAMS: I'm not applying it. But when we're focused on the age alone and the idea that a 14-year-old is overpowered and undue influenced, I think that we have to consider that the 50 states view the age to make important, certain types of decisions differently.

THE COURT: I would maybe think about that if your client was sitting there because it was romance and this was somehow statutory rape. But what we're talking about is coercion into sexual acts that he's pleaded guilty to.

MR. WILLIAMS: I agree with you and so does Sharon.

THE COURT: So I just don't understand, like, this argument about it.

MR. WILLIAMS: Well, I'm just responding to the

constant yelling of the age 14.

THE COURT:  Okay.

MR. WILLIAMS:  That there's not a universal acceptance of what the proper age to make -- to do certain things are, you know.  And so, I mean, I don't want to hear somebody yell -- nobody's in dispute that a young woman -- that a child was abused here.  That's why we're here, that's why he pled guilty.

THE COURT:  Well, I'm the one that's, like, it's either moving or it's not and I've heard 14.  I know she's 14.  You know I know she's 14.  Mr. Goldman knows that I know that she is 14.

MR. WILLIAMS:  Right.

THE COURT:  And so, whether he says it a hundred more times or one more time, it's known and it doesn't move me further, just it's a fact.

MR. WILLIAMS:  It is a fact and we don't contest that.

THE COURT:  Okay.

MR. WILLIAMS:  And we don't contest any fact that he pled guilty to, and so, we're not running away from that. We're talking about the applicability of special offense characteristics, and we contend that the undue influence special offense characteristic doesn't apply and we welcome your ruling.

THE COURT: All right. I'm overruling the objection. I find that the conduct does apply. I'm referring specifically to, in the second addendum the response, what's summarized there. But dang it, I just lost the place. When I was looking back at the conduct in the PSR as to N.G.L., that is specified at Paragraphs 35 through 39 and, in particular, 37 goes into the threats of assault if she didn't work by Bianca Reyna. And that also she was threatened by Hector Reyna himself and that she was given drugs by other participants to subdue her.

And then there's the other issue just as to the applicability of the guideline that Mr. Goldman raised. And so, I overrule the objection on that basis because I find it to be factually supported.

MR. WILLIAMS: Very well.

THE COURT: All right. Paragraph 54 is defendant objects to a four level aggravating role is basically because -- summarize it.

MR. WILLIAMS: It's --

THE COURT: That it's being operated by Walter Lopez. But the further -- I'm not sure that the summary here and the addendum accurately captures what you're trying to say.

MR. GOLDMAN: Your Honor, we need to stop right now. We have to approach. There is an emergency.

THE COURT: Okay.

(Side Bar)

THE COURT: Just for purposes of the record, we're sidebar and nobody else is listening. For purposes of the record, N.G.L., the victim that we've been talking about who is intending to give a statement later has not been present in the courtroom and that's what we're discussing is something that happened outside the presence of the courtroom.

All right. We are going to be in recess, so counsel can confer on some things. They will advise me when they're ready to proceed further or give an update, and so, we are in adjournment. Anybody that's here, stay close. I don't know how long this is going to take. For the defendant, your client, I don't know if he needs to exit the courtroom or where he needs to go, but whatever convenience he needs is fine. We'll just account for time to get him back when I come in. Okay?

MR. WILLIAMS: Yes, Your Honor.

MR. GOLDMAN: Thank you.

THE COURT: We're in recess.

(Recess)

THE COURT: All right. Thank you, everyone. Please be seated. All right. Counsel, where are we?

MR. GOLDMAN: I'd like to put on the record what happened. We have to continue as is, but I'd like to explain to the Court what happened.

THE COURT: We will continue.

MR. GOLDMAN:  There's no reason not to, Your Honor.

THE COURT:  Okay.

MR. WILLIAMS:  I think we should talk.

THE COURT:  Well, let's hear what the positions and then we'll decide what it means.  Well, tell me, do you want to not put anything on the record?

MR. WILLIAMS:  I'd like to have another bench conference as to how it started before we decide what to put on the record.

THE COURT:  Okay.  Let's do a bench conference and then we'll decide what goes on the public record.

(Side Bar)

THE COURT:  Sidebar portions are going to be sealed in these proceedings.  There can be a request to unseal them later, but there's a lot of things up in the air on this right now.

Mr. Goldman, you can proceed and give me the summary information that you have wanted to.

MR. GOLDMAN:  Yes, Your Honor.  Thank you.  Prior to breaking, Your Honor, I received information from Houston County Sheriff, Detective Viviana Guera, informing me -- and this was corroborated by FBI Special Agent Tina Morales and her victim witness coordinator, Janet Castillo -- that the victim, Your Honor, in this case was going to make an in-person statement.  She was kept downstairs and the court provided a

safe room for her to be in on this floor so that when she wanted to make her statement, she could go there.

She came up to the ninth floor late because she was finishing writing what she wanted to state. When she came out, it was observed by these three individuals and by others that the sisters of the defendant -- Gabbie Reyna, Ariana Reyna, and most important, Belinda Reyna -- were basically in the hallway walking around.

When the victim came upstairs, Belinda Reyna, who had since left the courtroom, I would note, saw the victim and gave her what can only be described as a menacing look. It caused the victim to become hysterical, to write -- to take her statement, give it to Ms. Castillo, and then flee the building. She has since left.

We have been informed also that after this happened and we started and looking and asking for video camera from the marshals, Belinda Reyna has also left. But we believe it's unquestionable that the menacing look from the sister of the defendant, Belinda Reyes (sic), caused the victim to become hysterical and to flee the building.

I'm going to ask Ms. Castillo to make a copy of the statement, so that counsel and the Court has it as well.

THE COURT: Okay. Anything else about consequences for anyone that might be happening?

MR. GOLDMAN: Yes, Your Honor. We will be reviewing

the video records following this proceeding and determining whether or not charges should be brought against the sisters, Belinda Reyna, Ariana -- Belinda Reyes -- Reyna, Ariana Reyna and Gabriela Reyna based on the actions that have been reported so far.

THE COURT:  Okay.  I'll note for the record that, as I said at the outset, I have a written victim impact statement from N.G.L. that's already in the record, which I have reviewed before now.  Mr. Goldman, you're intending to provide this other written statement now to defense counsel and docket it and make it part of the record?

MR. GOLDMAN:  That is correct, Your Honor.  Ms. Castillo is making a copy.

THE COURT:  So we'll have that -- we will have that on the record.  And, Mr. Williams, you're going to have the opportunity to review it and also tell me if you think you need more time, that's fine.

The one other thing that I want to note for the record, without prejudice Mr. Goldman to any investigation that you want to make and anything that might update in that regard based on that investigation.  My observation was that the defendant himself personally has been seated in the courtroom, sitting closely by counsel.  I'm not even aware of him having looked over at his sisters or having done anything that would have been implicated in this conduct.  But you can take a look

as you see fit and if there's a problem or consequence with that, you can take any action that you need.

MR. GOLDMAN:  Understood, Your Honor.

THE COURT:  For the record of what I have seen in the courtroom as to the defendant.

MR. GOLDMAN:  And I can also corroborate, Your Honor, that based on what I observed in the courtroom as well, I have not seen Hector Reyna himself, as far as his courtroom activities, engaged in anything in furtherance of this.

THE COURT:  All right.  Mr. Williams, is there anything that you'd like to state, observe, or object to?

MR. WILLIAMS:  No, sir.

THE COURT:  Okay, thank you.  All right, so let's move on with resolving objections, correct?

MR. WILLIAMS:  Yes, sir.

THE COURT:  All right.  So I think we were on Objection Number 4 as to Paragraph 54.  I had resolved Objection 3, correct?

MR. GOLDMAN:  Yes, Your Honor.

MR. WILLIAMS:  Yes, sir, you had --

THE COURT:  I had overruled -- I had overruled that.

MR. WILLIAMS:  That's correct.

THE COURT:  And I was asking you -- I was asking you to clarify your Objection Number 4 for me, so let's just start there.

MR. WILLIAMS: Okay. So, Your Honor, the PSIR recommends a four point role enhancement pursuant to United States sentencing guideline section for an aggravating role enhancement. As Your Honor is aware, there are two types of adjustments for role in the guidelines -- they're upward and downward -- and on the aggravating role, there are two, three, and four point adjustments available.

There's also no adjustment available for who would otherwise be considered an average participant. Now, this criminal activity certainly involved five or more people; that's not in dispute. Even though he was not convicted of the conspiracy, there was five or more people involved. So the question is what, if any, role adjustment is appropriate.

Defendant is not contending that he had a minor or mitigating role in seeking a downward adjustment of two, three, or four points, though that would be his right. We contend, instead, that he is an average participant. If you look at the plethora of people indicted in this case, several of whom remain fugitives, that constellation -- there's a hierarchy. There's certainly a -- you know, the government had created a org chart at some point.

But if we look in the indictment, unlike many cases and I don't think the government would dispute this, does it necessarily put -- rate people by defendant number in order of their degree of importance. I don't think that was done here.

If I'm mistaken, then I'll be happy that they contend he's Number 18, but I don't think he's going to do that.

THE COURT:  No.  Yeah, no.

MR. WILLIAMS:  So now that we've gotten through that part mechanically, what's really going on here.  And the evidence that was induced from the special agent -- and I don't want to mispronounce her name, so I'll just say Special Agent, I believe it's Morales -- at the detention hearing.  The other evidence before the court indicates that these brothels were owned and controlled by, I will say colloquially, the Lopez family, though given that's a common surname, that may not be fair to everyone named Lopez in this case, including the complainant.

So Walter William Lopez's mother, I believe she goes by Pat, okay.  So she owns the brothers, according to the evidence, with Walter.  William manages some other part of this conspiracy, as I understand it with respect to the international portion.  According to the evidence, the brothel that N.G.L. worked in -- and we don't necessarily have any evidence about where any other potential complaint would have -- what brothel it was.

But the brothel that N.G.L. was trafficked to work in, according to the evidence and the stipulated -- the factual basis, that was operated, owned and operated by Walter and his mother -- Walter Lopez and his mother, who is a defendant -- a

co-defendant, I should say. And it was operated or managed on a day-to-day basis by defendant's mother who goes by Gabbie and she doesn't have the same surname as him, but she's a co-defendant also, and then also a fugitive from this case, who I believe is Anadalit Duarte.

And so, the actual conduct, if we look at who's over the whole thing, it's not this defendant, so four points isn't appropriate. He's -- if he has an organizing role, he's mid-level management. And one of the -- and I cite some of this and reported on it in my sentencing memo and I cited to the record because I don't want there to be a dispute about -- I mean, what the agent or others said about who actually owns and operates these brothels.

Another thing I pointed out in my memo and it's an interesting -- it's tragic, as every aspect of this case, that the money -- follow the money. If he was a number -- if he was a four-point leader, his set and N.G.L. wouldn't be holding the car wash for a dead friend to raise money. They would be swimming in cash. They're broke. The man lives in abject poverty. When they -- I mean, they live in an apartment with multiple people. And, granted, as he's submitted evidence, I mean, yes, they found a gun, nobody disputes that. But the money is not getting to Hector Reyna. And so, that indicates that he's not in this leadership control position. That's the evidence before the court, that these other people own and

operate the brothel, so he's not a four-point defendant.

So you look at the other set of defendants in this case -- and there's 20 some odd -- and you could look at who's charged with what, not necessarily just what they pled guilty to, but you have people that were charged with maybe being a security guard or, you know, very minor roles.  And I don't have any impact or control over what happens to them because I'm not their lawyer, the prosecutor, or Your Honor.  But I would assume that their counsel would be moving for a minor role reduction, whether that's two, three, or four points, and I anticipate that that will happen.  My client, unfortunately, is just one of the first to be sentenced, so I can't point you to a specific thing, and a lot of those pleadings are sealed anyway, so I would know.

But there are people who are less important to this case than Hector Reyna and we don't dispute that.  So this is why I say he's the meat in the sandwich, he is the middle, he's an average participant because there are people who were doing very little in this overarching thing.  Maybe the person who brings food or whatever to the brothel, that would be a minor, maybe a mitigating role participant; the guy who's name that the prosecutor pointed out helped her escape.  So he's not in a managerial position, so four points is inappropriate.

THE COURT:  Let me get sort of basically the factual argument of what Mr. Goldman is going to say as to why

organizer or leader applies, as opposed to manager or supervisor, and then let's drill down on the facts that apply. Mr. Goldman, you would say what?

MR. GOLDMAN:  Yes, Your Honor.  Under the entire charge in the indictment, he has to be the organizer or leader of a --

THE COURT:  Of a --

MR. GOLDMAN:  -- criminal activity that involves five or more participants.  We have this in two manners: one, let's start with the charge to which he pled, the trafficking of N.G.L.  The at least five people that were involved were three people charged with easy ones are Walter Lopez, Anadalit Duarte, Mr. Reyna himself, as well as the sisters, Bianca Stephanie Reyne and Belinda Reyna.

THE COURT:  I don't think that we contest five or more; we've got that twice.

MR. GOLDMAN:  Okay.

THE COURT:  What facts are saying he's the organizer or leader of them or at least one of them.

MR. GOLDMAN:  Of that criminal activity, Your Honor, he is the one that told -- that instructed the two sisters to make the threats, to do the recruiting at the school; that is number one.

Number two, he is the one that, as we just talked about, caused and forced N.G.L. to be the individual that had

to go -- that made her go work at the brothel. It was his actions. He was the one that forced her to do that. He was the one that led her to Walter Lopez. He is the one that led her to get the fake ID, so he did that.

Most importantly, Your Honor, is that he -- and the documents here are overwhelming that he is the leader of the Bellaire Clique of the Southwest Cholos. I think we've provided -- I don't know how many documents establishing that he is the leader. We can have testimony if you need from Detective Guera and from Special Agent Morales. He is the leader on all these Facebook pages. He is identified as the leader and, indeed, that is why he was -- the victim was in fear of him because he is the leader of the Bellaire sect, both before and after his injury. He is known as that in every document that's been submitted to this court. So as the leader of the Bellaire sect, which engaged in numerous types of criminal activity and just as a criminal activity is unquestionable that he is the organizer and leader of that sect.

Regarding the specific activity -- and again, we're not here to dispute whether or not all the activity charged in the indictment is what he's the manager of or if he's the manager compared to Patty Moreno or Walter Lopez or to William Lopez. We're here to determine if he's an organizer or leader of a criminal activity that involved five or more participants.

As the court said, five or more is not in dispute.  Here, it's organized and led the criminal activity as documented over and over, whether it is in the general violence committed by the Southwest Cholos sect to which he's over or the criminal activity of the trafficking and forcing into prostitution of N.G.L. by directing other people what to do and with directing his sisters to go to the school and recruit, directing N.G.L. to be working in that brothel.

And so, I don't think there's any question that was an organizer or leader of a criminal activity for that definition of an aggravating role.

THE COURT:  Okay.  Mr. Williams.

MR. WILLIAMS:  Okay.  I'll break it two parts.  The first thing is he's not being sentenced for being a Southwest Cholo; that's not why we're here.  And this isn't a Southwest Cholo operation.  This is an operation that includes Southwest Cholos.  His mother -- and nobody's ever said his mother, Walter Williams mother are Cholos, okay.  So you've got two women.  You've got two -- I mean, you can call them Lady Macbeths, whatever you want to call them, they run the show.  Basically, the two moms run the show according to the evidence and they're not Cholo, so this is not a Cholo operation.  It is a Cholo crime that includes -- excuse me -- it is a crime that includes Cholo participants.

And not all -- you know, and so, if you look at -- if

we zero down, if we're going to zero into this brothel and these five people if, as counsel contends, the two sisters are involved, then they're the lower two. Let's just be clear, they're below, according to the facts. They're taking orders from somebody. The other three are the owners: Walter; his mother, Patty; the other reported owner of the brothel or the day-to-day manager, Gabbie, Hector's mother, and then Duarte. So there's four people above that actually run this criminal activity and he's an average participant. Much like when we look at Doe conspiracies, does he play an essential role? Absolutely. He recruited and helped turn this victim out. There's no question that's not in dispute.

The question is, in relative to this particular crime, is that a four-point enhancement. We're not arguing he's a minor. We're arguing he is -- he's in the middle, he's an average, and that's zero under the applicability of the guidelines. It's certainly not four. It could be three or two arguably, but we contend it's zero.

THE COURT: But it's you're sort of looking at it in terms of -- in terms of, like, other victims and things and what he pleaded to; don't look more broadly than that. You don't want me to do that.

MR. WILLIAMS: Of course not.

THE COURT: But for purposes here, you want to say, let's look at the very biggest, broadest picture of what the

overall criminal activity is that's being organized here and say he doesn't have an organizing leadership role in all of that.  But it is a crime that he was charged with and as to that crime, I believe is what I'm to look at is was he an organizer or leader of that.

And that's, I think, what Mr. Goldman is arguing, is that if the question was, is it overall as to the biggest picture that could be cast around the criminal activity here, maybe no.  But as to the conduct to which he pleaded and the participants in that, was he organizing and leading what was going on there and the answer to that, I think, is yes.

MR. WILLIAMS:  I disagree because, you know, as Bob Dylan says, "Everybody gotta serve somebody," and this gentleman is not getting the money, and I use the term gentleman loosely obviously.  He's not getting the money.  He doesn't control what's happening at the brothel.  That's not in dispute.  There are three other people that actually operate that.  And so, the question is, you know, if this was some other type of business, okay, would you say -- I mean, how would you compare it?  He's not on site; that's never been in dispute.  This man is never on site, so he doesn't -- he doesn't control anything that happens in the room other than, according to the evidence, that he recruited a prostitute and, through threats -- directly, indirectly, or through other parties -- he's making sure she continues to work at that

facility.

THE COURT: Mr. Goldman, what I'm looking at what this applies to, am I stating your argument correctly that it's like we don't draw the largest circle around it and say did you organize the whole thing. It's the crime that's at issue, correct?

MR. GOLDMAN: Well, for this case, it is that crime that's at issue, Your Honor, so I do agree. But I would --

THE COURT: I mean, and if there's other charged --

MR. GOLDMAN: Yes.

THE COURT: -- and people, I understand that. But it's each one of them, are they an organizer, leader of what's going on what they're charged with or are they average or are they minor, et cetera.

MR. GOLDMAN: Correct, Your Honor. And I would make two points in addition, Your Honor. First, as counsel just stated, he recruited and he made -- well, he also dropped her off and picked her up every day. He did get a portion of the proceeds that she made in order to pay the rent. And as he said -- as counsel just said, through threats and everything, he made her work. I think that is a concession that he is an organizer or a leader. Regarding the actual operation, Your Honor, this whole charge, this case involves ailing, smuggling, drug trafficking, immigration crimes, sex trafficking of adults and sex trafficking of minors. And the sex trafficking of

minors part, for which Count 2 applies and to which he pled guilty, he is, we submit, unquestionably an organizer or leader.  He was in charge of the recruiting, he did the recruiting.

And I think a good example, Your Honor, a good comparison is a case before your colleague, Judge Hoyt, called U.S. v. Hoang, et al, H-O-A-N-G; the caption is 4:19-CR-234. That was a 96th defendant marriage fraud case.  In that case, despite there being 96 people and one unquestionable leader, whose name was Ashley Wynn, probation and Judge Hoyt both determined that numerous people got the four-point bump for being in that managerial role and their managerial --

THE COURT:  Managerial or organizing.

MR. GOLDMAN:  Or organize yes, organizer role.

THE COURT:  Maybe not the leader, but the organizer.

MR. GOLDMAN:  Yes.  And their organization for that criminal activity was that those specific individuals -- and there were about a dozen in that case, Your Honor -- was that they did the recruiting of their particular area.  And so, just them -- so when looking at past case and what happened here, we think it applies.

MR. WILLIAMS:  I'd like to respond twofold.

THE COURT:  Yup.

MR. WILLIAMS:  Number one, that case is irrelevant. That's an immigration fraud case; it's not comparable to what's

happening here.  Number two, he did -- what he said raises an important question.  When those other people come before Your Honor, the government -- this is a situation where you're literally going to have too many bosses, not enough workers because they're going to seek four on everybody.  Walter Lopez --

THE COURT:  But they haven't done that already.

MR. WILLIAMS:  Well, I don't know because the pleadings are sealed.  And so, Walter --

THE COURT:  But I do know.

MR. WILLIAMS:  Okay.  Well, Walter Lopez pled to the same count as this defendant, okay.  I have no idea because, again, the pleadings are sealed, whether they're saying that he's a four also, and you can't have two fours.

THE COURT:  Yes, you can.  You can have many fours.

MR. WILLIAMS:  Theoretically --

THE COURT:  Because it's organizer or leader, and so, we can't just focus on the leader, leader, leader.  It's a lot of people organize.

MR. WILLIAMS:  Yes, Your Honor, and that's where I was headed, which is that is why the guidelines are -- there is a gradient in the guidelines.  This is not a four or nothing adjustment.

THE COURT:  Well, no, but that's why I corrected Mr. Goldman when he said a managerial role, because that's the

stepdown manager or supervisor.  What we're talking here is to organizer or leader.

MR. WILLIAMS:  There is also a two point.

THE COURT:  Right.

MR. WILLIAMS:  And so, if we look at --

THE COURT:  And there's the two point.

MR. WILLIAMS:  -- which also says organizer, you know.  They all actually -- so (c) which is at two point says, if the defendant was an organizer, leader, or manager and in any criminal activity other than described at (a) or (b), increase by two.  And so --

THE COURT:  And then (a) and (b) breaks it out.  If it's five or more and you're the organizer or leader, it's plus four.  But if you're the manager or supervisor, it's plus three.  But if it's less than five, it's plus two if you're any of those -- organizer, leader, manager, or supervisor.  That's how I read it.

MR. WILLIAMS:  That's my point is there's a scale, but it's -- so if he's trapped into the -- if we're talking about the four --

THE COURT:  But you conceded at the outset that -- I mean, it's not conceded like you gave something up.  It's a fact that there were five or more participants.

MR. WILLIAMS:  Right.  But he doesn't organize them, is my point.  He doesn't lead them; he just recruits.

According to the factual stipulation, he's not organizing the criminal activity; that's the on-site manager, his mother. That's what makes her a manager. He's just -- he's making sure somebody shows up to work. He's not organizing her work there and what she's doing, the money. He's not organizing it. He's not leading it there. He's playing an essential criminal role, but he's not an organizer leader under any common view of the term. That's the person on site and the person who supervises the whole scheme.

THE COURT: Okay. All right. I'm overruling the objection. Textually, it says organizer or leader of a criminal activity that involved five or more participants. But it's the criminal activity involved five or more participants, it did. The question is then was he an organizer of that activity, not that he was the organizer or leader of every single one of those five or more, but was he organizing criminal activity that involved five or more participants.

And I find factually that he did for the threats that were discussed as made by the sisters and getting them to recruit at the school, and then things specifically that he did with and with respect to N.G.L. So that objection is overruled.

Okay. Objection 5 is as to the use of a person less than 18 years of age to commit the offense. That, we already have it on the record that that does not pertain to N.G.L. The

government is not arguing that, nor was the probation going at that. It's as to Bianca Reyna, who was 16 years old at the time. And so, why would that not apply? Mr. Williams. I'm just catching us up on what we've said.

MR. WILLIAMS: It's closely related, okay? So if we look at the actual factual basis of the plea agreement, it says, "Moreover, Bianca and Anadalit gave N.G.L. drugs to calm her down while she worked at the brothel and Bianca threatened to assault N.G.L. if she did not want to work."

So that -- there's no evidence before -- there's insufficient evidence that he actually is the one who directed his sister to make those threats. This goes back to the organizer or leader, that it could have been their mother, it could have been Patty, it could have been Walter, it could have been Walter's -- Anadalit Duarte. So these things are happening, but it's not -- there's insufficient evidence that he's the one using his sisters as enforcers against N.G.L.

THE COURT: But that's -- but there's other bigger picture things of who he's bringing in and how they're being used. And even as to this, Bianca Reyna and Duarte -- Paragraph 37 -- gave N.G.L. drugs to subdue her while she worked at the brothel. And I've just made a finding that he's responsible as an organizer for them and their conduct. And so, once I make that finding, I think it's just a question mathematically, was one of them less than 18 years old and that

is so.  That's my thought.

Let me hear Mr. Goldman's argument and then you can respond to both.

MR. GOLDMAN:  I agree with the Court, but I would just note that it just requires that the defendant use or attempt to use, which is not just limited to directing under application Commentary 1, but also commanding, merely encouraging, intimidating, counseling, training, recruiting, or soliciting, so it's a very broad definition.

And again, if we talk just about even those not mentioned on the response by the probation, Belinda and the sisters who did the recruiting, his directing them to recruit in and of itself establishes this.  But also, when you look at that broad definition and the actions of the person with which he aided and abetted, Bianca Stephanie Reyna, who was under 18 at the time and who did provide the drugs, which is totally admitted to in the factual proffer of the plea agreement.

THE COURT:  Say that again, what part was factually admitted to?

MR. GOLDMAN:  The role of Bianca Reyna in this.

THE COURT:  Okay.

MR. GOLDMAN:  Yeah.  We would submit that 3B1.4 and that very broad definition of use or attempted to use applies.

THE COURT:  And what in that statement connects the defendant -- she did that and that's been pleaded to.  But in

terms of him -- did he provide the drugs.  I mean, is there anything as to what's going on there, the background of that?

MR. GOLDMAN:  Well, as Your Honor said, he is part of the leadership.  So to make sure she continues that, he doesn't have to direct Bianca to do that, but they are living together.  But what he's doing is he is encouraging this activity and, again, he's recruiting -- he having people -- he's recruiting people, he's soliciting, and he's counseling.  So we believe all that's combined, even that direct knowledge of what she is doing will make that Bianca section apply.

But again, also, we have what we just talked about, which is having his younger sisters who go to school at Jane Long Middle School, having them recruit on his behalf; that also definitely applies.

THE COURT:  Mr. Williams, anything else?

MR. WILLIAMS:  Your Honor, we dispute that factual.  There's not evidence that he directed that, as opposed to someone else in this -- in this crime.  The factual basis that he stipulated to certainly stipulated that Bianca and Anadalit did what is written there which I read earlier.  But as far as holding him responsible for it with respect to this enhancement, it's inappropriate.

THE COURT:  All right.

MR. GOLDMAN:  And, Your Honor, we will just note that includes just the mere act of encouraging.

THE COURT: Yeah. I'm overruling the objection. He is responsible for bringing N.G.L. into this entire orbit of activity. And I do believe that the reasonable inference from the evidence that's recounted as to Bianca Reyna supports a finding that the defendant is responsible for using or attempting to use her, who's under 18 years, to commit the offense by the administrating of drugs and threats to -- well, used or attempted to use as encouraging and intimidating, in particular.

I mean, recruiting is there as well, but the encouraging and intimidating to engage in offense conduct is sufficiently established, so that is overruled.

All right. Objection 6. This is as to the statement to the school administrator who was looking into some of these things, that she needed to keep his name out of her mouth, and whether that is something that warrants an increase for a threat or an obstruction of justice.

Mr. Williams.

MR. WILLIAMS: Your Honor, first of all, the purported threat isn't clearly a threat. It's just keep his name out of his mouth. And if you look at -- it's made prior to the commencement of prosecution for certain. It's made purportedly at some time and it's not made to the administrator. It's made to a school resource officer, which is literally a security officer at court -- I mean at school.

And so, the idea that you would communicate a threat to a police officer, it's equivalent to be delivered to somebody is a little farfetched, I contend. I mean, you're going to take a threat and say, hey, school security officer.

He didn't say go tell this person she needs to keep -- I'm going to do something to her; if she does X, I will do Y. He said, yeah -- according to this, which is in dispute, he said she needs to keep my name out of her mouth, which is essentially to -- you know, it's not a threat that if she doesn't, something will happen. It's not, hey, go tell her this. It's a comment that somebody should be quiet essentially or not say, you know, so it's not even really a threat. And again, if he was going to convey a threat --

THE COURT: But he's a member of the Southwest Cholos and presumably, she knows that. And so, that comes with everything that by reputation of intimidation, et cetera the Southwest Cholos pride themselves on. I mean, that statement comes with a context. And so, he has to recon with that fact, doesn't he?

MR. WILLIAMS: I don't -- no, no. And I'm troubled by the comment that the Southwest Cholos pride themselves on that because there's no evidence of that from the PSIR before the court. Is it this idea that --

THE COURT: I just said, like, having read the PSIR. I don't know anything else about Southwest Cholos, but I see a

lot of references about gangbanging and intimidation --

MR. WILLIAMS:  I know --

THE COURT:  -- somebody from MS-13 who was killed.

MR. WILLIAMS:  MS-13 --

THE COURT:  And then other things that had to do potentially with -- not like doing any increases for that, but there's a lot of in the PSIR that was not factually disputed that's just sort of like the Southwest Cholos are a very tough and rough group and everybody knows that.

MR. WILLIAMS:  Well, the Southwest Cholos are a street gang.  They're a street gang of young men.  They're not an international criminal organization or even a prison gang. And so, this is part of why when I contended earlier that this wasn't a Cholos criminal activity, but in the criminal activity they included Cholos.  It's not something that's -- even if you go on the Houston gang database and you see they have a chart that says this is a prison gang, international, whatever, whatever, MS-13 checks all the bad boxes.  Southwest Cholos is literally a street gang in Southwest Houston; it's a regional, you know --

THE COURT:  Right.  But a street gang in the vicinity of a middle school who's going to be familiar with the street gang.

MR. WILLIAMS:  That's, I mean --

THE COURT:  And the point of a street gang is to have

a reputation, if I'm not mistaken.

MR. WILLIAMS:  Perhaps.  Perhaps.  But with -- against who?  Against other gangs, for example, he was --

THE COURT:  You know what I mean.

MR. WILLIAMS:  Without belaboring the point, the issue was was this obstruction of justice such that she would not, you know, participate in some type of investigation of law enforcement.  And, you know, obviously she did, so if it was a threat, it wasn't successful.  But if we look at what he actually says and who he says it to, are you really going to convey a threat through a school resource officer?

I think that we're making a little too much about an offhand remark that may or may not have happened, such that this two points, which is traditionally when you say, okay, are we going to -- you know, after prosecution has commenced, for example, does the defendant do something to intimidate, you know, a witness so that they don't appear in court or give testimony or something to that effect.

And so, I mean, this offhand -- this reported statement years earlier that someone needs to keep their name out of his mouth, I don't think rises to that level under the guideline.

THE COURT:  Mr. Goldman.

MR. GOLDMAN:  Yes, Your Honor.  I think this is a very straightforward point.  At the time, the administrator was

already talking to many of the victims, many of the girls that were being recruited to work as brothels for the defendant and members of his Bellaire clique.  And as a result of that, when she started investigating and talking to these girls, that's when the defendant came to the school.

I would note that under the document provided to the court and the report that's been adopted, after the report was made, so after the administrator made the report -- this is on Page 2 of our objections, Your Honor.  After the report was made, the defendant attempted to confront N.G.L. at the school but was approached by a school resource officer who then informed the administrator, and then the defendant did tell the resource officer the administrator needed to keep his name out of her mouth.  That's clear -- I don't know how that's not a threat.

The fact that the Southwest Cholos were so powerful and so strong that he's not afraid to do it to an administrative officer --

THE COURT:  Okay.  I agree.  Subject to Mr. Williams, do you want to respond to that?  I think I've heard enough on it.

MR. WILLIAMS:  Then we anticipate your ruling, Your Honor.

THE COURT:  Yeah.  I'm overruling the objection. It's also part of the record that the school administrator,

that she took the defendant's statement as a threat against her.  And I just think the fair context of that statement would intimidate and otherwise unlawfully influence a potential witness, so I overrule the objection.

So the Objection 7 was as to career offender, and probation conceded and made the revision on that basis, correct, Mr. Williams?

MR. WILLIAMS:  That's correct, Your Honor.

THE COURT:  Okay.  And then Objection 8 was really something that would change the offense level, the ultimate calculation if other objections had been granted.  But I think with where we are, that stays where it is based on rulings that I've now made.

MR. WILLIAMS:  I believe that's correct.

THE COURT:  Do you know what I mean?

MR. WILLIAMS:  Sure.

THE COURT:  It's like in prior objections, you're saying, well, this plus two shouldn't be there, et cetera.  And so, then Objection 8 was, and if you agreed with that, this is where it would total.

MR. WILLIAMS:  I always include what I think the advisory computation should be just so everybody can visualize it.

THE COURT:  I think it's -- no, I think it's a good thing to make sure it's on everybody's plate.

MR. WILLIAMS:  Right.

THE COURT:  But that's what it was, right?

MR. WILLIAMS:  That's all it was.

THE COURT:  Okay.  And I've overruled the objections, and so, that objection is overruled because it remains calculated at the total offense level of 39 and criminal history category of four for guideline imprisonment range of 360 months to life.

Are there any other objections that I've overlooked?

MR. GOLDMAN:  None at this time, Your Honor.

THE COURT:  Mr. Williams, was there anything else?  I think that we have covered yours.

MR. WILLIAMS:  No, there are no more remaining objections that affect the guidelines calculation.

THE COURT:  All right.  So the objections have been resolved as now noted on the record.  Some were overruled.  The other that were corrected by probation along the way are treated as grants of the objections and the PSR has already been amended on that basis.

So with that, I had previously deferred decision on whether to -- was this just one count against him?

MR. GOLDMAN:  Yes, Your Honor.

THE COURT:  Okay.  So that actually didn't defer accepting the plea agreement.  There's no counts to dismiss.

MR. GOLDMAN:  There is Count 1 to dismiss, Your

Honor.

THE COURT:  There is Count 1 to dismiss.

MR. GOLDMAN:  Yes.

THE COURT:  All right.  Well, then I did defer.  And so, I do accept the provisions now of the plea agreement, and so, Count 1 will be dismissed at the conclusion of these proceedings --

MR. GOLDMAN:  Yes, Your Honor.

THE COURT:  -- on motion of the government.  So I calculate the following advisory guideline range.  A total offense level of 39, criminal history category of 4, a prison term range of 360 months to life, ineligible for probation, supervised release term of not less than five years, a fine between $25,000 and $250,000, restitution is mandatory but not determined right now, a special assessment of $100.

I will note that the 39 reflects the three-point reduction, but the government made a submission suggesting that perhaps that wouldn't -- shouldn't apply.  Where are you on that at this point, Mr. Goldman?

MR. GOLDMAN:  Your Honor, first is the guideline would be relevant because even at a 42, he would be at 360 to life, so we do not believe that would affect the guidelines at all.

THE COURT:  All right.  And so, then it is as I stated 39 and 4 with those numbers.  Is there any other -- is

there objections or clarifications to that that are needed, but that's where I think we are.

MR. GOLDMAN:  Nothing further, Your Honor.

THE COURT:  Mr. Williams.

MR. WILLIAMS:  My objections are all on the record.

THE COURT:  They've been made and ruled on.  All right, so at this point, I have to consider the relevant factors set out by congress to ensure that I impose a sentence sufficient but not greater than necessary to comply with the purposes of sentencing.

At this point in the proceeding, if here were victims that wished to be heard, they would be now heard in person if they were here.  And I just confirm, Mr. Goldman, there are no victims that will be speaking today, but I do now have a further written statement; is that correct?

MR. GOLDMAN:  That is correct, Your Honor.  And again, she was present, but based on what we represented to the Court happened, she is now too afraid to appear.

THE COURT:  Okay.  Mr. Williams, it's a handwritten in large letters, but it does sum up to six and a half pages. I was just handed it a moment ago.  I think you just got it. Have you had a chance to read it?  I have no read it yet.

MR. WILLIAMS:  I have skimmed it.  It looks substantially similar to a prior handwritten statement that she -- that was submitted in discovery about the events of her

victimization.

THE COURT:  Do you need more time?  I want to sit here and read it for a second because I didn't get to do that.

MR. WILLIAMS:  No, I'd like to have a few more minutes if that's what you're asking.

THE COURT:  Yes.

MR. WILLIAMS:  Okay.

THE COURT:  Okay.  So let's take a reading because I haven't looked at it yet.

We're off the record but not in recess.

Okay.  I'm ready when you are, Mr. Williams, and take your time, sir.

MR. GOLDMAN:  Can we just have another moment, Your Honor?

THE COURT:  Of course, as long as you need.  I'm just letting you know I'm ready when you are.

MR. WILLIAMS:  I'm completed with it.

THE COURT:  Okay.  I've read it.  I had also read her previous victim impact statement, so both of these are part of the record.  I don't know that there's more to say about it, certainly not by me right now.  Y'all can refer to it as you see fit in your argument and recommended sentence.

My procedure is to hear from the government first, then from you, Mr. Williams.  Mr. Goldman, you can respond to anything that you want.  Mr. Williams, I give defense counsel

the last word before I hear from your client, so that's how we'll proceed.  Mr. Goldman.

MR. GOLDMAN:  Yes, Your Honor.  I asked if I could use the ELMO just very quickly.

THE COURT:  You may.

MR. GOLDMAN:  It's just a short few things that I've already turned over and it's from the Facebook page.

THE COURT:  Okay.  Let's not bring the screen down though.  Let's just put it on my monitor here.

MR. WILLIAMS:  If we can see them, that's fine.

MR. GOLDMAN:  And, Your Honor, I wanted to show -- if I may begin.

THE COURT:  I'm ready, yes.  I have it here.

MR. GOLDMAN:  Your Honor, so the reason I asked to use the ELMO and to -- I know we've made reference to the age of the victim countless times, as Mr. Williams has pointed out and the court has pointed out, because we're not just dealing with a 14-year-old.  In this Facebook postings that both counsel and I have referenced in our sentencing memorandum, you see what the victim looked like at the beginning of this.  I use this because they're very small in the photos I gave.  You can see photos here -- make sure it focuses -- and this one in particular, Your Honor.  These are when the relationship began.

THE COURT:  Okay.

MR. GOLDMAN:  The reason I point this out, Your

Case 4:17-cr-00651    Document 1228    Filed 10/23/25 in TXSD    Page 83 of 120    Page 83

Honor, is that when looking at these pictures, this is a child. I know we refer to a 14-year-old, but when looking at these pictures, this is not a mature woman for her age. The pictures show you a child in a very -- so we've talked about a 14-year-old, but I think the pictures bring home how young she was.

And then after this lifestyle, we see what became of her. I mean, this is -- this is I think a big crux of this offense. I'm done with the ELMO. But I wanted to point that out, Your Honor, is how young, we call her N.G.L. I think everybody knows her name, but we're going to keep it N.G.L.

THE COURT: We're going to keep it N.G.L.

MR. GOLDMAN: Yeah. This is a child. We refer to a young woman, teenager, but this is a child. A child who, when the defendant gets out of jail -- I mean, he wasn't, you know, just some regular guy looking for a date. He gets out of jail. The PSR documents has extensive criminal history. That he then goes for this child and starts dating a child. Knowing this child is vulnerable because she's a runaway, knowing she has a prior history of sexual activity, he then takes advantage of her.

And I think it's partially that overwhelming use of psychological force to come out of prison, to be the leader of the sect of Bellaire, to have all this power over all these individuals and take this child and then start dating her, start having sex with her, and then the only way to describe it

is pimping her out.  She doesn't want to go back.  He knows that, so he uses that psychological power, that emotional power, that emotional blackmail to take this child and tell her if you want to work, I got one way for  you.

He makes her get a fake ID to work there.  He then has her go there.  He knows exactly what's going on at that brothel.  She describes in her statement how she was always chosen first.  It may have been a few weeks, it may have been a few months -- she wasn't very clear on that -- but the fact that every day, except when she's having her period, man after man after man is having sex with this 14-year-old so that she can pay this defendant rent, so that she can pay off Walter Lopez and Anadalit Duarte is just a truly heinous, heinous act.  And then we learned that to calm her down, the sister of this defendant is giving her drugs to make sure she keeps working.

She has indicated in both her statements how she is still afraid of this defendant, how she is begging the Court not to be -- I don't want to say fooled, but it's the only word I can say.  Counsel quoted Dylan, I'll quote The Who, "don't get fooled again."  He keeps relying on the fact that he has a disability to ask for sympathy.  But we see the pictures that we've attached while he's in this wheelchair, guns pointed at people.  We have the police report of what happened to C.G. where he's shooting at her after the injury.  We had the picture of ammunition everywhere.  We have a search warrant of

his house when the state charge comes where he has guns everywhere in his room, despite the disability, so he's incredibly violent.

I mean, I know that she is not here anymore and I can't attribute what happened to the defendant, so I'm going to hold my powder on that.

One of my issues, Your Honor, and the reason that I have trouble with what the defendant is doing is this sentencing memorandum, where it appears to me -- and the only way to put this is that it's blaming the victim.  I can't read that sentencing memorandum any other way; that this is a memorandum saying this is all the victim's fault.

Again, I said it, I'm going to say it again, she's 14, Your Honor, very youthful.  She has a troubled history and, because of that, a sentencing memorandum goes after this victim and the most shocking language possible saying that she wants this lifestyle, she knew what she was doing.  She's a child, Your Honor.  And to do this to a child, she talks about how she can't have -- she can't hug her husband sometimes.  She talks about how she's afraid to go to certain areas.

I have Special Agent Morales here, who can explain to this Court and I can proffer that during trial prep, she wanted to take her to some of the locations where this happened to identify them so we could provide pictures during trial.  And N.G.L. was too traumatized to even go to the flea market where

the ID got obtained; that's how traumatized she was.  We have other statements in which she indicates that not only did this happen, but Mr. Reyna himself would go solicit clients for her at the flea market.

And regarding his activities, this car wash that keeps referred to.  He got the money to pay the rent.  She did the sex, he got the money; it's as simple as that, so it's not like he's innocent.  Regarding the car wash, Your Honor, I had detective from Harris County, Viviana Guera here, who is a member of the Texas Anti-gang Task Force.  He can explain to the court -- and, again, I'll proffer it, but if testimony is needed, I'll get it -- that giving car washes to deceased fellow gang members is a common practice.  It doesn't show some sort of impunity on the part of the defendant.

The defendant was the leader.  We've seen other evidence.  Counsel in his -- in the sentencing memorandum, we talked about some of the other victims that the principal identified.  Counsel said, well, some of them didn't identify the defendant specifically in their CAC interviews or in their other interviews.  Well, two of them did, J.S. and C.G., they both identified him.  Counsel has challenged them regarding the dates and when he was in prison and their ages, but they both positively identified him.

And, quite honestly, Your Honor, we would support it belies reason to think that the defendant with his criminal

background, with what happened here would only limit his actions to one individual and one individual only. He was in charge of these other individuals as part of the leader of the sect, to get some of these other girls that were not one of those three to engage in their activities. A lot of them talked in their police statements about how they were sexually assaulted by the defendant, including C.G. C.G. talked again about how she was shot at by the defendant; a police report was made to that effect. And that's just regarding this incident and this incident alone, Your Honor.

But then the PSR, if you look at the PSR, Your Honor -- I know the Court has reviewed it extensively and now I can't find my most recent version of it. But it talks about the lengthy, lengthy criminal history of this defendant. It is not -- this is not a one-off thing for him. I mean, if we just briefly go through it and I'm not going to go through everything, but we have drug possession. Okay, drug possession. But we have burglaries of vehicles. We have the robbery causing bodily injury. I mean, you know, we have a possession with intent to distribute and a rather serious one, and he keeps getting convicted and convicted and convicted.

And then we have, of course, the felon in possession of a weapon and he got 10 years for that, Your Honor. So he already has this reputation. He has a 10-year sentence. And what does he do when he gets out of that 10-year sentence? He

does these heinous, heinous acts towards the victim and who is now too afraid to come here.

Paragraph 75 discusses what happened to C.G. where he's shooting at her. He's charged with directing gang activity. The record from his social media is just replete with all the criminal actions he commits, the constant displaying of guns, many of those again after his felony convictions; those are in and of themselves, other crimes that he commits. This Court has referred, at the plea of Maria Angelica Moreno-Reyna, that these are some of the worst facts Your Honor has ever heard. And I see Ms. Bagshaw here; she was present when that happened.

I would submit that when you talk just about N.G.L. and what happened to her and what this defendant did. Just take that in isolation. Those are those worst facts this Court ever heard. He's recruiting at a middle school. He's threatening officials at a middle school because he thinks he can get away with it. He's having his sister give the underage prostitutes drugs. He's having other sisters --

THE COURT: Let me ask this, Mr. Goldman.

MR. GOLDMAN: Yes.

THE COURT: Because, as we've been at this for a while and I think you all are both aware and appreciate that, I have read the PSR very closely. There is -- and so, I do have familiarity with the background facts. I think you might --

you're going to want to respond to characterizations that Mr. Williams makes.  But I think it's important the guideline range still is quite broad at 360 to life and so, where are you arguing.  I don't know where you are on that.

MR. GOLDMAN:  I was trying to get to that, Your Honor, because I have --

THE COURT:  No, I understand that and I'm saying I really do have the factual background of the crime in mind.

MR. GOLDMAN:  Yeah.  So, Your Honor, I have to be honest and I've talked to counsel about this.  I've been struggling with this.  We are somewhere in between 360 and 480, I'll be honest.  When I first talked to Mr. Williams, I will be honest and this is during our conversations, I had 360 in my head as sort of my guesstimate as to where it would be, giving him the benefit for pleading guilty, which I think saved the victim from having to endure a cross-examination, so we do think that he does deserve some credit for that.

But just looking at the heinousness of this crime and I'm very troubled by the, what I consider, victim blaming in that sentencing memorandum.

MR. WILLIAMS:  Your Honor --

THE COURT:  You'll have a chance.  You really will have your chance.  And you've previewed it before, which I've heard, so you're going to get time on that.  Don't worry.

MR. WILLIAMS:  Okay.

THE COURT:  I understand.

MR. GOLDMAN:  I think that the 3553(a) factors compel something higher than the minimum.

THE COURT:  The 360.

MR. GOLDMAN:  So, therefore, we do believe --

THE COURT:  So you're tossing it to my discretion, but somewhere up to 480.

MR. GOLDMAN:  We would think that.  We said at least 360.  If you had to peg me down to a number, I think 480.

THE COURT:  All right.  You're going to have more time.  Obviously, you know, you've done these in front of me before.  Mr. Williams, now, what would you like to say?

MR. WILLIAMS:  So I have a lot to say, so I'll start with where we left off.  Our memo is not victim blaming.

THE COURT:  I'm sorry?

MR. WILLIAMS:  Our memo is not victim blaming.

THE COURT:  Okay.

MR. WILLIAMS:  There's no way we would.  We have -- everybody in this courtroom agrees these are terrible facts, this is a terrible crime, and nobody's here to minimize or dispute that.  The purpose of putting into the context the history of this defendant and what happened to her, we put in there what happened to her.  We stuck to the record of what happened to her.

What's terrible about this and I alluded to earlier,

the tragedy for everybody is that when you look at gangs and gang life, you know, you don't go over to Hedwig Village and recruit gang mentions.  You go to the Gulfton ghetto because there's broken families, there's kids, there's adults behaving like children, adults that have drug problems, adults that have to work three jobs to make ends meet.  There's adults in prison.  So you recruited among the kids that they're looking for a substitute family.

And we show that that's part of what happened to this defendant and the tragedy of is that it's a false family and that's, in part, how they recruit N.G.L.  Because obviously, her own home life is broken as well, so she falls for the allure of this fake family of the gang, which is itself an abusive family.  It's not a family and it's abusive.

And so, we put that context because these relationships, they're complicated and confusing because these people talk about themselves as their friends or their home boys and their girlfriends, but at the same time, they're making each other do horrific things that have no place.  It's just terrible, it's a tragedy.  We're not blaming her.  We're showing that this is a tragedy for everybody involved, though she obviously does not have any culpability; that this is the problem.

And if we look at where Hector started and we look at him, I would be shocked if he wasn't before Your Honor or some

other judge because you can see his progression through crime through petty offenses as a juvenile up to a 17-year-old of smoking weed, breaking into cars, up to purse snatching.  And then as soon as he gets out of teens for that, he's caught on a drug smuggling.  So nobody's minimizing his criminal history or what happened to this particular defendant.

But I'd like to zoom away from that and talk about what we're here to actually do and your role in it because Mr. Goldman touched on something that's very important, is that my client pled guilty.  And just from the purpose of judicial economy and this judge with discretion, what we've seen from the Supreme Court for the past 25 years is your discretion is growing, okay, from the time of Booker and Baker saying the guidelines are advisory in this context, to more recently in the Loper Bright decision in saying that Your Honor doesn't have to defer to an agency interpretation in otherwise ambiguous circumstance, which under Keyes or (indiscernible) doesn't necessarily apply to the guidelines.

But I mention it to illustrate that your discretion is greater than the guidelines and that's what 3553 says.  And I bring it up because I get concerned when at the commencement of a sentencing hearing a judge appears to give deference or speak of the guidelines as if they hold this greater importance than the Supreme Court has empowered you with.

All of our time spending fighting over these

byzantine guidelines that are come up by bureaucrats and the sentencing commission and I've known people -- I've practiced in front of judges on the sentencing commission.  I've known people who worked there and they're well-meaning and it's great, but it's a little bit like you see in the old movie, "Dead Poets Society," we're judging a poem based on the ruler. You know, we've reduced this man's life and his actions in this tragedy to a chart where we measure here and measure there based upon -- we're questioning -- I mean, the absurdity of some of our debates today, we're questioning what the definition of undue influence is, instead of looking at really what's appropriate in this case, not whether this fits into this particular rubric.

And I doubt -- I haven't pulled --

THE COURT:  But the sentencing guidelines, and you could go back and read a law review comment to 3L law student -- me -- who in 1989 was dealing with what was then the new sentencing guideline range.  And it is, you're taking a statute that could say -- I'm not even sure what the statute for this one says, but it could say any term of years from one year to 20 years or five years to life and taking factors that zero in a range that's there.

And so, the way I approach is is two things, is what about it -- I've overruled the objections, so it's -- no, no. But then in terms of the argument is, what do you see that in

these points that have been earned by the conduct are overcompensating given the circumstances or what is there that's mitigating that's not there that takes it down.  Like, one thing that I know that you've said is he has since been shot and he's in a wheelchair and et cetera.

But I do -- it's not that the guidelines are just this willy-nilly thing.  It has zeroed in on a very broad range of years to what's still broad, 360 to life.  So where are you on that?

MR. WILLIAMS:  As a product of my own culture, if someone had tasked me to take -- and I'm going to make a comparison of Texas law.  So first degree felony in Texas law has a range of punishment, absent some special things, of five to life, okay, 5 to 99 years or life and up to a $10,000 fine. And so, when we do jury punishment or judge punishment hearings after in the punishment phase of a trial, assuming that there's a conviction, we have to do that as lawyers because we don't have that framework.

But if somebody said to me, hey, Tate, I want you and some of your, you know, not so genius and your other genius friends to go in a room and come up with a guidebook for judges, as they've done in other states, it would be very similar to what we have because, otherwise, you're taking for -- you're trying to make sense of this, and I understand what you've asked through that context.

I just, sometimes I think -- and that's what my lead in is, is that I think that we're forgetting something that the guidelines overlook and what they overlook is that we're people, we're not numbers. And the criminal justice system, much like the people it's designed to address, does a pretty good job of dehumanizing people and the irony of that is not lost on me. Because you would say, and I don't think my colleague would disagree, that you have to dehumanize somebody to do to them what happened in this case.

At the same time from the point of entry for this gentleman or others and through the system, they're dehumanized; they've given an inmate number, they're given a case number and they become a number. And the criminal justice system is, in fact, a very dehumanizing process. And I've told my church Sunday school class or others, what I say a lot of my job again is to remind people that this is a human being too and he had a mother. Unfortunately, I don't think anybody would dispute that he had a good mother and he had a father. And at some point in time, he was a baby in her arms and I don't think this is what she wanted for him and he was 3 or 4, I don't think this is what he wanted for himself.

But he took a different path and that's what we have to deal with. So how did he get on that path. And I think it's important, because the guidelines do not address where he started and what the framework and the tools that he had. I'm

not saying that every kid that grows up off Gulfton and Bellaire is bound to be a federal defendant.  No, but you have to be exceptional to succeed.

I went to a private boy's school a mile from there at Strake Jesuit.  Most of my friends were from much more privileged backgrounds.  We didn't have the opportunity to fail in the way that he did.  It's a universe that I can't even begin -- well, I can begin to imagine because I'm a criminal defense lawyer and my dad owned a construction company or a painting contracting company.  I've been around immigrant communities.  I've been around, unfortunately, some of this my whole life.

And so, when I look at this individual and I ask you what's mitigating about him, look at what he started with before he started making the worst decisions that any human being in the United States could possibly make.  Because we looked at human traffickers and child exploitation worse than we look at murderers because there's a lot of reasons you might kill somebody that we would all agree with.  We just, you know, can't tolerate that conduct, and so, we have to punish it.  Whereas, there's not a lot of us that look at child exploitation and think, oh, I would do that.  No, unless you're in Jeffrey Epstein's, you know, conspiracy, you know, or something similar, whether it's XIV or the other high profile things that come to mind, there's not a constituency for that.

It's not a jury situation where everybody on the jury or at least half of them have drunk driven in a DWI trial.

And so, we look at him now, okay. He's been in custody through no fault of the court for now eight years, 93 out of 96 months to be precise. We're talking about events that happened in 2014. So with this defendant born in 1991, from the time period that this conduct happened, he was in his mid-20s; he wasn't even 25 yet. And there's an old colloquialism that, you know, you can be old enough to drink but your car insurance doesn't go down as a young man because your brain is not fully formed.

But regardless of that, he made these awful decisions and he was a part of a lot of really bad criminal activity. It's documented, we don't have to dispute that. But for eight years now, he's not only been in custody, he's an older person and we know that people age out of crime, Your Honor. And while he did commit -- excuse me -- while he did do bad things and certainly when he was arrested, what was found at the apartment certainly speaks for itself, we're not going to concede that he committed everything that HPD's ever investigated him for and we're not asked to do that.

But this is someone 12 years later, 11 years later maybe to be more precise. He's been eight years in custody. He is from an underprivileged background. There is, just as much as there is an undue influence purportedly or use of

minors of his sisters and him on others, you also have to look at the influence of his mother on him in this case and others. And so, these are mitigating factors that the Court can consider that aren't addressed by the guidelines. And I mention them because these are also the types of things that I cite in the memo that the U.S. Sentencing Commission, when it does its annual survey of judges, of why did you get a variance or departure. And I list the number of times and there's a hyperlink in my memo where you can look at it and say, oh, well, you know, we didn't think the guidelines sufficiently addressed XYZ, so I linked to that. I gave the reasons at the end. Because these are things that other judges have said, like these -- and the number of times that this is important.

So his background, his path here, and then the fact that he is in a wheelchair and what happened to N.G.L. is tragic and the consequences, as you speak, they were tragic, but this man will never have a family. He's a paraplegic. He's not going to have a family; he can't reproduce, okay. He's in a wheelchair at a jail. We've talked about his medical, we've argued about it and fought about it. But the bottom line is he has open wounds, and perhaps justly so, that he's going to require significant medical treatment. If he's released, he's not going from Club Fed back to a mansion and a lake house. He's probably going back to some other poverty situation where he's going to end up on Medicaid and

disability.  His future is bleak regardless of what the sentence here is today.

We'd ask that for a period of incarceration, before I forget, that he be -- you recommend the Federal Medical Center at Fort Worth.  I think it's appropriate.  If the BOP determines otherwise, that's fine, but we ask that you recommend that.

THE COURT:  I will make that -- he's obviously getting a prison sentence and I'll make that recommendation just so that it's noted and I don't forget it later.

MR. WILLIAMS:  I would also ask that -- two other things I'd like to mention about this case and this defendant, is that his crimes -- and I'm not going to get into the weeds of it because you're going to hear from him and he accepts responsibility and you're going to hear from him.  He knows he's done wrong and he knows what he did with her was awful.  But he was a younger man and he was in the gang life at that time and you can't see beyond that.  I contend that that deserves some consideration.

But he also should not be the scapegoat for every crime that the Southwest Cholos have ever committed.  His conduct in this case is bad and it's enough.  You don't need to punish him for those other things.  And the only reason that we addressed those other potential individual complainants is because the government brought them up and there is conflicting

evidence.  And the part of this factors into why he pled to what he did.

But really going back to the guilty plea, there are a couple of things to think about.  Number one, this defendant, despite his prior conduct, he's not a danger to anyone anymore.  I contend that he's aged out of whatever street gang life he had prior to incarceration for eight years, but he can't enforce or impose his will on anyone anymore.  And he may, as I know the government will show these pictures of him with guns, you know, et cetera, but that's eight, nine years ago and he's been out of that life.  The people there don't even know who he is.  I mean, there's nobody to deter that's going to remember who he is and he can't go -- they don't have an old timers day at the Southwest Cholos.

Finally, I ask Your Honor to consider going back to the judicial resources and economy.  This court -- the statistics change annually.  But I would submit that in the Southern District of the Fifth Circuit that 90 plus percentage of cases, criminal cases --  first of all, the Southern District and the Western District are the two busiest criminal dockets of all federal courts in the country.  I think that one of the districts in California is a close third.  It varies year to year and 2020 was an aberration, so you can throw that out.

But of those, there is a dying jury trial.  We have

less than single percentage jury trials.

THE COURT:  That is true.

MR. WILLIAMS:  And that's good for you and that's good for the court because 80 --

THE COURT:  You're wrong.  I try to get my cases to trial and I try to have --

MR. WILLIAMS:  Judge --

THE COURT:  -- both prosecution and defendants and plaintiffs and defendants ready for trial.  And I'd say I've got the most wide open trial docket and I've got all the time in the world and I can't get anybody to go to trial, but I try.

MR. WILLIAMS:  Judge, and that's where I'm headed. Your Honor, I ask you to think about your criminal docket.  And I'm pretty sure when you were becoming a judge when they had the sentencing thing, they didn't ask you about criminal cases, even though that's most of what you do.  Everybody wants to know what you think about abortion and other stuff.  The reality is, you're in here sentencing every week.

THE COURT:  Oh yeah.

MR. WILLIAMS:  You might get one abortion case every 10 years.  But from that perspective, you had three criminal jury trials since you've been a judge that I'm aware of, maybe two and one bench trial.  Is that right?

THE COURT:  I think it may be four --

MR. WILLIAMS:  Oh, I missed one.

THE COURT:  -- and one was a bench trial.  And, off the top of my head, it's not a plethora, I will tell you that.

MR. WILLIAMS:  No.  And I would suggest, sight unseen, that puts you above average in this building.

THE COURT:  With that many trials?  No, no, no.  I'm always amazed that Judge Tipton and Judge Bennett and Judge Hanks in particular, they seem to be in trial a lot.

MR. WILLIAMS:  Since I've been tracking it, apparently in the entire --

THE COURT:  I should probably look this up myself.

MR. WILLIAMS:  -- the entire Southern District of Texas, all divisions, that includes the Corpus and the Valley, there are approximately 75 criminal jury trials a year.  That means, among all of the judges, that's one and a half of business, right?  That's a crime, in my opinion, because --

THE COURT:  So what's your point about that?

MR. WILLIAMS:  My point is though is it's also necessary because if by pleading guilty my client is going to get the same sentence he would have gotten had we just gone to trial and lost, then it's going to create a problem because there's no incentive for people to plead guilty.  And he shouldn't get a sentence -- and this is where it comes in back go the guidelines and this is what it officially doesn't take into account -- that three points, that acceptance three points gets swallowed the further down and to the right you go into

the chart, where the benefit is swallowed; it becomes di minimis.

And so, in the interest of not just that the guidelines do not sufficiently take into account the value of acceptance for offenders with larger criminal histories and more serious offenses, to put a technical argument, okay. It doesn't take that into account sufficiently. It just becomes, because as you can see at a certain point, three points doesn't matter even in Category 4 between 43 down to 38 or it becomes decreasing value.

THE COURT: But tell me why -- tell me why on the acceptance of responsibility, pleading out. In other words, if he went to trial and was convicted based on other testimony that I heard, it would probably be a mandatory life sentence and that's a lot of what --

MR. WILLIAMS: Well, it's not -- this is what --

THE COURT: Mandatory in terms of the guidelines.

MR. WILLIAMS: Advisory guidelines, that's true.

THE COURT: Advisory guideline. The advisory guideline range would be life. And so, in one sense, I would say you've done a great job because we're talking about whether we're going to vary downward from 360 months. But for a young man, 360 months to life and the alternate is 480, there's a lot of room to go above 360 that credit has been obtained for the plea of guilty and accepting responsibility.

MR. WILLIAMS:  Well, to the person hearing it --

THE COURT:  I commend the defendant for accepting responsibility.

MR. WILLIAMS:  Yeah.  It's a plea, but it's not a bargain.  And it really -- I mean, I'm being serious that we look at it, it's of diminishing value in more serious cases, and so, it deserves more credit than three points.  And the guidelines don't -- there's not a provision that reflects that and there's not a departure that reflects that.  And so, that's why I request a variance because a variance isn't outside the guideline sentence because the departures are limited and most of them are bad.  And so, I think that his acceptance actually is worth more than three points in this context, even given the horrific crime that he's been charged with.

THE COURT:  Your specific request was for 120 months or was it less?

MR. WILLIAMS:  My request in my memorandum was the mandatory minimum.

THE COURT:  Which was?

MR. WILLIAMS:  It's 120 months.

THE COURT:  Which is 120 months.

MR. WILLIAMS:  Yes, and he has 93 months in the way I calculate it.  And with respect to -- so, we're asking Your Honor to consider a substantial variance down from what you calculated based upon the rulings of the applicable guidelines

range of 360 to 480.  We're not victim blaming, we're not. There's no way you could blame this victim for anything.  We were trying to show that the gang life is -- what attracts people to it, it's false.  It's destructive for its members as well as its victims and no more than that.

And so, I ask you in closing to consider also -- and finally, this is the first defendant of many.  I know you've got -- excuse me -- you have most of the sentencing in this case left to go.

THE COURT:  Yet, but I have done some.

MR. WILLIAMS:  There have been a few.  I tried to track it, but it's a lot.  I've been busy and it's a lot to keep up with.  There were some that are early.  And this kind of goes back to something we discussed earlier is that, you know, I had a sentencing in front of a federal judge in another district in another state and he had in his mind this construct where for the people in a drug conspiracy.  He had ranked in his mind who he thought was more important and I was tracking the defendants for the same reason because there were a lot of them.  And he -- when I looked at the end because I kept following it even after my client was sentenced.

When I looked at where my client landed, you could tell for different reasons, he had -- he decided who was the most culpable and then their sentences reflected that.  And there was something else I could tie it back to, but I figured

that was it.  And so, even within where he varied in that case, it was still within that range where it put us between the next most and the next least.

And I don't know whether Your Honor engages in that type of analysis or you've had done enough in this case to even form that opinion.  And so, you can't put Hector at the top.  I know the government is going to say there are people that can be equally culpable and they could get the same sentence, and I don't dispute that.  I've seen that happen, and I've asked for it, specifically when I was trying to get the sentence that was at the bottom.

But, you know, but I ask you to consider really -- and I understand each person has different characteristics and different roles, but he's not in the top of this.  Is he a -- is his conduct awful?  Yes.  Does everybody have the same criminal history as Hector?  No, but that may just be because they haven't been caught.

And so, when you're evaluating what is an appropriate sentence for this individual, focus, please, Your Honor, at his family unit of origin and the path that he took that led him and the opportunities to make the horrific decisions that he made in this case.  You don't have to look far.  You just have to look at the rest of the indictment to see his mother.  Take that into consideration; the guidelines don't.  Take into consideration the value of acceptance in somebody with his

criminal history and under these things; the guidelines don't do it sufficiently.

And we ask for a substantial variance, preferably the mandatory minimum.  Thank you, Your Honor.

THE COURT:  Thank you.  Mr. Goldman.

MR. GOLDMAN:  Yes, Your Honor.  I'll try to keep it brief.  I will keep it brief then.

Your Honor, counsel referred to the fact that this was a long -- that he hasn't done anything bad for a few years. The only reason he hasn't committed any crimes is because he's been in jail, let's be straightforward.  If you look at his criminal history, the only times he doesn't commit crimes is when he's in jail.

Counsel referred to the fact that people in that neighborhood are recruited by gangs and the recruitment goes through this downward spiral.  Your Honor, the record is replete with evidence.  The person doing that recruiting is Mr. Reyna,  He's the recruiter.  He's the one that gets people into this lifestyle.

Regarding the acceptance of responsibility and not going to trial.  Your Honor, if he wants a trial, we'd be asking for life, okay.  So that's the benefit, I'm not asking for life.

I'd also like to refer to something that my former colleague, Sherri Zack, explained as to why sex trafficking

cases are so horrible and counselor compared them to murder cases. The reason a sex trafficking case is so horrible and Sherri Zack says this a lot better than I did -- I want to give her credit -- is that the pain, the suffering, the victimization to the victim never ends for the rest of their lives. It never ends. What N.G.L. had to go through in her life will never end. She explains even to this day, she still has trouble hugging her husband. She has still has trouble being close to her daughter. She still has trouble walking through certain neighborhoods without breaking down.

Agent Morales and Deputy Guera can tell you this entire morning before the events that happened here, she was in tears, breaking down. This never ends and that is something my former colleague, Sherri Zack, noted and it is true when she said it as it is today. That is why these crimes are so horrible.

Now regarding something else, Your Honor, I just want to refer to something about the victim's statements, both of them. She begged this court not to be fooled by the fact -- this is her (indiscernible) using, "Don't feel sorry because he's in the wheelchair. He's still as dangerous as ever." She explained that she still fears for her life from him, even though he is in the wheelchair. He got a huge break from one of your colleagues for being in the wheelchair when he rammed through a checkpoint with tons on marijuana on him. I mean,

this is a very dangerous person in the wheelchair or out of the wheelchair.

And finally, I know there was a lot of talk by Mr. Williams about, I think, a confirming hearing, the number of trials you have, what other judges are doing.  That doesn't go to the 3553(a) factors.  It is an interesting academic conversation, Your Honor, but the court -- Your Honor asked me to look at the 3553(a) factors.  And as interesting as those conversations are, those don't affect those factors and what this defendant did to that victim.

Thank you.

THE COURT:  Thank you.

MR. WILLIAMS:  May I make one point, Your Honor?

THE COURT:  You may.

MR. WILLIAMS:  One of the 3553 factors that I didn't argue, it's in our memo, is unwarranted sentencing disparity and I put statistics nationwide for 2017 to the present with charts in our memo with links to where Your Honor could use the analyzer.

THE COURT:  And what does it show?  I mean, just for --

MR. WILLIAMS:  Well, basically, what we're asking for would not be unwarranted sentencing disparity.  About 29 plus percent of people with a criminal history Category 4 with 2G with this as their primary guideline received a sentence

between 10 to 15 years.  And the average in the median are there and then the average, I believe the average term of supervised release was pretty substantial.  It was actually like 10 plus years.  So roughly the distribution of imprisonment link, 10 to 15 years with 29.8 percent, which is what -- the reason I mentioned it is because that's what we're asking obviously.  And then the average length itself was 185, the median was 151 and these are months.  And then for supervised release, and this is under distribution of imprisonment length.  The chart, the blue because there's other charts in the tool.  But the average and median supervised release for these filters was 171 was the average and then 120 months for the median.

THE COURT:  All right, thank you.  Mr. Reyna, as I had said at the beginning when we started, the defendant has a right to make a statement or present any information that you'd like me to consider that could mitigate your sentence.  I have read your acceptance of responsibility statement.  You can reiterate that, go over that again if you'd like.  But what else would you like to tell me before I impose sentence?

MR. REYNA:  Yes, Your Honor.  Thank you for listening to me.  I would like to say I'm sorry to N.G.L.  I know everything that she's been through, all the pain that she's be going.  I didn't know that I was causing her pain and suffering around the time because I was young.  I was never even much

focusing on what's going on.  I was just doing stuff without thinking, just without the consequences.

And since I've been in (indiscernible), like solidarity now because due -- because of my condition and my wounds, I got wounds and infection in the wheelchair because they got no place to put me in population.  Since I've been there for the past five, six months, I be -- what was that word again -- reflecting.

THE COURT:  Reflecting.

MR. REYNA:  Yes, sir, reflecting back on everything that happened in my life since I was a little kid.  I know and I admit it, I take full responsibility for everything that happened.  I know I committed crimes.  I know I'm not perfect. All I wish -- all I hope is wish at least from the bottom of my heart that she can at least accept my apology because every day, I regret every single time.  It's something I got to live with due to my conscious and myself.  I lost so much since I've been in jail.  And all I got to say, I know I'm a bad person in general, but I'll change in the way because reflecting all those times that I was even by myself.

I lost my stepdad.  He died.  My stepdad passed away. I never had a relationship at all, but my stepdad was the one I actually had more.  He died.  I'm missing out on my brothers and my family's lives.  My brother is right here, he's about to go in the military, my little brother.  My nephew, he's in

college, like I'm missing out on stuff.

And, like, all I'm asking is -- I'm sorry for everything that I did, especially to N.G.L. for all the pain and suffering that I caused her when I didn't even know that I was doing it.  You know what I mean.  And hope she finds it in her heart if she can to forgive me.  And like I said, I accept full responsibility for what happened, you know.  And I just ask to see if you can be a person and so at least -- I'm not saying release or nothing, but just be a fair sentence so I can at least in the future be home reunited with my family again if it's possible.

Thank you.

THE COURT:  All right, thank you.  All right.  I believe that the sentencing guidelines have already adequately accounted for the facts and circumstances pertinent to this offense and this particular defendant.  And so, I find that a variance from the guideline range is not appropriate here, but I find that the appropriate sentence is at the bottom of the guideline range at 360 months.  Because of the range that's there, 360 to life, even though I'm in the guideline range, I have to state reasons justifying where the sentence is imposed.

Government provisionally asks for me to consider up to 480 months.  I believe that the low end is sufficient if, for no other reason, than the defendant's physical condition.  But in terms of why I find a variance is not warranted, as I go

through the 3553 factors, I just don't see how a variance downward. And first of all, as to just looking at the specific - the crimes specifically as to N.G.L.

Mr. Goldman, this written statement that was submitted today, this is what she was going to read on the public record, correct?

MR. GOLDMAN: That is part of it, Your Honor. My understanding is that she did not finish it.

THE COURT: Okay. But this was intended to be read on the public record.

MR. GOLDMAN: Yes, it was, Your Honor.

THE COURT: So what, just so that we understand and that the record is clear about her experience and the consequences of what she is dealing with here, I have made observations about the threats and coercion and intimidation of her at age 14 as a runaway that was brought to bear and the administration of drugs to subdue her into doing this. But that the victim impact statement indicates that she then had to go to work every day to that apartment and that we're not talking just a little, but that it's 50 to 60 times a day to have sex with men that she doesn't know. That's what she was dealing with and that is not something that this court can simply look the other way or try to explain by a difficult upbringing or other circumstances in the background.

As to 3553(a)(1), the nature and circumstances of

this offense, account for that.  The history and characteristics of the defendant at Category 4 are certainly all points that were earned and are not in dispute here. 3553(a)(2)(A) is as to the seriousness of the offense.  I think what I've just summarized shows how serious it is and there is the need to promote respect for the law and to provide just punishment for this type of offense and I think the guideline sentence does that.

Then there is adequate deterrence to criminal conduct under (a)(2)(B) and under (a)(2)(C) to protect the public from further crimes of this particular defendant.  And I think that the record establishes that being in a wheelchair doesn't necessarily deter a gang member from continuing to direct and organize gang activity.  And so, I can't see a release, that the mandatory minimum of 120 months, which would only be a couple of years from now, is something that's protecting the public from potential future crimes of the defendant.

I do make the recommendation that he be in the Fort Worth medical facility as requested by counsel.

Oh, and I would also like to note -- I did want to note for the record that in the first impact statement just in terms of why crimes like this are so difficult and her statement there.  It's a victim impact form to be filled out. And among the number of things that can be ticked off as to reactions to the crime to what happened to the victim, she

states that she continues to experience anger, shame, anxiety, nightmares, embarrassment, fear, grief, depression, humiliation, guilt, and a loss of self-esteem.

And based on what I'm supposed to consider as to victims of crimes, I do think that that means that the appropriate sentence is within the guideline range.

With that, let me formally impose the sentence. Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the court that the defendant, Hector Reyna, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 360 months. Upon release from imprisonment, he shall be placed on supervised release for a term of 10 years. Within 72 hours of release from custody of the Bureau of Prisons, the defendant shall report in person to the probation office in the district to which the defendant is released.

While on supervised release, you shall not commit another federal, state, or local crime. You shall comply with the standard conditions that have been adopted by this court under General Order Number 2017-01, abide by any mandatory conditions required by law, and shall comply with the conditions outlined in the appendix of the presentence report.

As of the date of this recommendation, no restitution claims have been received. But pursuant to 18 U.S.C. Section 3664(d)(5), if the victim's losses are not ascertainable by the

date that is 10 days prior to sentencing, the attorney for the government with a probation officer shall so inform the court. And I will set a date for the final determination of the victim's losses not to exceed 90 days after today's date. I don't think I have any requests or specification in on that yet; is that correct, Mr. Goldman?

MR. GOLDMAN: That's correct, Your Honor. She did not indicate any (sound drops).

THE COURT: If there's any forthcoming, I will take that up when received, but would need to be within 90 days. Such order may be granted only upon showing of good cause for the failure to include such losses in the initial claim for restitution relief.

I find that the defendant doesn't have the ability to pay a fine, so fine is waived in this case. It's further ordered that the defendant pay to the United States a special assessment of $100. That will be paid in payments, the greater of $25 per quarter or 50 percent of any wages earned while in prison, in accordance with the Bureau of Prison's inmate financial responsibility program.

As to forfeiture, is there anything I need to do now on that, Mr. Goldman?

MR. GOLDMAN: For this defendant, no. I think the one remaining one -- I see Ms. Bagshaw here is going to be Ms. Bagshaw's client. We're going to have some issues on that

soon.

THE COURT:  It's fine, so long as I have anything that I need for purposes of the record today.

MR. GOLDMAN:  Nothing today, Your Honor.

THE COURT:  All right.  That concludes the formal imposition of sentence.

Mr. Reyna, you can appeal your conviction if you believe that your guilty plea was somehow unlawful or involuntary or if there's some other fundamental defect in the proceedings not waived by your guilty plea.  Under some circumstances, defendant can also appeal the sentence, but the defendant can waive right as part of a plea agreement and you've entered into a plea agreement which waives some or all of your rights to appeal the sentence itself.  Such waivers are generally enforceable, but if you believe that waiver itself isn't valid, you can present that theory to the appellate court.

You must file any notice of appeal within 14 days of the entry of judgment or within 14 days of the filing of a notice of appeal by the government.  If requested, the clerk of court will prepare and file a notice of appeal on your behalf. You have the right to request to proceed without payment of costs if you can't afford costs, and to have an attorney appointed to represent you if you cannot afford an attorney.

Is there anything else from the government?

MR. GOLDMAN:  Nothing else from the government. We'll file our motion to dismiss the remaining count via ECF later today or tomorrow.

THE COURT:  Okay.  Mr. Williams, anything else.

MR. WILLIAMS:  No, sir.

THE COURT:  Were you CJ appointed your --

MR. WILLIAMS:  Yes, sir.  I'm the second.

THE COURT:  All right.  I commend you on your service very much.

MR. WILLIAMS:  Thank you.

THE COURT:  You've spent a lot of time on this and thought about it a lot and I would say that that was in the best traditions of the law, so I commend you for it.

MR. WILLIAMS:  Thank you.

THE COURT:  The defendant is remanded to custody and we are adjourned.

CLERK:  All rise.

(Hearing adjourned at 6:10 p.m.)

* * * * *

I N D E X

RULINGS

|  | Page | Line |
|---|---|---|
| Sentencing | 115 | 7 |

C E R T I F I C A T I O N

I, Sonya Ledanski Hyde, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

*Sonya M. Ledanski Hyde*

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:   October 23, 2025