1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

UNITED STATES OF AMERICA                    4:17-cr-651-14

VS.                                         November 12, 2025
                                            Houston, Texas
                                            3:39:30 p.m.
EDDIE ALEJANDRO TORRES


SENTENCING

BEFORE THE HONORABLE CHARLES R. ESKRIDGE, III

UNITED STATES DISTRICT COURT

APPEARANCES:

| | |
|---|---|
| For the United States | Adam L. Goldman, AUSA |
| | U. S. Attorney's Office |
| | 1000 Louisiana Street |
| | Suite 2300 |
| | Houston, Texas 77002 |
| For the Defendant | Mark A. Diaz |
| | Attorney at Law |
| | 719 59th Street |
| | Galveston, Texas 77551 |
| Case Manager | Janelle Gonzalez |
| Electronic Recording Operator | Brad Williams |
| Also Present | Lyndsey Fermin |
| | Megan Chester |
| | U. S. Pretrial Services |
| | Office |

Proceedings from official electronic sound recording;
transcript produced by court approved transcriber.

DIGITAL SCROLL TRANSCRIPTION                          281.382.9862

THE COURT:  Thank you.

Everyone please be seated.

All right.  I call for Sentencing Criminal Cause 17-651-14 United States versus Eddie Alejandro Torres.

Can I get appearance of counsel, please?

MR. GOLDMAN:  Good afternoon, Your Honor; Adam Goldman for the United States.

THE COURT:  Thank you, sir.

MR. DIAZ:  Good afternoon, Your Honor; Mark Diaz for Mr. Torres.

THE COURT:  Thank you

And Mr. Torres is here.

Welcome, sir.

All right.  We now proceed to a Sentencing Hearing in this case.

Mr. Torres, you'll have the opportunity to address me today, and I may have some questions for you along the way.

You can stay seated, but can you raise your right hand for the oath, please?

(Defendant sworn.)

DEFENDANT TORRES:  I do.

THE COURT:  Do you understand that you're now under oath to tell the truth?

DEFENDANT TORRES:  Yes, sir.

THE COURT:  All right.

If you don't understand a question I ask or what's going on in the proceedings, you can have me pause, repeat or rephrase anything.  Okay?

DEFENDANT TORRES:  Yes, sir.

THE COURT:  And if you want to ask your attorney a question privately, you can do so at any time, just let me know.  All right?

DEFENDANT TORRES:  Great.

THE COURT:  All right.

Let me briefly describe my Sentencing procedures.

The Supreme Court holds that the United States Sentencing Guidelines are advisory and not mandatory on me as the Judge.  This means that I will first consider and apply the Guidelines in their entirety, along with the relevant policy statements to correctly determine the total offense level and the Criminal History Category.  That will establish the applicable Guideline range.

I'll then exercise my discretion to tailor a Sentence in light of other statutory concerns.  In doing so, I'll consider the factors set out in Section 3553(a) to fashion an appropriate Sentence in this case to achieve the Sentencing purposes mandated by Congress in the Sentencing Reform Act of 1984.

The Supreme Court stresses that the Guidelines are the starting point in the initial benchmark in the Sentencing process, and that District Courts are to remain cognizant of them throughout the process.

It is also stated that these requirements mean that in the usual Sentencing the Court will impose a Sentence within the applicable Guideline range because such range is the Federal Government's authoritative view of the appropriate Sentence for specific crimes.

I'll abide by these directions from the Supreme Court, but to be clear, any comments I make today are to be an indication that I believe the Guidelines are somehow mandatory on me or constrain my ultimate Sentencing discretion.

All right.  I have received and reviewed in advance a number of items.  Let's make sure we have them all recorded on the record.

The written plea agreement, the Presentence Investigation Report – there were no objections, I believe, filed by the Government, but there is a statement – the Government has filed the statements in response to a revised PSR that was – and that's statement is at Docket 1269, I think.

Is that correct, Mr. Goldman?

MR. GOLDMAN:  Yes, Your Honor.

We've actually – we filed objections in our last two filings.

THE COURT:  And then, in – okay.

Which – I have – all right.

Let me sure of what I see.

MR. GOLDMAN:  1269 is the first one, yes, Your Honor.

THE COURT:  So, 1269 – got that.

Let me go at it this way.

I have the Defendant's objections to the Presence Report.  That was at Docket 1029.

And there is a Memorandum in Aid of Sentencing.  That's at 1155.  There were additional filings by the Defendants, including most recently at Docket 1296 – I believe it was just yesterday – a First Amended Memorandum in Aid of Sentencing and Objections to the Final PSR.

Mr. Diaz, were there other – anything other objections or filings?

MR. DIAZ:  No –

THE COURT:  1029, 1155 and 1296 is what I have.

MR. DIAZ:  There were no other filings by the Defense, Your Honor.

THE COURT:  Okay.

And so, Mr. Goldman, for you, I have the one that I mentioned at 1269, which was a response to the Revised Presence Investigation Report, and I guess that has objections in it, correct?

MR. GOLDMAN:  I think it has –

THE COURT:  That was filed on November 2nd.

MR. GOLDMAN:  Yes, Your Honor.

THE COURT:  And then, I have your filing at Docket 1297, which was filed just earlier today.

Yeah.

MR. GOLDMAN:  12:30 a.m., yes, Your Honor.

THE COURT:  A response to the Sentencing Memorandum.

Was there another filing?

MR. GOLDMAN:  No.  But they both have objections to them.

THE COURT:  Objections.

MR. GOLDMAN:  The second one we have possible objections, yes, Your Honor.

THE COURT:  Okay.  Great.

And then, I have addendums to the Presentence Investigation Report – an Addendum, plus the First, Second and Third Addendums.

And, Mr. Diaz, with what you filed yesterday, it's not formally denominated as a Sentencing Memorandum, but it had a lot of attachments that are by way of a Sentencing Memorandum, correct?

MR. DIAZ:  Yes, Your Honor.

THE COURT:  Okay.  So, I have those.

Is there anything else that I should have been aware of?

MR. GOLDMAN:  There's the Victim Impact Statement, Your Honor.

THE COURT:  Okay.

MR. GOLDMAN:  That docket at 1158.

THE COURT:  Okay.

And was that – and then, we were here last week and had the Victim Impact Statement, correct?

MR. GOLDMAN:  Yes, for the –

THE COURT:  Was that from the same?

MR. GOLDMAN:  Yes, same person, Your Honor.

THE COURT:  And the acronym?  Can you give me the acronym?

MR. GOLDMAN:  VZ, Your Honor.

THE COURT:  Yes, VZ.

MR. GOLDMAN:  And also, there was a Victim Impact Statement from – in Docket 1158 from GP and from EMR.

THE COURT:  Okay.

MR. GOLDMAN:  Those are all part and parcel of the same docket entry, Your Honor.

THE COURT:  Okay.

Thank you.

Anything else, Mr. Diaz?

MR. DIAZ:  No, Your Honor.

THE COURT:  Okay.

So, let's work through objections.

Mr. Goldman, how do you want to work through yours?

MR. GOLDMAN:  Well, Your Honor, I don't want to – I'll try to be a little less emotional than a Monday, but I think the first issue is dependent on whether or not Defendant is going to press the claim that he made in his most recent filing on page 6, regard- -- specifically, subdivision C, because if that is going to be continued, and if the Defendant is going to go – continue with that alle- -- those allegations, we would submit that he should not get acceptance of responsibility and should get obstruction of justice.

I don't want to put words in Mr. Torres' mouth –

THE COURT:  So, I could see, theoretically – I can see how that links up to acceptance of responsibility, perhaps.  Where is obstruction, just because it delays things or what?

MR. GOLDMAN:  Your Honor, under 3C1.1, Your Honor, the Commentary has two examples of – of where there would be obstruction, and I go to the Application Note quickly – put my fingers here.

It's Application Note 4(b), which is, committing to suborn – or suborn perjury, including during the course of a civil proceeding.  But we would submit that if the allegations, if Mr. Torres is going to stick by the allegations on subsections C in that filing –

THE COURT:  Then, it's contrary to his –

MR. GOLDMAN:  He would have committed perjury before Judge Bryan.

THE COURT:  -- proffer.

Okay.

MR. GOLDMAN:  And the other one would be providing materially false information to a judge or Magistrate judge –

THE COURT:  Okay.

MR. GOLDMAN:  Under Application of 4(f), again, for the same reason.

So, I don't want to put Mr. Diaz or Mr. Torres on the spot, but I think a lot of it –

THE COURT:  Well, no, actually, I meant, no, I will do it for you then.

MR. GOLDMAN:  Okay.

Mr. Diaz, how do you want to proceed on this?

MR. DIAZ:  Okay, Your Honor.

Mr. Torres fully understands the plea that he accepted.  Obviously, he understood the range of punishment.

The issue is that – and I attached it as an exhibit – it's dated 2/23/22.  Counsel provided him with the document that says, you're looking at 121 to 151.

Yes, he understands, and he understood when he took the plea, when the Judge said, do you understand that –

THE COURT:  It could be life.

MR. DIAZ: -- the final sentence could be – he understands that, but it doesn't mean that it didn't affect his mindset. That's the purpose of raising the issue.

THE COURT: Okay.

MR. DIAZ: So, as the Court knows, I was not the attorney when this case was pled, so I can't speak to what conversations, what negotiations – I can't speak to plea negotiations at all. I just know that when previous counsel gave me his file this was included.

So, when the initial PSR came out and it said 360 months, obviously, he was in shock, but at the same time we didn't come to court asking to withdraw a plea. We didn't try to change anything.

THE COURT: Right. There hasn't been any of that; I know.

MR. DIAZ: But – but I think it's important for the Court just to understand the mindset –

THE COURT: Okay.

MR. DIAZ: -- that he's in, because I doubt – again, I wasn't counsel, but I doubt the Government told Defense counsel, hey, I'm going to be asking for life on your guy. Because counsel probably wouldn't have had his client plead. But that's where we are today.

THE COURT: Well, but the Government doesn't have to do that.

I – actually is I was – I read yours first, obviously, before I read the Government's response.  As I read that section of your filing about the plea advice – I mean, I really read it more as part of what swirls into – where you come around to at the end for a request for mercy.

MR. DIAZ:  Correct.

THE COURT:  But I wasn't reading because it's, like, hey, you, or trying to withdraw the plea agreement.  And while – you cite a case that says – Mr. Goldman responds to it with his understanding of what the case says, but that, you know, if an attorney gave him such advice, he's performed efficiently.  But I don't know that I'm – you're not asking me to find that prior counsel was ineffective.  I think that's just something that –

MR. DIAZ:  I am not.

THE COURT:  -- I think even in his plea agreement it's preserved for a later argument, because waiver of ineffective assistance isn't –

MR. DIAZ:  Your Honor, I'm –

THE COURT:  -- isn't gone.

MR. DIAZ:  I'm not, and that's why I didn't name counsel in the plea agreement.

THE COURT:  Yeah.

MR. DIAZ:  I just wanted the Court to know what Mr. Torres has gone through --

THE COURT:  Okay.

MR. DIAZ:  -- getting to this point.

THE COURT:  Okay.

MR. GOLDSMAN:  If I could respond, Your Honor?

THE COURT:  Yeah.

MR. GOLDMAN:  There's one factual issue and one legal issue.

This problem with the factual issue on page 6 is a statement, quote, if coun- -- if plea counsel had accurately informed Mr. Torres of his true Sentencing exposure, then he would have not – he would not have pleaded guilty.

That is a direct – direct contradiction, a 180-degree contradiction from what he stated under oath before Judge Bryan.  I don't think there's any two ways to do it.  He was told what his Sentencing exposure was time and again by Judge Bryan, and he said he understood under oath  He was told time and again that nobody knows what the Sentence is and that what his – what his attorney told him was basically a guess, standard Rule 11 statements, and he stated under oath he understood.  He specifically stated he understood that his exposure was life.

So, I think that is a very important thing.  So, if he's stating now that he would not have pleaded guilty if he knew his Sentencing exposure –

THE COURT:  Okay.

MR. GOLDMAN:  -- that is lacking acceptance.  That is perjurious to what he said before.

THE COURT:  Okay.

MR. GOLDMAN:  On –

THE COURT:  So – so, what I'm going to  --  what I will say is, in terms of, like, the four corners of that argument that's at the bottom – that's on page 6 – that is not alone moving me towards anything that's going to – I am not ratcheting down like a Guideline range or – or what it should be based on that argument.  So, I've – if you want to now have an objection or say, oh, we should add something to the Presentence Report because of the statement that's there, that's not being withdrawn; you can make that argument.

MR. GOLDMAN:  So, yes, Your Honor.

THE COURT:  All right.

MR. GOLDMAN:  So, we would like to make the argument that he should get an Instruction, because if Mr. Torres – and, again, I don't want to put – I think he has to actually affirm his statement before, Your Honor, because I don't want – I don't want to put statements against him –

THE COURT:  Yeah.

MR. GOLDMAN:  -- that might be his legal argument.

THE COURT:  Well, the typical standard is, you know, if –

MR. GOLDMAN:  But if he's going to –

THE COURT:  If you heard anything else, it was just an estimate; it's not a promise.  Your Sentence could be different, and you understand that the Guideline range here could be as high as life.

MR. GOLDMAN:  Yeah.  Because –

THE COURT:  He was advised of that.

MR. GOLDMAN:  Yes, because the thing is that he stated under oath what his true Sentencing exposure was.  He stated that under oath that he knew what his true Sentencing exposure was time and again to Judge Bryan, and if he is now going to – now that he's under oath here, if he is now going to state that he did not know what his true Sentencing exposure was –

THE COURT:  Okay.

MR. GOLDMAN:  -- then we have a perjurious statement.

THE COURT:  Okay.

MR. GOLDMAN:  Although he's going to withdraw that and say that that's not correct and that –

THE COURT:  Okay.

MR. GOLDMAN:  -- so – then, obviously, this should be stricken or that it should not apply.

THE COURT:  All right.

MR. GOLDMAN:  As far as the legal argument – or should I wait on that, Your Honor?

THE COURT:  Go ahead.

MR. GOLDMAN:  I'm – as the Court knows, I think it's been 16 pages, *Herrera* does not state anything regarding this.

THE COURT:  I got it.

MR. GOLDMAN:  Okay.  Yeah.

THE COURT:  Okay.

MR. GOLDMAN:  *Herrera* is a booker thing.  It's – if there was no plea allocution and the former counsel said, your maximum possible Sentence was 33 months, a 120 months, whatever number you want to put there, and Mr. Torres was never informed –

THE COURT:  Uh-huh.

MR. GOLDMAN:  -- in any allocution or anywhere else of what his Sentencing disclosure was, then *Herrera* would apply.  But I won't go through every single case, but I think the Court saw – I have cited one, two, three, four –

THE COURT:  I saw that.

MR. GOLDMAN:  I mean, I think I've cited well over a dozen Fifth Circuit cases, at least seven District Court cases, and I think Judge Jack was very – and Casey was sort of very adamant about this.

THE COURT:  I'm not finding ineffective assistance of counsel here, and I'm not sure that there's really a factual record that's been presented here upon which I could find it.

Mr. Diaz, you know, in candor he's said that he reviewed the client file, and he's referred to what it is, but

that alone doesn't prove anything.  I don't know the nature of that conversation or how that was calculated or what was then said about it, so I'm not finding ineffective assistance of counsel here, so.

MR. GOLDMAN:  But I think the issue is that in all those District Court cases where there were identical – and at least two of them that are identical estimates by the counsel of a 120 months and the person got life.  And those courts said that estimation, just as Judge Bryan stated here and just as Your Honor states in every allocution you do, that is just sort of a – a educated guess.  It does not bind them; you could face the maximum.  He knew that, and to the extent that this is trying to ask for sympathy or to say that there's a possible appellate issue by any sort of misestimation by counsel, I just think is not –

THE COURT:  Okay.

MR. GOLDMAN:  -- is incorrect just as a matter of law and on the factual record here.

THE COURT:  All right.

All right.  On that, I'm overruling the objection.  I don't find – I think the argument is parsing too finely what is said in the brief versus what's against said in the colloquy.

The Defendant is not walking away from the fact that he was advised that he faced a life sentence, and he did

acknowledge that he had talked with his counsel about what the potential Sentence was and reflected that he understood that was an estimate and his Sentence could be different.

At best, it's say- -- like, when it's saying true Sentencing exposure, is that what he now knows the Guidelines actually add up to, that he wouldn't have pleaded guilty but that's not undermining the basis of the guilty plea, nor is it attempting to withdraw the guilty plea.  So, I see the concern.  I just don't find the – find it to be obstruction.

MR. GOLDMAN:  Okay.

THE COURT:  Okay.

And then as to –

MR. GOLDMAN:  And then there was the other – the other aspect of – I don't know if it goes to obstruction or to – I don't know – we've raised them both issues.  It could be sort of a separate point for either obstruction or lack of acceptance.

THE COURT:  Uh-hum.

MR. GOLDMAN:  And it is the continuing criminal conduct that happened at the Joe Corley Detention Center and would it –

THE COURT:  And that was what?

MR. GOLDMAN:  We have the video here, and I've shown it to counsel.

THE COURT:  Well, you can just represent.

MR. GOLDMAN:  Yeah.  In 2024 – and I have Special Agent Mario Aguilar from the FBI here, who provided the video and has much more know- -- direct knowledge – this Defendant and three others attacked another inmate, engaged in a – I would call it a brutal assault.  The understanding is they believed that he was providing information regarding criminal conduct in the Joe Corley facility.  It was later, I think, we learned that it was not but it does not, decided that what – but the fact is that this Defendant with three others engaged in a assault on an inmate, which is criminal conduct.

THE COURT:  Okay.

MR. GOLDMAN:  And in the video you, specifically, see – and I counted four direct blows with a closed fist fight, this Defendant against that individual while that individual was on the floor.

THE COURT:  Okay.

MR. GOLDMAN:  So, we would submit that –

THE COURT:  So, we've had some other – we've had others in this case where it was sort of – the criminal conduct was, hey, you got found with a small amount of drugs.  And I haven't found that to be something that is contrary to acceptance of responsibility, but this is he participated in the beating of an inmate –

MR. GOLDMAN:  Yeah, it's in –

THE COURT:  -- is what you're representing.

MR. GOLDMAN:  And we – and the video has been provided to counsel.

THE COURT:  Okay.

MR. GOLDMAN:  We showed it to him, yeah.

THE COURT:  Mr. Diaz, what do you see in the video, and I may need to watch it.

MR. DIAZ:  I would say the Court should watch it, simply because when the Government says that it's particularly brutal, while it's not pleasant there's not – it's brief. There's not blood.  Theres's not – again, it's not nice.  The reality is –

THE COURT:  I think –

MR. DIAZ:  -- guys fight in jail.

There's another incident where he was jumped and hospitalized, but the inmates that did it were smart enough to do it in the vestibule where there's not a camera.  I mean, it –

But I would say it's not very long if the Court would like to watch it.

THE COURT:  Was he charged with a disciplinary infraction of any kind.

MR. DIAZ:  Uh- ---

MR. GOLDMAN:  I can check with the – with the Agent, Your Honor.

DIGITAL SCROLL TRANSCRIPTION                         281.382.9862

(Pause in the proceedings.)

MR. GOLDMAN:  The punishment, Your Honor, is he was put in the segregated housing unit, which is sort of the – the nice federal way of saying, solitary confinement.  That was the punishment for it.

THE COURT:  Okay.  All right.

Well, that's --  yeah, that's a Finding.

Yeah, can you cue it up.  I'd like to watch it.

MR. GOLDMAN:  Okay.  Yes, I think it's about three minutes long.  Yeah.

UNIDENTIFIED SPEAKER:  Do you – you want to show that to him, or do you want to go to 1:10?

I just need to –

MR. GOLDMAN:  If we can go to 1:10 if counsel is okay with that, going past the first minute, since it's –

MR. DIAZ:  Sure.

MR. GOLDMAN:  Okay.

THE COURT:  And just for purposes of what I'm going to – it's – I think for Sentencing it's admissible anyway, but do I need to have anything done to, like, prove up this video?

We all agree it is what it is, right?

MR. DIAZ:  It is.

THE COURT:  Okay.

MR. GOLDMAN:  And I can try to copy it for the record, Your Honor.

THE COURT:  Okay.

Yeah, I think that you should.

MR. GOLDMAN:  Yes, Your Honor.  We will.

(Video played.)

THE COURT:  That's probably suffi- -- I mean, did anything else happen?

MR. GOLDMAN:  Yes, Your Honor.

THE COURT:  Okay.

What do you want to say, Mr. Goldman?

MR. GOLDMAN:  Oh, so, Your Honor, we believe that that constitutes the criminal conduct that would warrant a lack of acceptance under the Application notes to the acceptance of responsibility subdivision under the Sentencing Guidelines.

THE COURT:  Mr. Diaz?

MR. DIAZ:  Your Honor, I don't know why a fight between inmates should take away his acceptance of responsibility.  You know, part of the reason for taking a plea is receiving certain benefits, one of them being acceptance of responsibility.

I know there have been people caught with drugs in jail, phones in jail, all types of contraband, and I guess that might be more like participating in criminal activity.  But a fight between inmates without more context doesn't get me there.

THE COURT:  I'm just surprised that it was so flagrant as to like literally take place in front of a guard. And then, from what I saw in the video, the Defendant didn't start the assault, but then after the guy was on the ground decided to join in himself.  That doesn't make much sense to me.

Let me look at something.

(Pause in the proceedings.)

THE COURT:  I'm just looking at the Guideline itself.

(Pause in the proceedings.)

THE COURT:  Mr. Goldman, under the Guideline, would you be pointing to anything other than the Commentary at 3E1.1, and I think it's Application note 1(b), voluntary termination, withdrawal from criminal conduct or associations? Or in the other text is there something more that you would point to?

MR. GOLDMAN:  It would be that one, Your Honor.  Let me just make sure there's no other one.

That's what – that was the primary one.

Yeah, that is the primary one, yes, Your Honor.

THE COURT:  Okay.

Probation, were you – for Probation, were you all – when were you all aware of this video, and does it adjust your Recommendation on acceptance of responsibility?

PROBATION OFFICER:  We received it the same time that

counsel for the Government filed that motion indicating that it was there.  We've just watched the video when we were here for the Victim Impact statement last week.

But, Judge, I would – our stand to be that acceptance of responsibility would still apply in this case.

THE COURT:  Okay.

PROBATION OFFICER:  There is no Commentary notes, specifically, for just the withdrawal from criminal associations.  However, I would state that part – part B of the acceptance of responsibility for the additional one point reduction does have to be based on a motion from the Government.  But, at least, from our understanding, there would still be an adjustment, because they would be withdrawing that –

THE COURT:  Yeah.

PROBATION OFFICER:  -- that motion for one point.

THE COURT:  So, you would be withdrawing the one point.

MR. GOLDMAN:  Before I do that, Your Honor, I – I would want to check the – I want to make sure I'm not violating the plea agreement, Your Honor, because I think the way it's written is that if the Court finds acceptance applies, I –

THE COURT:  I see what you're saying –

MR. GOLDMAN:  I – yeah, I do not want to violate the

plea agreement. I want to be every clear about that. So, let me – I can just read exactly what I wrote. And it's sort of just standard language that counsel is similar to it.

THE COURT: Yeah.

No, that – that's a good thought.

(Pause in the proceedings.)

MR. GOLDMAN: Oh, Your Honor, I do think that I am required under the plea agreement –

THE COURT: To move for one point –

MR. GOLDMAN: -- to move for –

THE COURT: -- if I find acceptance –

MR. GOLDMAN: Yes, Your Honor.

THE COURT: -- of responsibility.

I appreciate that candor.

All right. I'm – I'm going to find acceptance of responsibility to still apply.

But, Mr. Goldman, I will tell you that that – and, Mr. Diaz, I'll let you know – that what that really undercuts is the extent of the request for mercy in your briefing, but then also things about recidivism, et cetera. That complicates that argument in terms of trying to say he is a peaceable, responsible citizen.

So, overruled there.

MR. DIAZ: Yes, Your Honor.

THE COURT: Okay?

MR. GOLDMAN: And then, the last one we have, I think – the Court has probably heard this in every single case, but – or for every single Defendant – let me make sure I have it right – would be the life – the permanent life injuries from the tattoos for the victims and the adding of the abduction or the physical restraint were appropriate. And this would be – I moved my various plea agreements around here –

Here it is.

Just going through the various paragraphs, Your Honor, it would be for – starting with 104 –

THE COURT: Hold on. Let me – let me turn to it.

Okay. All right.

So, I'm looking at – I think the current PSR is the one at Docket 1266 filed on October 31st. Is that the one you're looking at, Mr. Goldman?

MR. GOLDMAN: I think it is – mine just has the date on it, Your Honor, because this is when we had that weird issue with ECF. The counsel I talked to that were –

THE COURT: Okay.

MR. GOLDMAN: We had to get them from Probation because of – a weird hiccup with the ECF system –

THE COURT: Yeah.

MR. GOLDMAN: -- during a certain period.

THE COURT: Well, you said, paragraph 104. It starts

out Count 1, conspiracy to –

MR. GOLDMAN:  That is it.

THE COURT:  -- engage in sex trafficking?

Okay.

MR. GOLDMAN:  So, for that one, Your Honor, we believe that – that she would count for the – for the plus four under 2B- -- 2A3.1(b)(4) for the – for the tattoos that she was forced to get.  And I will make the record that I've made, I think, in every case that that particular subsection does not require that the Defendant himself be the one inflicting that permanent life – permanent or life threatening injury, only that it be done against the victim as part of the conspiracy, whether by this specific Defendant or not.

And also –

THE COURT:  And do you know off the top of your head which paragraph in this PSR that particular victim and tattoo is recited?

MR. GOLDMAN:  Yes.

So, MAVM is – oh, it's in the – so, we actually provided a copy, Your Honor, on Exhibit 2 to our – our initial filing.

THE COURT:  Okay.

And then, the sex trafficking paragraphs of MAVM begin at paragraph 21.

MR. GOLDMAN:  See if they're in there.

(Pause in the proceedings.)

THE COURT:  And –

MR. GOLDMAN:  I don't see it in the PSR, Your Honor, so that is why we did attach the exhibit as –

THE COURT:  Yeah.

MR. GOLDMAN:  -- our – as proofs of the tattoo actually being there.

THE COURT:  Yeah.

And – let me see.

Okay.  I'm looking at the – I'm looking at Docket 1269.  And are those the – I see – well, it's at 1269-1 is a tattoo of William covered by a heart; 1269-2 – is it that same tattoo in progress?

MR. GOLDMAN:  I don't know, so I – No. 1 is for –

THE COURT:  Because then it becomes –

MR. GOLDMAN:  -- MAVM.  Page 2 is for the victim EMR. Page 3 is for EMR, and page 4 and 5 is for – I believe that's ABP – or is that A, period, BPME?

THE COURT:  Okay.

All right.  So, that's as to MAVM, but you're, like, referencing all –

MR. GOLDMAN:  Yes, so –

THE COURT:  There are other tattoos that you showed me in – in Sentencing proceedings than these, correct?

MR. GOLDMAN:  Yeah, and each one had different

tattoos, Your Honor.  So, I know Your Honor, has seen a lot of different tattoos.

THE COURT:  But would your – your point would be, but all of them would be partner in this part of the conspiracy, right?

MR. GOLDMAN:  Yes, Your Honor.  For the pseudo –

THE COURT:  Because – yeah.

MR. GOLDMAN:  -- For the pseudo Counts for which Mr. Mont- -- Flores is charged with, he's only charged with three what we call pseudo Counts, or –

THE COURT:  Okay.

MR. GOLDMAN:  -- for three victims.  So, that's why we're holding for his case.

THE COURT:  You are just focusing on those.

MR. GOLDMAN:  Focusing on those three, yes.

THE COURT:  Okay.

And that's not an assertion; that's sort of like it's the name William is on some of them, et cetera.  Your assertion isn't that this Defendant himself required or compelled those tattoos, but that it was required or compelled by others in the course of the conspiracy.

MR. GOLDMAN:  Yes, Your Honor.

THE COURT:  All right.

Mr. Diaz?

MR. DIAZ:  And, Your Honor, while I do understand the

DIGITAL SCROLL TRANSCRIPTION                          281.382.9862

law of conspiracy and the way that it works, I feel like this is a little bit different because as you know – because you know the case very well by now – I don't think there's anyone else involved that would be more violent and more just mean than William.  And so, in this type of situation, the tattoos say, William.  There's not even a suggestion that Mr. Torres knew or was there when the tattooing was going on.  And so, I – again, like I said, I – I do understand, but there – it seems to me that it would be logical that there should be some type of consent or acknowledgement of things that others are doing, and I just don't see it.  So, I – it just doesn't feel right for me, Your Honor, is I guess is the point I'm trying to make.  Because we know exactly who it was, and he seems to be a fairly bad individual.

THE COURT:  Janelle, can you print out that Sentencing chart that we – you know – it's like showing – or maybe you have it handy.

Mr. Goldman, what else would you like to say?

MR. GOLDMAN:  So, I don't rush to continue with that one for the other individuals as well, Your Honor, but we do believe, obviously, it would apply also to ABP – I understand counsel's argument, but we – so like as part of the conspiracy it would apply.

I think it was – I would like to see if it was applied to –

THE COURT:  Okay.

MR. GOLDMAN:  Yes, we do – we just think it would apply to all three bases of the tattoos, Your Honor, for the – for paragraphs 104, 109 and 114.  And if that did not apply, Your Honor, we would still submit that for MAVM.  She was also forced again – and we are not claiming this by this Defendant but as part of the conspiracy – to get the cosmetic surgery –

THE COURT:  Yeah.

MR. GOLDMAN:  -- that we've talked about previously - and I know counsel was not here, but that again is a life – a permanent chan- -- permanent bodily injury.

We also have which might be a lesser level if the Court does not find that for – for – I think at least for ABP the drugging and the suffocation with a pillow, causing her to lose consciousness would be at least a plus two, and that would be for paragraph 114.

THE COURT:  Now, I know of the tattoo itself I have found that enhancement to apply.  Was that in the context of just by conspiracy, or was it because that was the direct Defendant that did it and required it?

MR. GOLDMAN:  For the ones we've had so far, Your Honor, the Court has not said it was Defendant specific.  That is my recollection.

Coun- -- Probation, correct me if I'm wrong, but

my recollection is the Court has applied it not being Defendant specific, and I think just based on the language of the –

THE COURT: Uh-huh.

MR. GOLDMAN: -- of the Guidelines.

I know we were in the middle of that issue on Monday, but I'll just keep out of that.

THE COURT: Yeah.

MR. GOLDMAN: But I do believe that for – that when there is a tattoo, it wasn't just – in other words, it wasn't just for William Lopez; the specific one would actually be Maria Angelica Moreno Reyna. It was applied for her. And, obviously, nobody has a Patty tattoo on them.

THE COURT: And I did apply it there.

MR. GOLDMAN: Yes.

THE COURT: And she got life.

MR. GOLDMAN: Yes, Your Honor.

THE COURT: All right.

MR. GOLDMAN: The doublecheck with Probation is still on, make sure I'm misstating that.

They have their chart, too, Your Honor.

THE COURT: Yes.

PROBATION OFFICER: Your Honor, for Maria Morena Reyna, as to victim MABM, the Court applied a two-level for serious bodily injury.

THE COURT: Okay.

You're asking for four or –

MR. GOLDMAN: I was asking for four, but if the Court wants to be consistent, it would be two, I guess.

THE COURT: Just two; I do want to be consistent.

MR. GOLDMAN: Yeah.

THE COURT: I am finding it to apply, and I have expressed, with respect to several Defendants in this case, that I do find coerced, painful conduct like that that leaves – and it's intended to leave a permanent mark like that, that that is within the scope of the Guideline, and it does apply by conspiracy. And so, I find that to apply.

MR. GOLDMAN: Yes, Your Honor.

THE COURT: All right. What else, Mr. Goldman?

MR. GOLDMAN: The other one would be – I think the only other one I have –

THE COURT: And I don't know if I've said it strongly enough – I've said it very strongly in some other ones that these women were required to submit and endure something like that is not something that can be overlooked, sanctioned, condoned or taken lightly. It's absolutely, flatly wrong, and in the language of the law, it is something that is malum in se. It's not just because it is prohibited; it's because it's morally wrong and should never be done.

Mr. Goldman?

MR. GOLDMAN:  Yes, Your Honor.

So, the last one we had was – and I think would only apply to paragraph 114, and that would be adding the abduction.  And again, similar to before, we want to note that for ABP it just says, was the victim abducted.  It is not again, Defendant specific.  So – and so, I know counsel is going to – wants me to raise it, so I will concede that we are not claiming Mr. Torres was the one doing the abduction, but we do believe that what happened to ABP would qualify as abduction.

She was forced to accompany the co-Defendant William Lopez to different locations in Cancun, was not allowed to leave, was then abducted by Raul Moreno in Monterrey and then was sort of – was physically restrained by him – by William Lopez, by being tied and locked up in the Cancun brothel.

So, we would submit that it would apply for ABP that there should be the abduction as well.

THE COURT:  And I have found that previously with –

MR. GOLDMAN:  My – my recollection is you have, Your Honor.

THE COURT:  Was that also with –

MR. GOLDMAN:  I honestly can't recollect if it was for someone other than William Lopez.  I do know it was for William Lopez.  I do not remember if it was for Maria Reyna or

not.  I – I just – I do not recollect, Your Honor.  I don't want to make a false record on the record here.

PROBATION OFFICER:  Your Honor, for ABP, the Court did not apply abduction for Maria Moreno Reyna.

THE COURT:  But I did for Lopez.

PROBATION OFFICER:  Yes, Your Honor.

THE COURT:  For William Lopez.

PROBATION OFFICER:  That's right.

And for – and for – and also in the case of Gaberialla Gonzalez for it.  So, you also applied it to her as to this victim.

THE COURT:  What was her connection to it, Mr. Goldman?

MR. GOLDMAN:  Yes, Your Honor.  She was for ABP.  She was the day-to-day manager –

THE COURT:  Of her.

MR. GOLDMAN:  -- of the Carriage Way brothel on –

And think of – I think even counsel called Mr. Torres, the security or enforcer of the same Carriage Way Apartment.  So, we would submit if it does apply to Ms. Flores it should apply to Mr. Torres as well.

THE COURT:  Mr. Diaz?

MR. DIAZ:  Judge, I have, basically, the same –

THE COURT:  The same argument, yeah.

MR DIAZ:  But to go just a little bit further, I

don't know that there's anything to even suggest that my client would have known she had been to Cancun or brought from Cancun.  There's – there's nothing that I have seen that suggested that he participated in that in any way, so I –

Again, I understand how a conspiracy works.

THE COURT:  I know.  Other than – other than participating in a conspiracy –

MR. DIAZ:  Correct.

THE COURT:  That was doing horrible things like this.

MR. DIAZ:  Correct.

THE COURT:  That's the – that's the problem for the Defendants who agreed to work together on this operation.

MR. GOLDMAN:  The only time there, Your Honor, he did actually have – we would submit he does have knowledge as established by the consensual recordings of the Confidential Informant in which Mr. Torres was the one that brought the phone with William Lopez on it.  He was one of the people that came to the apartment as stated in the plea – in the facts of the plea agreement.  He was one of the people that brought the phone with Mr. Lopez on the other end who was in Cancun at the time making the threats to her.

THE COURT:  That was Mr. Torres.

MR. GOLDMAN:  He was one of the – yeah, he was one of the individuals there, yes.

THE COURT:  Okay.

Mr. Diaz, anything else?

MR. DIAZ:  He – I didn't understand.  He was one of the individuals where?

MR. GOLDMAN:  Uh- --

THE COURT:  There was coercive conduct, like, giving – making victims listen to things that are happening on the other end of the line or being told what's going to happen to people on the other end of the line.  That then gets them to be compliant and do things.

MR. GOLDMAN:  Yeah.

For counsel, specifically, Your Honor?

THE COURT:  Yes.

MR. GOLDMAN:  What happened on one of the incidents is that when she did not want to work Mr. Moreno and others brought a phone to her with Mr. William Lopez on the other end making threats against her and her family in their home country, stating if you don't work you know what's going to happen and that he's going to instruct the individuals, including this Mr. Torres, to assault Ms. – that victim if she did not go back to work.

So, we would show – we will submit that –

THE COURT:  And does that connect to the abduction?  And that's horrible conduct, and I have – I have accounted for that in several sentences.

But like, we're talking about the application of

the abduction.  Was it done towards getting her to consent –

not consent but allow herself to be abducted, if you see what

I mean.  Like – and go where –

MR. GOLDMAN:  For the Cancun –

THE COURT:  And go where she didn't want to go.

MR. GOLDMAN:  So, I will say for the Cancun portion, no.  For the portion here in Houston, I would submit that it would either be considered abduction that forced her to go to another location, mainly the brothel, and 1B1.1 is – has just physically forcing someone to go from one location to another, or alternatively, if it was not that, it would constitute some sort of physical restraint based on the threats.  And that would be under these other subsection 3A1.3 – that would only be a two-level increase.

THE COURT:  Refresh me again on the – the Cancun or Cozumel –

MR. GOLDMAN:  Yeah.

THE COURT:  -- end of the argument.

MR. GOLDMAN:  Yes, so in Cancun while she was being – she – this victim came from Nicaragua.  Mr. William Lopez brought her up, smuggled her to Cancun and when there forced her into the prostitution, and while there she was being drugged.  She was being tied up with a pillow, suffocated, beaten and forced to work as a prostitute.

She later escaped, was unaware that the rest of

the family, including Mr. Coney (phonetic) Raul and Mr. Torres and Patty were all part of the same group. She thought William Lopez was sort of a lone wolf, so she made it to Raul Moreno Reyna, also known as Coney, the uncle of this Defendant, and then when she got there she was sexually assaulted by him as well. She's still unaware that everyone was working together.

She eventually made it to the United States, got apprehended by Customs and Border Protection, was released to her mother at the Carriage Way, and when she was there, that's when she learned everyone was working together.

She was told that she would have to increase the amount she has to pay back, because she escaped from William Lopez. And it was in that situation where she was being forced to work as a prostitute to pay back the extra money and just to work as a prostitute in general under that force, fraud, sort of coercion that this Defendant engaged in his conduct as outlined in the plea agreement of making threats against her, bringing the phone to William Lopez and things of that nature.

MR. DIAZ: It's – it's the same, Your Honor. He did plead to forced threats, coercion, all the horrible things we've already discussed, but he didn't seem to participate in any way from the Nicaragua to Cancun to the U. S. with that particular victim. And that's where I think the abduction

really is and what we're talking about.

Clearly, he forced her to do things she didn't want to do, threatened her, used his brother to threaten her. That's not disputed.  That's what we pled to.

THE COURT:  Okay.  And I'm looking at the plea agreement, the proffer as to APB right now.

(Pause in the proceedings.)

THE COURT:  Okay.

Mr. Goldman, what's the requested Guideline that you're saying you want to apply?

MR. GOLDMAN:  It would be 2A3.1 – well, either – 2A3.1(b)(5), and it –

THE COURT:  Hold on.  Let – hold on one second.

MR. GOLDMAN:  Okay.  Perfect.

(Pause in the proceedings.)

THE COURT:  2A3.1(b)(5); okay.

MR. GOLDMAN:  And if the Court were to reject that, we would then submit that the restraints that should apply is – and that is at 3 – 3A1.3, I think the ultimate end of it, which is only a two-level increase.

THE COURT:  3A1.3?

MR. GOLDMAN:  Yeah.

THE COURT:  Okay.

(Pause in the proceedings.)

THE COURT:  So, as to 3A1.3, what would the specific

40

conduct be that you says – you say was physical restraint?
And it's physical restraint.  There's a lot of coercive mental
things going on here, but it says, physically restrained.

MR. GOLDMAN:  Well, that would have been the conduct
in Cancun where she was tied up and suffocated with a pillow –

THE COURT:  Okay.

MR. GOLDMAN:  But she's – and being drugged as well.

THE COURT:  Yeah.

Okay.  I find the two points to apply for
physical restraint.  I'm not finding abduction.  I'm trying to
connect it up to the way abduction is actually understood.
It's more towards coercive tactics that are being taken to
have her then kind of move herself from one spot to another,
but there is a record of physical restraint that supports
3A1.3.

MR. GOLDMAN:  Yes, Your Honor.

THE COURT:  Okay.

PROBATION OFFICER:  Your Honor, question for
Probation.

The plus 2 that was supplied for serious bodily
injury, that is some of the tattoos is it intended to apply
for all three victims, because there is the same basis.  I
just want to make sure that I'm clear on the adjustments.

MR. GOLDMAN:  Plus 4.

PROBATION OFFICER:  Oh, I thought you said plus two.

MR. GOLDMAN:  I was supposed to – oh.

THE COURT:  It would be plus 2, but her question is, is it plus 2 three times.

PROBATION OFFICER:  Well, plus 2 for each of the three victims.

THE COURT:  Right.

PROBATION OFFICER:  That –

MR. GOLDMAN:  Well, Your Honor, I think we're – so, it's plus 2 for the restraint on ABP.

THE COURT:  The –

MR. GOLDMAN:  I think counsel – counsel is asking about the tattoo is that a plus 2 or plus 4.

THE COURT:  Right.

No, it was plus 2, but – but there are three different victims that had tattoos.

PROBATION OFFICIER:  That's correct.

THE COURT:  So, you're asking is it two plus two plus two.

PROBATION OFFICER:  Is it a – a two-point adjustment as to each –

THE COURT:  Yes.

PROBATION OFFICE:  -- pseudo account for each victim.

THE COURT:  Mr. Goldman, they each had –

MR. GOLDMAN:  Yes.

THE COURT:  -- a tattoo in the same circumstances.

That's what I was looking at –

MR. GOLDMAN:  Yes, Your Honor.

THE COURT:  -- attached to your filing.

MR. GOLDMAN:  That's correct.

THE COURT:  It's – it's plus 2 each of those times.

PROBATION OFFICER:  Thank you, You Honor.

THE COURT:  And the physical restraint is plus 2 just once for ABP.

PROBATION OFFICER:  Yes, Your Honor.  And we had already – we had applied abduction for Victim E and R already, and that was part of the Presentence Report as –

THE COURT:  Which is – okay.  So, this is –

MR. GOLDMAN:  I do not object to that, obviously.

THE COURT:  Right.

Okay.

All right.  What else, Mr. Goldman, if anything?

MR. GOLDMAN:  I think that was it for my objections, Your Honor.

THE COURT:  All right.

MR. GOLDMAN:  Yeah.  That would be it for my objections, yes, Your Honor.

THE COURT:  All right.

Mr. Diaz?

And your – we'll take up all of the objections that you want to raise here.  They're spread across several

different filings, so if you'll direct me to which you want me to consider, and we'll work through them that way.=

MR. DIAZ:  Well, Your Honor, I feel like – in regard to some of them, my argument and my Sentencing request kind of overlap, but I don't know how the Court would prefer to go through them.  If I start with –

THE COURT:  I guess I would just say this, Mr. Diaz.  With the Findings that I've just made – and it's increased – I mean, it makes it very difficult to work your way back down below 43 or 42, but you need to preserve your record.  You need to – and you have objections, and I want to rule on those for your record.  So, what would you like me to do?

I can't – but I'm not saying withdraw anything.  I just need to know how you want to work through them, because they're your objections.

MR. DIAZ:  Well, I was thinking that what I would do here is kind of go through them.

THE COURT:  Yes.

MR. DIAZ:  And as we're going through, I can decide if I want to – the Court specifically to address it, or if I can incorporate that into my argument.

THE COURT:  Okay.

MR. DIAZ:  Okay.

THE COURT:  I guess I'll say this, Mr. Diaz, for your purposes.

Everything that you're now telling – and I notice that, especially in your final filing.  As to your objections, it's also part and parcel of why you're saying it would be too severe to senten— -- you know, to fully account for that in the Sentence.  So, I guess I will just tell you – anything you're going to argue now by way of objection, you're wanting me to consider also by way of your recommendation for variance.  Correct?

MR. DIAZ:  Correct.

THE COURT:  All right.

So, I'm – I'm listening to it that way.

MR. DIAZ:  Okay.

THE COURT:  All right.

Go ahead.

MR. DIAZ:  So, role – I – and again, this – I've not been in this position before, but it kind of goes to the – the other arguments that I've made in my memos.

I don't think he was an organizer or a leader. I think that – his mother certainly was, and his brother seemed to dictate everything else.  It seemed to me that Eddie did what he was told to do.  So, I don't know that he should get an adjustment for role, but I know the Government doesn't agree with me.

THE COURT:  There's the – the part that is – I understand your argument about him doing the bidding of others

who might be above him, but in terms of his own personal management, he's managed by others, but that doesn't negate the fact that he had management and security oversight at one of the brothels, and I think he kind of – like even his factual proffer he indicated that.

MR. DIAZ:  Correct.

THE COURT:  Yes.

MR. DIAZ:  But for some reason in my head, it seems – I don't deny that.  Mr. Torres doesn't deny that.  But I still don't get the sense that it was independent of anything that his mother or brother did or told him to do, if that makes sense.

THE COURT:  Uh-huh.

MR. DIAZ:  In other words, he didn't go outside of the family to do this.  It was with their participation.

THE COURT:  Right.

MR. DIAZ:  So, I understand that doesn't make it better.  I just feel like it doesn't make him at the top of the decision making in this organization.

THE COURT:  Mr. Goldman?

MR. GOLDMAN:  Yes, Your Honor.

We would submit that he does qualify as a four-level manager for several reasons.

No. 1, he did admit it in the plea agreement. He has indicated that he operated and managed – and operated

6363 Skyline Drive.  That was the one that he operated.

Also as we noted, we provided a exhibit to the Court in our initial response, the document, the brothel, he controlled.  It is important, Your Honor, to note that there were several brothels –

THE COURT:  Right.

MR. GOLDMAN:  -- run by this organization, and as far as at least the first two victims – well, EBP worked his brothel also, but the first two victims, EMR, MABM worked under his  control at his brothels.  We are not claiming that Patty is not the mastermind.  I think that's – nobody's disagreeing.

THE COURT:  Right.

MR. GOLDMAN:  But there can be more than one manager.

I also, preparing for today, had a copy of it – and I can read it into the record – from the wire intercept of – of Patty, and the date of this is July 18th, 2017.  They indicate that, quote, Eddie was in charge of all the operations there.  And that is referred to as the Glenmont brothel.  So, we just think that the evidence is – we don't want to say, overwhelming, but we do believe it's overwhelming, but we do believe it's overwhelming based on his admission in the plea agreement, the wire, the documents, and al- -- again, the information in the PSRs that he was, in fact, the manager at a plus 4 level.

THE COURT:  Well, but it would be organizer, leader is a plus 4 level; manager or supervisor is a plus 3 level.

MR. GOLDMAN:  Yeah, we would say, organizer/leader based on the fact that he was in charge of those places.  That would make him the – I would say the head honcho, but it would be head honcho of Glenmont, as indicated in the – in the wire intercept and Skyline Drive is indicated in the plea agreement.

THE COURT:  Okay.  Mr. Diaz, anything else?

MR. DIAZ:  No, Your Honor.

THE COURT:  I do find the aggravating role at four levels to apply.  Application Note 2 talks about organizer/ leader, manager; a supervisor of one or more participants. But then, Application Note 4 talks about the factors to consider, and it's the fact that this conspiracy involved so many different brothel locations.  And so, there's some one or two persons maybe at the top of that.  But in terms of decision making of 40 and the nature of the participation and the commission of the offense, it does apply as to the brothel where a substantial amount of criminal conduct that's charged occur, at least in terms of the sex trafficking itself.

And since he's – was it the manager of that location he knows the nature and scope of the illegal activity.  It's a degree of control and authority exercised over others there, participation in the planning or

organizing.  It's just – those factors apply.

Okay.  So, that objection's overruled.

MR. DIAZ:  Yes, Your Honor.

THE COURT:  What else?

MR. GOLDMAN:  Judge, as we were talking, I was looking through the other original objection was, you know, basically, expanding on minor role, which I think you just took care of.  But the rest are really going to be taken care of in argument and in my Memorandum.

THE COURT:  All right.

MR. GOLDMAN:  I think the – dealing with the objections that the Government raised first were things I had already addressed.  We've already dealt with those, so the rest will just be basically argument.

THE COURT:  All right.

So, I'm overruling the other objections.  Given earlier Findings, I do not – a resolution of those issues is not going to affect the Guideline calculations at this point.

And, Mr. Diaz, as I've said to you already, the factual arguments that you want to make about those in terms of variance are something that I have yet to take into account and can be argued, but in terms of objections as to correct applications of the Guidelines, they are overruled.  Okay.

All right.  Any other objections?  I think we've heard everything.

MR. GOLDMAN: Nothing from the Government, Your Honor.

THE COURT: Mr. Diaz, and that was all for you?

MR. DIAZ: Yes, Your Honor.

THE COURT: Okay.

For Probation?

PROBATION OFFICER: Just to note, that based on the Court's Findings the total offense level would become 43.

THE COURT: Right.

PROBATION OFFICER: Which would be a Guideline Sentence of life.

THE COURT: Yes.

And actually, the total offense level would become what, but it maxes out at 43?

PROBATION OFFICER: It would be 47 before acceptance and then come down to 44 but be capped by the Guidelines at 43.

THE COURT: Okay.

All right.

And then, the Guideline range is life.

All right.

I accept the provisions of the plea agreement. There are a number of Counts to be dismissed, Mr. Goldman. Do you have that handy, or do you want to just submit at the end of the hearing?

MR. GOLDMAN: I think I have – I think I have worked well with the Case Manager to get the assistant down here, Your Honor.

So, we would move to dismiss Counts 3, 4, 6, 7, 8, 9, 11, 13, 14, 15, 17, 22, 23 – and that is it, Your Honor.

THE COURT: All right.

Those are dismissed.

All right. So, I've stated the – that the Advisory Guideline range has become a total offense level of 43 and a Criminal History category of 3; the Guideline prison term – range of life; supervised release term – I take it – stays at least five years. And did the fine change from 50,000 to 500,000?

PROBATION OFFICER: No, Your Honor.

THE COURT: All right.

So, those stay the same.

Any clarification needed on that before I proceed to hear argument?

MR. GOLDMAN: Nothing for the Government, Your Honor.

THE COURT: All right.

Mr. Diaz?

MR. DIAZ: No, Your Honor.

THE COURT: All right.

I have previously heard last week when we first convened on this a Victim Impact Statement from BZ, so I have

that in mind.  Are there any other victims that wish to be heard today?

MR. GOLDMAN:  No, Your Honor.

THE COURT:  All right.

Mr. Goldman, you can proceed.

MR. GOLDMAN:  Yes, Your Honor.

So, I believe the issue is, Your Honor, should you impose a Guideline Sentence of life or should there be some sort of – I don't know what you would call it – I guess it would be more of a variance than a departure to have him get something less.

So, first we do believe, the United States, that life would probably be appropriate here, and if not, we'll explain what a – we think a lesser Sentence, if the Court were to go down, would be.

But the issue is, is there any sort of situation which the Defendant based on his background could be released at a point where he would no longer be a threat, where he could be a functioning member of society, where the crimes were not so egregious that there is some chance of rehabilitation for him.

I think, unfortunately, Your Honor, when looking at his record, the facts of this case, the – I think the very impactful statement of the victim, who is present again today, Your Honor, I think the answer is in the negative for

Mr. Torres.

Again, looking at – I think the first thing to note is that unlike many of the other Defendants in this case he has a substantial criminal history.  That's not to say that the other Defendants did not do a lot of really bad stuff in their lives, but his is actually documented on – in paragraphs – I think we have 127 through 141.  So, we have a lot there, Your Honor.  And some of them are – although they might be a little old compared to today, they are a little troubling – we have the gun possession on paragraph 129, and the – then we have the issue on 130, where although it's a possession of marijuana, it noted that at the time he had four active warrants out of Houston and five warrants out of Pasadena.

The issue on paragraph 131 where it appears that he was trying to steal cars, I think, and put on fake license plates.  That's the only way to look at the paragraph, I think.

He was found with pliers and screwdrivers, was found with license plates for other cars.  So, I think that is very troubling.

We have a lot of, you know, drug sales in 132, where he's had over $1600 in currency.

And then, we have another assault referenced in paragraph 134 where he is one of five males beating another

person and smashing beer bottles against his body. That person has a swollen face, swollen shut right eye, cuts on his arms, lacerations on the back of the head. That witness never showed up, but that – that sort of goes to the -- the background of Mr. Torres.

And then, of course, we have the other troubling thing of even after all this happens, as the Court saw on the video, he – I think the term is – and I don't want to sound, you know, course here, but he jumped another inmate. So, he has this continuing pattern, both before and after this of severe violence against other individuals.

Obviously, the violence in those cases, as horrible as I think it is, it really does pale in comparison to what happened to the victims in this case, and although she is not named in the Indictment as one of the named victims, she is a victim, and as – call her VZ, the victim in court who made the statement.

I think the – I would almost call it torture of what he did to her to make her work as a prostitute, where she's having children with him. She's locking him in a room. You read her statement. You heard her statement. She is still to this day scared of him based on the horrors – and I'm not going to go over them. I think the Court heard of them from her, and she explained them far better than I can. And what she called in her statement the hell that she went

through with him.

The concern we have, Your Honor, is that even today with him being incarcerated now for a substantial amount of time she is still to this day petrified of him just because of what he did and that ongoing fear still exists.

We then have the other victims.  With ABP, he is going to her, Your Honor – and I think this is horrible – he's acting as a tool of his brother, who has gone over, sort of William Lopez, I think – everyone acknowledges how horrible William Lopez is, but we've – this Defendant knowingly, voluntarily, purposely acted as – as his instrument when he was not in this country, to make sure that the victims complied with his – his will.  I think that's not a good thing for him.  That is a rather horrible aspect.

The other one – he was in control of those brothels, Your Honor.  So, we have this ongoing pattern – I will call it more of a lifetime pattern of this horrible abuse towards these victims.

The other thing, Your Honor – and we did note this is concerning – is that he did provide reference letters, and I will be honest, Your Honor, the United States is troubled that one of those letters is from one of the children of him and the victim.  She explained what he did to that child – I mean, locking him in a room with her, because she wouldn't work, and now that child – I don't know if it's – I

don't know if you would call it Stockholm syndrome – I don't want to get, you know – engage in too much hyperbole – but I think it is very disturbing that this child that he was so horrible to is now the only – one of the people he has writing letters on his behalf.  That child almost appears unaware of the harm that is done to him by the Defendant based on those letters.

We did note that we have another interesting issue.  I don't know if you call it interesting, but it appears as we indicated in the lengthy most recent filing – and I have shared this with counsel – that two of the other letters are from individuals that have been sentenced by this Court.  The information that Agent Morales had about this indi- -- woman named Beatrice Sandoval she lives at the same address as a woman named Maria Lucia Rojas.  Beatrice Sandoval and Maria Rojas are the two individuals that wrote letters on his behalf.

My colleague, Jennifer Lowry, indicated that Defendant's name was mentioned during a debriefing of he Ms. Rojas, Ms. Sandoval Rojas.  She is now serving 135 months in imprisonment based on a drug case before Judge Hittner involving being – bringing in more than 5 kilograms of cocaine from – from Columbia.

So, when the people that he's having letters – that are writing letters on his behalf are – I don't call them

questionable character.  It does raise more concerns about what he does.

So, we're looking at all these – I don't call them – I can only call them prolific acts, Your Honor, that he does whether for his own profit or for the profit of his brothers.  And then, of course, we have the guns.  I don't think that can be overlooked.

As counsel even stated, his role in that last brothel, sort of towards the end, he was the security.  He went around in a quasi-police car with sirens on it acting as a security, making sure no police were around, making sure no one disturbed this prolific enterprise that was going on at the location.  And then, when his apartment is found, we find numerous amounts of ammunition or firearms, and of course, he is a convicted felon, and yet, he has all these items there.  That only goes further to his dangerousness, because when you look at his record and his reputation and he's having these firearms and he's providing security, that only causes more fear in the victims that were forced to work there.  So, Your Honor, we do believe that that – we just really do believe that a life Sentence, would you say, a Guideline Sentence would be appropriate in this case.

If by chance, the Court does determine that there should be something less than life based on, I know, arguments by counsel, we still believe it has to be in a

rather substantial range.  And I think we initially asked for 450.  We think 480 – we said at least 450 months, but we would say this was – it was 360 to life – we would say that within now at a – with the additional information of what happened at the jail, all the other stuff that –

THE COURT:  Okay.

MR. GOLDMAN:  -- 480 would be a more appropriate Sentence if the Court is going to go down.

And I know that sounds like a long time, but that is less than William Lopez, who did cooperate, but I do think it goes to sort of where he is in the dangerousness category of the many Defendants this Court has had.

We do believe, therefore, that life is appropriate, but should the Court determine that some sort of downward variance departure is necessary it should still be at least 480 months.  And again, it just goes to the level of dangerousness that this Defendant has exhibited both out of custody and in custody and just keeps continuing.

So, that is – that is our representation, Your Honor, and I do think again – the victim I know she asked for life when she was on there.  We would ask for that also, but if the Court is going to go down, we do believe 480 would be appropriate.

Thank you.

THE COURT:  All right.

Mr. Diaz.

MR. DIAZ:  Thank you, Your Honor.

Your Honor, I would like to point out that when we talk about this extensive criminal history we're talking about 20 days in jail, 3 days in jail, 2 days in jail, 3 days in jail, 3 years deferred adjudication, which was apparently completed, which would then have been dismissed.  Then, we've got 75 days in jail, and then we've got another case that you were told about being a felony that was dismissed.

So, while I do understand that there were several convictions, I would hardly call that a substantial criminal history.  I mean, I don't think he ever did more than 75 days in jail, so – I've been doing this a long time. That's not substantial.  Substantial is penitentiary trips.

But, Judge, here's my biggest issue with this case.  I don't know how any child could survive this upbringing.  I don't know – you know, when he's younger, he does know what his mother's doing, and I think maybe the reason that there's a difference between him and his brothers and the level of perhaps violence is that time that he went to live with his grandmother.  And then, as – as it's stated in the PSR, he comes back from living it with his grandmother – I think that was when he was when he was 17 years old – and nothing has changed.  It's still the same lifetile (sic) – lifestyle.  And I don't know how you --  how anyone as a

teenager with nothing but prostitution, drugs, violence everyday – I don't know how we could hope that that child would turn out any different.  It's – obviously, it's easier – easy for me to sit here and say that what his mother created is — is just horrible.  And I believe we all understand that that's why his mother got the sentence that she got.

And I understand, obviously, William, in my opinion, did a lot of things that were more horrible than Eddie did – and, Judge, you're going to go through – you've been going through the sentencings, and you've got a good idea of where everyone is at – and I'm sure you have an idea of what's appropriate for each Defendant in your head.  There's one thing – you know, I would like to point out –

At the time this arrest came, he had actually gotten away.  He was – he had gotten a dump truck and was driving a dump truck.  So, he might have made it.  We won't know, but –

The other thing and I'll let him touch on this a little more was – and you heard from his ex-wife that he has children with – and you heard that – I guess she said she was 14 or 15 when they got together.  So was he.  I think he might be a year older than her.  And so, you've got two teenagers hooking up, one of whom has never been taught to treat women like anything other than property and a prostitute.  And so – and I've talked to him about this.  How are you as a teenager

supposed to get out of this lifestyle when this is what you were surrounded by every day?  Right?  And the only way that that could change, Judge, is – is within him, and that's why we submitted, you know, all the classes he's taken.  It's a substantial amount.  He's done as much as he could do inside.

But obviously, I think he should have a chance to be in the free world one day and be a productive member of society.  You know, what – if he had his – his choice.  He would get out, get his commercial driver's license back and go back to driving.

But, Judge, I just – I – this is a case before you that is, you know, 100 percent that he's a product of his environment.  I'm not new to this concept, because I've seen it in a lot of families where drugs are involve— -- drug cases are involved, drug dealing.  But this is the first time I've had a case like this where, you know, the family business is prostitution and, you know, you're – you're – not necessarily rewarded, but you're taught that you should do these cruel things to women so that you can use them for profit.  Only he can tell us that he's not – that he has learned and he has appreciated what his mother created and where he is today.

And, Judge, you know, I put in most of my pleadings that I think an appropriate Sentence would be in the 121-month range.  And the reason I say that is because I have a lot of contact with Eddie.  I – so for a long time I have

never wanted to find myself in a position where a Defendant is in court saying that they can't get ahold of me.  So, I let all my clients call me.  I keep money on my account, so they can call my cell phone.

I think Eddie will tell you if he's not happy with me about anything it's certainly not lack of communication.  We've probably talk at least once a week.  I even talked to him last Sunday, and he apologized for calling me on a Sunday.  But he understands the life.  He doesn't want the life.  And I'm just asking you to take that under consideration, Your Honor.

THE COURT:  Thank you.

Anything else, Mr. Goldman?

MR. GOLDMAN:  Just very briefly, Your Honor.  A quick response to just one, two, three – six quick points, Your Honor.

First counsel refers to the fact that Mr. Torres saw his mom's life and what she went through.  The issue, Your Honor, is that he saw that and then he did the same to his own – to not only the victims in this case but, most particularly, to Ms. VZ, who was present in the court, the mother of his own children.  He treated her the same way despite seeing what happened to his own mother and to see what had happened with his own life.  We would submit, Your Honor, that is actually a negative impact on him.

Again, Your Honor, regarding the violence of – I know counsel has tried to say that he wasn't as violent as others. We would submit that when VZ told us what she went through from him he is incredibly violent. I – I mean, she told us about the beatings, the locking in the room, the threat. I think the violence is – is – I guess for her it's astronomical.

One other thing, Your Honor, is about getting out of this life, and that comes through one of the letters counsel did provide that – but we don't object to it – that's from his sister, Cindy Moreno. She is not involved in this. She got out.

THE COURT: Uh-huh.

MR. GOLDMAN: So, it's not something that the people are forced to go into.

The next point, Your Honor, is counsel claimed that Mr. Torres wants to say that right before the arrest he had gotten away from this life.

Your Honor, we would submit that the wire intercepts from right before this indicated that is anything but the case. We already gave you the statement of where he said in July, which is just four months before the arrest, that he was still in charge of the Glenmont one. I have other ones from that same period in July and August about the drug trade with Freddie Montes and him being involved in that and

talking about engaging it.

So, we would submit that when looking at the wire intercepts what was found in his apartment, the observations of him being in the truck right before the arrest show that he was not actually trying to get out of it, even if he had another job.

Your Honor, so the next thing is, is this wasn't a business about prostitution. It was a business about sex trafficking with incredible violence. This is not just a prostitution case. So, we do believe that is all important, Your Honor.

121, Your Honor – I don't want to – I know counsel is doing his job, but we just think that would result in him getting out relatively soon based on the time that he has been in. That would be incredibly scary, I think, Your Honor, is the only way I can describe it on behalf of the Government for someone with this record to be out right away and especially for the – for the victim in this case that's present today.

Your Honor, quite simply, this is his life, and I think we're still a little, obviously, disturbed with the initial point about him saying he wouldn't have pled guilty and then saying he still miss it, but I will get out – get away from that.

But we just believe that it's just really – when

looking at all these factors, we just can't see how any time of other than life would be appropriate, and if the Court were to do that again we would just think at least 480 months.

That's it.

THE COURT:  Thank you.

MR. GOLDMAN:  Uh-huh.

THE COURT:  Anything further, Mr. Diaz?

MR. DIAZ:  Just briefly, Your Honor.

I would like to point out that the Government keeps referring to his ex-wife as a victim in this case.  I will concede – and Mr. Torres is going to address this – she was definitely a victim of domestic violence.  She was a victim of many things at his hands, but she was not a victim attached to this case at his hands.  Even in her own words, she said that she worked at his mother's brothel.  She never claimed that Eddie was acting as a pimp or anything for her.

Again, Judge, he's going to address that, but I just wanted to make that clear that she is a victim of domestic violence.  She's a victim of a lot of things at the hands of Eddie but not connected to sex trafficking in this case.

MR. GOLDMAN:  Your Honor, I would say the record controls, but she was very clear that she was being forced. The beatings and everything was because she would not work.  I just adamantly disagree with that.  I think – I think her

statement clearly establishes that he was controlling her in a pimp role, even though they did have children in common.

I would just admirably disagree with that based on her own statement to the Court.

THE COURT:  Okay.

I'm just looking at my notes from her statement.

(Pause in the proceedings.)

THE COURT:  Okay.

All right.  Mr. Torres, the Defendant has the right to make a statement or present any other information to lessen the Sentence.

Is there anything that you'd like to tell me now, sir?

DEFENDANT TORRES:  Yes, Your Honor.

I'm under oath, so I will say the truth.  When I met Veronica, I fell in love with her, because as teenagers she was my high school sweetheart, and we – we lived together. We had kids.  And as a teenager, we didn't know much.  We didn't know – we didn't know – I didn't know much either.  I didn't have no father figure, but I still loved her.

I didn't introduce her to this life of prostitution.  She had met one of my – my mother's friends and when we had an argument she left and I guess she started working over there with her and then she calls me one day and asked me – and she says, I'm already working.

Well, anyways, I tried my best to pull her out of that.  We went to live with her mom.  We had a child.  Everything was good.  I remember she says, she doesn't remember when – when everything started going down.  Well, it was when infidelity started coming in between both of us that every- -- that love and everything and the respect and the domestic violence started coming in between.

So, we forgave each other, and we had another baby, Eddie.  And we kept on living together.  Her mom bought us some rings.  In July 29th, 2006, we married in a chapel, and we were happy.  We had Ray, which afterwards he died – I mean – of cancer.  But we already split up.  She threw away my clothes and everything it's okay.  I told it's my fault for being unfaithful, and I'm sorry.

When we were in the funeral, even though she was already married to someone and had kids with that someone from 2007, in that gap to 2017, I always felt for her.  I always provided for – I pay the child support and I – and I wished her the best.  I always did.

When he died, I went and I hugged the coffin and she went – and I remember she hugged the coffin, too.  And I wanted to tell her, I'm sorry for not being the person that she wanted for me to be, and so.

When I went to jail, I still kept communication with her, and she used to write me and told me that – that she

knew that I was not that person, that she knew that God was going to be on my side, and that's what made me go more into going into the religion, finding God, finding for – praying for me to be a better person.  And I told her that I was – I was starting to be a better person and to forgive me.

And I remember when her mom died she was crying and I was crying with her, because, Your Honor, if you cut my finger and that finger falls over there and you go and pinch it I can't feel that.  But if that finger is in my bod- -- in my body and you pinch it, I'm going to feel it.  And whatever she feels, I feel it, because we grew up together.

Whenever she said that – that her husband was having an affair with my daughter, I – I told her – she was crying and I told her, no, that's not happening; he loves you dearly.  He loves you, and I was always there for her.  I just want to – I just want to tell her I know she's here, and I don't want to see her, because I don't want to make her feel uncomfortable, but I want her to know that ever since – and I'm not going to sit here and say hypo- -- hypocrisy that I – I am a preacher.  No.  I'm in baby steps in the religion, and ever since I found the Lord all my – my life has changed completely.

And even though you see in the videos where I was in a fight, Your Honor, that man now is my friend.  He gave – he – every time I see him we hug each other, and I told

him, please forgive me.  I didn't want to do that.  So, he's my friend – he's my friend now, and we exchange numbers and everything.  I say, whenever we go out – I thought I was going to go out, but now that I have heard the point system, I know that I'm facing life, and I just want her to know that – and from the bottom of my heart, I am sorry and I would like for her to please find it in her heart to forgive me for not being the man she wanted me to be.

By the time I became that truck driver and she seen me at Taqueria El Sol, she told me that she seen that happy man in me.  And I wished it would have been with her, but I was too young.  I was too young.  I was in my teenage years when the domestic violence was going in our lives.  Now, I'm 44 years old, Your Honor.  I'm 44, and I don't think the same.  I don't.  And if given a chance to – to come to the world, and –

I'm not asking for time served.  I'm not, not because people love me or because I deserve it, but I would like a second chance for my grandkids now to see a good man or my kids and have my mom a proper burial, since I know she have – she went – she got life.  And if she – she – if she could forgive me – I don't know if – if I may, we'll just say it in Spanish, but I'll say it to you, looking at you, but I'll say it in Spanish – I know she knows English, because I taught her English and I taught her how to drive, but I want

her to understand in my – in her first language.

(Defendant speaking in Spanish.)

DEFENDANT TORRES:  That's it, Your Honor.

THE COURT:  I thank you.

I picked up "corazon" and I picked up "forgive me" several times.  Do you want to state, generally, to me what you just said in Spanish?

DEFENDANT TORRES:  I said –

THE COURT:  Just generally; you don't have to cover it all, but –

DEFENDANT TORRES:  I said, please find it in your heart to forgive me.  I'm not the same.  I am 44 years old now, and I'm not that teenager that I was back then.

And to my kid, to my son, please give him a good advice, good – because jail is not where I would like to see my son.

I got my daughter in jail now.  I don't want to lose him either.  I lost my mom, and I'm losing my brothers.  I'm losing everyone.  It's like a curse in my life.  I don't want – I don't want it.  I would – I to -- I would like to just go out there – I promised my- -- myself that if I ever was to go to the street I would – I will grab another dump truck and – and never go back to that old life.

Every time I went back to that old life is because I was – I felt caught up in that life.  I wanted to

break that cycle.  I always wished to be that dump truck driver.  She knows it, because I used to tell her all the time, but now that – there's nothing that attaches me to the Southwest Turtles (phonetic) or the brothels.  All I think about when I'm in my cell block is going to – to the world and driving and – and staying away from trouble and never engaging in criminal activity and not wanting to come back here.  This is not the place to live.  This is not the place to be.

THE COURT:  Okay.

All right.

Give me just a moment.

(Pause in the proceedings.)

THE COURT:  All right.

The Guideline range is set where it is because of the extreme conduct in this action by very many persons of which many others were fully complicit because of conspiracy to go forward with that type of criminal conduct.  And it included a lot of violence; it included a lot of sexual coercion.

I do find that the Guideline range is appropriate here given the criminal – given the Findings that have been made.  I am varying from that only in the sense of wanting to avoid unwarranted Sentencing disparities among the Defendants.

I'm going to impose a Sentence as requested in

the alternative by the Government at 480 months.  While William Lopez got 540 months because of his cooperation, it's still – I think everybody in this case has recognized that he was perhaps the most violent person in terms of what was going on here, and that is not Mr. Torres.  And I –

But as I said, very many times I've been quite moved by several of the Victim Impact statements that I've heard along the way here, and indeed I heard from VZ here.  And so, it reflected a very violent nature of this Defendant.

Mr. Diaz, I take your point that that's not as to – that it's a contention as to domestic assault.  My recollection of it was that it was also towards participating, continuing to participate in the prostitution conduct, so I am considering it.  And it was, as we all heard, a very sincere and very powerful statement by the Defendant.  And so, I – I don't see the reason or ability to vary downward further than that.

I also feel – in terms of unwarranted Sentencing disparities, based on those who have received 360 months, no sen- -- certainly no Sentence would – would be going below that given Findings that have been made about the Defendants own personal conduct and leadership role here.

So, that's the Sentence, along with 10 years of supervised release and other – the fine is waived, and there's a small special assessment.  So, let me formally impose the

Sentence.

Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the Defendant Eddie Alejandro Torres is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 480 months.

Upon release from imprisonment, he shall be placed on supervised release for a term of 10 years.

The Defendant is to report within 72 hours of release from the custody of the Bureau of Prisons in person to the Probation Office in the District to which the Defendant is released.

While on supervised release, the Defendant shall not commit another federal, state or local crime, shall comply with the mandatory conditions of supervision as approved by the Judicial Conference and required by law and shall comply with the standard conditions as adopted by the Court in General Order 2025-22 and with the additional special conditions for the reasons outlined in the Appendix of the Presentence Investigation Report.

Mr. Diaz, I may not have asked earlier, you had, obviously, received the Presentence Investigation Reports. You had also gotten a Sentencing recommendation from Probation, correct?

MR. DIAZ:  Yes.  Yes, Your Honor.

THE COURT:  And as to all of the terms and conditions

of supervised release, there wasn't an objection or a question about any of those?

MR. DIAZ:  No, Your Honor.

THE COURT:  All right.

Restitution remains undetermined.  My understanding is that the special assessment under the Justice for Victims of Trafficking Act of 2015 has expired, and so that doesn't apply anymore, and there's a special assessment of $100.

I find the Defendant doesn't have to pay, have the ability to pay a find, so that is waived.

And so, having assessed the Defendant's ability to pay, payment of the total criminal monetary penalty shall be due as follows:

He is to make a lump sum payment of $100 towards the special assessment due immediately.  If he does not have that amount available, he is to make a payment of half of the amount that he does have available and then the rest from wages that he earns while in custody.

Payment is to be made through the United States District Clerk's Office, in the Southern District of Texas.

All right.

Mr. Torres, you can appeal your conviction if you believe that your guilty plea was somehow unlawful or involuntary or if there is some other fundamental defect in

the proceedings that was not waived by your guilty plea.

Under some circumstances, a Defendant also has the right to appeal the Sentence, but a Defendant can waive that right as part of a plea agreement, and you entered into a plea agreement which waived some or all of your rights to appeal the Sentence itself.  Such waivers are generally enforceable, but if you believe the waiver itself is not valid, you can present that theory to the appellate court.

Mr. Diaz, I would ask that you go over the waiver that is contained in the plea agreement with him, so that he is aware of what grounds do – are available to him, if he wants to pursue any of those.

MR. DIAZ:  Yes, Your Honor.

THE COURT:  You must file any Notice of Appeal within 14 days of the entry of judgment or within 14 days to the filing of a Notice by the Government.

If requested, the Clerk will prepare and file a Notice of Appeal on your behalf.

You have the right to request to proceed without payment or cost if you can't afford that and to have an attorney appointed to represent you if you cannot afford one.

Anything else from the Government?

MR. GOLDMAN:  No, Your Honor.

THE COURT:  Mr. Torres, good luck to you, sir.

DEFENDANT TORRES:  Yes, sir.

THE COURT:  Mr. Diaz, anything else?

MR. DIAZ:  No, Your Honor.

THE COURT:  All right.

The Defendant is remanded into custody.

We are adjourned.

I'm going to stay on the Bench, and I will – but everybody else can be at ease.

MR. GOLDMAN:  Yes, Your Honor.

(Proceedings concluded at 5:22:28 p.m.)

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

    I, Linda Griffin, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ Linda Griffin                           January 15, 2026
Linda Griffin                                      Date